UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION


JOHN RUSSELL POWELL,

     Plaintiff,

vs.                    CASE NO.:  3:08-cv-00449

HARRY R. MCNESBY, Sheriff of
Escambia County, Florida; Chief
Deputy Sheriff LARRY SMITH,
Deputy Sheriff REX BLACKBURN,
MICHAEL SWINEHART POLITICAL, INC.,
a Georgia for profit corporation
registered to do business in the
State of Florida; MICHAEL T.
SWINEHART, in his individual
capacity; and JIMMY R. CAHOON,
in his individual capacity,

     Defendants.

_____/


DEPOSITION OF JOHN RUSSELL POWELL


     Taken by the attorney for the Defendants Harry

R. McNesby, Larry Smith, and Rex Blackburn, at


217 East Intendencia Street, Pensacola, Florida, on


the 2nd day of February, 2009, commencing at


8:52 a.m., before Kimberly M. Gregory, Registered


Professional Reporter and Notary Public.

1                    APPEARANCES

2

3 FOR THE PLAINTIFF:

4
                     JAMES R. MURRAY, ESQUIRE
5                    Attorney at Law
                     420 East Pine Avenue
6                    Crestview, FL  32536

7

8

9 FOR THE DEFENDANTS, HARRY R. MCNESBY, Sheriff of
  Escambia County, Florida; Chief Deputy Sheriff LARRY
10 SMITH, and Deputy Sheriff REX BLACKBURN:

11
                     KEITH C. TISCHLER, ESQUIRE
12                   Jolly & Peterson
                     Post Office Box 37400
13                   Tallahassee, FL  32315

14

15

16 FOR THE DEFENDANTS, MICHAEL SWINEHART POLITICAL, INC.,
   a Georgia for profit corporation registered to do
17 business in the State of Florida, and MICHAEL T.
   SWINEHART, in his individual capacity:
18

19                   JASON W. PETERSON, ESQUIRE
                     Clark, Partington, Hart,
20                     Larry, Bond & Stackhouse
                     125 West Romana Street, Suite 800
21                   Pensacola, FL  32502

22

23

24 ALSO PRESENT:  MS. DARLENE DICKEY

25

1                    I N D E X

2 JOHN RUSSELL POWELL                          PAGE

3        Direct Examination by Mr. Tischler      5

4        Cross-Examination by Mr. Murray        315

5        Cross-Examination by Mr. Peterson      333

6        Redirect Examination by Mr. Tischler   353

7        Recross-Examination by Mr. Peterson    360

8 CERTIFICATE OF OATH                          362

9 CERTIFICATE OF REPORTER                      363

10

11

12

13

14

15              INDEX OF EXHIBITS

16 DEFENDANTS' EXHIBITS                         PAGE
   (McNesby, Smith, and Blackburn)
17
   1 - Reports of Interviews                    23
18
   2 - Reports of Interviews                    30
19
   3 - Letter dated October 28, 2004            36
20
   4 - Undated Letter Beginning "Dear"         170
21
   5 - Performance Record of John R. Powell    176
22
   6 - Campaign Flyer                          213
23
   7 - Attachment to Escambia County Sheriff's
24     Office Citizen Complaint made by
       John Russell Powell, dated May 5, 2004  267
25

1                    INDEX OF EXHIBITS (CONTINUED)

2 DEFENDANTS' EXHIBITS                              PAGE
  (McNesby, Smith, and Blackburn)
3
    8 – Letter dated May 17, 2004                    269
4
    9 – Plaintiff's Response to Defendant
5       Blackburn's First Interrogatories to
        Plaintiff                                    283
6
   10 – Income Tax Returns for 2003                  291
7
   11 – Income Tax Returns for 2004                  294
8
   12 – Income Tax Returns for 2005                  293
9
   13 – Income Tax Returns for 2006                  295
10
   14 – Income Tax Returns for 2007                  295
11

12

13

14

15

16

17

18                         STIPULATION

19   It is stipulated and agreed by counsel for the

20   parties that this deposition is taken for the

21   purpose of discovery and/or evidence; that all

22   objections, except as to the form of the question,

23   are reserved until the time of the trial; and that

24   the reading and signing of the transcript of the

25   deposition by the witness is waived.

1 WHEREUPON,

2                    JOHN RUSSELL POWELL

3 was called as a witness and, after having been first

4 duly sworn, was deposed and testified as follows:

5                    DIRECT EXAMINATION

6 BY MR. TISCHLER:

7        Q.      Mr. Powell, can we start with your full

8 name, please?

9        A.      John Russell Powell.

10       Q.      Mr. Powell, have you ever had your

11 deposition taken before?

12       A.      Yes.

13       Q.      I figured, being in law enforcement as

14 long as you have, you probably had.  You probably are

15 familiar with these rules, so to speak, but I always

16 like to remind people on the record of them.

17              First, let me introduce myself again.

18 My name is Keith Tischler, I'm from Tallahassee, with

19 Jolly & Peterson.  I have the pleasure of representing

20 Sheriff McNesby, Larry Smith, and Rex Blackburn in

21 this case that you've brought.  I'm going to ask you

22 some questions about your complaint, some of the

23 background information, some of the facts surrounding

24 what you've alleged.  If I should ask you a question

25 you don't understand, if I talk too softly, if I

1 stumble, mumble, anything about our communication that

2 you're not understanding, please let me know; okay?

3      A.     Yes, sir.

4      Q.     A couple of other things that tend to

5 happen during depositions.  The first is that if I ask

6 you a "yes" or "no" question, you may nod your head or

7 shake your head or say "uh-huh" or "uh-uh," and that

8 doesn't lend for a very clear record.  So if you do

9 that, I'm going to ask you is that a yes or a no.  I

10 don't mean any disrespect, I just want to make sure I

11 have a clear record.  Okay?

12      A.     Yes, sir.

13      Q.     The other thing that tends to happen is

14 as I ask a question, you may think you know what I'm

15 going to ask, and you're probably going to be right

16 most of the time, but as you probably know, it's

17 difficult for a court reporter to get two people

18 talking at the same time.  If you'll wait until I

19 finish my question before you start to answer it, that

20 will also give us a clear record.

21           By the same token, if you pause in your

22 answer, I move on to my next question, you're not done

23 with your answer, you have something more to say, if

24 you would just let me know that, I'll back off my next

25 question and let you finish your answer.  Okay?

1    A.    Yes, sir.

2    Q.    Great.  As we sit here today, are you

3 under any medication or anything that would impair

4 your ability to understand my questions or answer

5 truthfully?

6    A.    No, I'm not.

7    Q.    And have you reviewed anything before

8 your deposition today?

9    A.    Yes, I have.

10    Q.    What did you review?

11    A.    With my attorney, went over some

12 documents, the complaint, and we had a verbal

13 conversation.

14    Q.    So the complaint is the only document

15 you reviewed?

16    A.    Yes, sir.

17    Q.    I'm going to ask you just a little bit

18 of background information in addition to what we

19 already had from the interrogatories.  I'm not going

20 to repeat what was asked in the interrogatories in

21 terms of background information, but just a couple of

22 things.  Are you presently married?

23    A.    I am.

24    Q.    And who are you married to?

25    A.    Elizabeth L. Powell.

1    Q.    Okay.

2    A.    Maiden name is Sharp.

3    Q.    Sharp?

4    A.    Yes, sir.

5    Q.    S-H-A-R-P?

6    A.    Correct.

7    Q.    And how long have you been married to

8 Ms. Powell?

9    A.    Since January 1995.

10    Q.    Do you have any other marriages?

11    A.    I have a previous marriage.

12    Q.    And who was that to?

13    A.    Diane Gail -- her maiden name was Watt,

14 W-Y-A-T-T (sic).

15    Q.    And what are the approximate dates of

16 that marriage?

17    A.    Sir, I believe it was 1983 to '84 or

18 '85.  Once again, that would be an estimate.

19    Q.    Fair enough.  Was that while you were

20 living here in Escambia County?

21    A.    Correct.

22    Q.    And does Ms. Watt still live in Escambia

23 County, do you know?

24    A.    Yes.

25    Q.    Do you still have contact with her?

1      A.      On a rare occasion.

2      Q.      Do you have any children?

3      A.      Yes.

4      Q.      How many children do you have?

5      A.      I have two boys, and I have one that's

6 my wife -- when we were married, it was her daughter.

7      Q.      Sure.  Stepdaughter, I guess you would

8 call her.

9      A.      Correct.

10     Q.      What are your boys' names?

11     A.      The oldest is named John Russell Powell

12 II.  The youngest is named Harrison Allen Powell.

13     Q.      What are their ages?

14     A.      The oldest is 13 years old, the youngest

15 is seven.

16     Q.      And those are both by Elizabeth, your

17 marriage to Elizabeth?

18     A.      Correct.

19     Q.      And then what is the stepdaughter's

20 name?

21     A.      Stephanie Nicole Vasquez.

22     Q.      Are you a member of any religion or

23 religious denomination or church?

24     A.      Baptist.

25     Q.      Okay.  Is there a church in Dothan that

1  you attend regularly?

2      A.      First Baptist Church of Dothan.

3      Q.      Are you a member there?

4      A.      No, sir.

5      Q.      Do you have any military service?

6      A.      I do not.

7      Q.      And any arrests or convictions?

8      A.      I was arrested once here in Escambia

9  County, Florida, no conviction.

10     Q.      And what were you arrested for?

11     A.      Misdemeanor battery.

12     Q.      When did that occur?

13     A.      1987.  I believe it was the summertime

14  of '87, I don't recall the exact month.

15     Q.      Tell me a little bit about the

16  circumstances surrounding that.

17     A.      I was working on Pensacola Beach in the

18  capacity of a law enforcement officer, deputy sheriff.

19  I got into a fight on the beach with an individual I

20  was taking into custody.  Subsequent to that arrest of

21  that individual, the sheriff's office had received a

22  complaint.  Pursuant to their investigation on the

23  complaint, they filed a charge against me.

24     Q.      Who was the sheriff at the time that

25  happened?

1      A.      Vince Seely.

2      Q.      And was that charge nolle prossed?

3      A.      No, sir.  I went to trial for the charge

4 and was acquitted on the charge, a jury trial.

5      Q.      You make reference in, I think your

6 answers to interrogatories, about there being some

7 post-acquittal proceedings related to that charge,

8 involving a sealing of the records or something of

9 that nature.  Is that accurate?

10      A.      That's correct.

11      Q.      Tell me about after the trial was over

12 and you had been acquitted.  What proceedings took

13 place?

14      A.      Once the trial was over, the record was

15 sealed by the order of the court.  And then there was

16 some time period afterwards, based on the statutory

17 requirements, and there was an expungement ordered by

18 the Circuit Court of Escambia County.

19      Q.      Now, for instance, when you've applied

20 for positions over the years since that, do you

21 disclose that arrest as part of the employment

22 application process?

23      A.      Only if I'm asked.

24      Q.      So if there's a place on the employment

25 application where they ask have you ever been

1 arrested, you would disclose this arrest?

2      A.      I would disclose the arrest.

3      Q.      And I'm not familiar with the

4 requirements in South Carolina or North Carolina or

5 Alabama, but -- let me ask you first, do they have

6 some sort of law enforcement certification process,

7 like Florida has, through FDLE?

8      A.      Yes, sir.

9      Q.      And as a part of their process,

10 regardless of expungement, are you still required to

11 disclose an arrest of this nature?

12      A.      If you're not convicted -- well, let me

13 back up.  If it's a misdemeanor arrest, there was no

14 conviction, there is not a requirement to disclose it,

15 and I don't recall specifically the wording for either

16 state.

17      Q.      Okay.  Do you recall in your employment

18 applications for Hartsville, for Wilson, or for

19 Dothan, whether you disclosed this arrest?

20      A.      Dothan, Alabama, the arrest was

21 discussed with the city manager.  I do not recall for

22 Hartsville, I do not recall for Wilson.

23      Q.      Now, maybe it wasn't a very good

24 question.  In terms of your employment application,

25 did you disclose that when you applied for employment

1 in Dothan?

2     A.     I don't believe it was on the
3 application itself.

4     Q.     Okay.  And you say you did disclose it
5 to the city manager during the course of the
6 interview?

7     A.     We had discussion of it, yes, sir.

8     Q.     Who was the city manager?

9     A.     Mike West.

10     Q.     And was that in response to a general
11 question during it, "have you ever been arrested?"

12     A.     It was in response to information that
13 he received from Escambia County, Florida, in regards
14 to the arrest.

15     Q.     Okay.  In your experience as you go
16 through interviews for particularly being chief of
17 police of a law enforcement agency, even if it's not
18 requested on the employment application, do you find
19 that to be a routine question that city managers or
20 whoever is interviewing you for that position will
21 ask?

22     A.     If there is not information on the
23 employment application where it's asked specifically,
24 we do not inquire about the arrest history.  The
25 arrest application (sic) is very specific as far as

1 any type of arrest that will impede the individual

2 from being certified in the State of Alabama.

3    Q.    Okay.  I'm not sure that answers my

4 question.  My question was, in your experience -- and

5 I guess you've interviewed for at least three chief of

6 police positions, maybe more, over the years.

7 Regardless of whether that information is asked for in

8 the application, as you have interviewed for the chief

9 of police position, do you still find that whoever is

10 conducting the interview for the position still asks

11 about whether you've been arrested or not?

12    A.    Are you asking me personally?

13    Q.    Yes, sir, personally, you.

14    A.    I have personally not been asked.

15    Q.    Okay.  So it's your testimony that in --

16 for instance, when you applied for employment at the

17 City of Wilson you were not asked about arrests?

18    A.    That is correct.

19    Q.    And the same thing with City of

20 Hartsville?

21    A.    Other than the information on the

22 application.

23    Q.    Now, in terms of your employment, on the

24 interrogatories I note that it only went back ten

25 years.  So the first employment listed is U.S.

1 Department of Justice, FBI.  The employment you had

2 immediately preceding that was with the sheriff's

3 office, correct?

4     A.     Correct.

5     Q.     Escambia County?

6     A.     Yes, sir.

7     Q.     And before you worked for the Escambia

8 County Sheriff's Office, where were you employed?

9     A.     I worked with a company -- well, prior

10 to working with the sheriff's office, I actually

11 worked with Escambia County, with the Escambia County

12 Road Prison.  It's a separate entity from the

13 sheriff's office itself.  And then prior to that, I

14 worked with a lumberyard, Massachusetts Surplus and

15 Salvage.  It's located here in Pensacola.

16     Q.     Okay.  In conjunction with your

17 employment with the sheriff's office -- for instance,

18 this incident involving the arrest back in 1987, did

19 you lose your job as a result of that event?

20     A.     I was terminated.

21     Q.     And I gather you were reinstated?

22     A.     I was, after a hearing with the Civil

23 Service Board.

24     Q.     Were there any other times when you

25 received discipline when you worked at the Escambia

1 County Sheriff's Office?  And that would include even

2 a reprimand.

3       A.      Not that I recall.

4       Q.      You would defer to your personnel file,

5 in terms of if it reflects some other discipline?

6       A.      Could you restate that, please?

7       Q.      Sure.  If your personnel file were to

8 reflect any form of other discipline, would you defer

9 to the written record?

10      A.      I would have to review it, yes, sir.

11      Q.      You indicated at the beginning that you

12 had given depositions before.  Have you ever given

13 depositions as a party to a lawsuit; in other words,

14 as a plaintiff or a defendant?

15      A.      Never as a plaintiff on a lawsuit.

16      Q.      How about as a defendant?

17      A.      Yes, sir, I have.

18      Q.      In what kind of situations have you been

19 sued as a defendant?

20      A.      As a chief of police for the -- I guess

21 for all the cities I've worked for, and suits that's

22 been brought against the city.

23      Q.      Let's start with your present employment

24 in Dothan.  How many times have you sat for

25 depositions -- let me back up.

1          In terms of these lawsuits where you sat

2 for depositions, that you referenced, have you ever

3 been sued personally in any of those lawsuits, or

4 individually?

5     A.     I have been named, but I don't recall

6 being sued personally with the City of Dothan.

7     Q.     But you've been named as a party in the

8 lawsuit; is that what you're telling me?

9     A.     Yes, sir.

10    Q.     Okay.  And have you received a

11 summons --

12    A.     I have answered interrogatories based on

13 those lawsuits.  I have not had to go to deposition on

14 any of them.

15    Q.     Okay.  Now, in terms of this battery

16 incident which occurred with the sheriff's office back

17 in '87, were you sued as a part of that?

18    A.     No, sir.

19    Q.     Do you know if the sheriff's office was

20 sued as a result of that?

21    A.     I do not.

22    Q.     So in terms of what's presently going --

23 or what has happened since you've been the chief in

24 Dothan, what sort of lawsuits have you been involved

25 in where you've had to give testimony?

1      A.      Other than the interrogatories; is that

2 what you're referring to?

3      Q.      Yes, sir.

4      A.      I have not had to give any testimony

5 other than the interrogatories.

6      Q.      Okay.  And what are those lawsuits

7 about, what kind of lawsuits has the City of Dothan

8 been involved in under your --

9      A.      Use of force, some property damage

10 claims against the city.  That's all I can recall.

11      Q.      Okay.  Now, while you were chief --

12 well, let me rephrase that.  As a result of events

13 occurring while you were chief at the City of Wilson

14 in North Carolina, were you ever made a party to any

15 lawsuits there?

16      A.      Yes.

17      Q.      How many lawsuits?

18      A.      I don't have a number.  There were some

19 because of the activity of the police department, as

20 far as just day-to-day operations.  There was a

21 lawsuit that was filed against me and the management

22 of the city on a dismissal that took place, of an

23 individual.  And the dismissal was upheld.

24      Q.      Who was the person that filed that

25 lawsuit?

1      A.      Phil Baggett.

2      Q.      Now, when you say the dismissal was

3 upheld, does that mean the case went to trial?

4      A.      As far as his dismissal?

5      Q.      Yes, sir.

6      A.      It did not go to trial, but it went

7 before a review panel.  The city does not operate

8 under Civil Service, but they do have a personnel

9 review panel that's made up by other department heads

10 inside the city.  It went before that and was upheld,

11 the dismissal was upheld.

12      Q.      And did Mr. Baggett subsequently file a

13 lawsuit in court?

14      A.      He did.

15      Q.      What was the outcome of that lawsuit?

16      A.      It was dismissed.

17      Q.      And this was based on an employment

18 decision that you had made while you were chief?

19      A.      A recommendation that I made, yes, sir.

20      Q.      Any other lawsuits that you were

21 personally named in while you were the chief at Wilson

22 or that resulted from actions that occurred while you

23 were the chief at Wilson?

24      A.      Other than the ones that I mentioned

25 before, as far as being personally named, no, as far

1 as any kind of suits, other than the one that I named

2 earlier.

3      Q.      I see from your answers to

4 interrogatories, that in addition to your present

5 employment at the City of Dothan, you're an adjunct

6 professor at -- or instructor, I should say, at Troy

7 State University.  What do you teach at Troy State?

8      A.      Criminal justice classes and management

9 classes.

10      Q.      And how many classes a year do you

11 instruct there?

12      A.      Probably no more than two or three.

13 Now, once again, that would be an estimate.

14      Q.      Are you presently instructing a class at

15 Troy State?

16      A.      Not presently, no.

17      Q.      When was the last time you did that?

18      A.      I think it would be November of last

19 year, 2008.

20      Q.      And you also have Jacksonville State

21 University listed, as an adjunct instructor.  The same

22 sort of courses?

23      A.      That is correct.

24      Q.      Okay.  And when was the last time you

25 did some instruction at Jacksonville State?

1    A.    I think it would probably be the

2 summertime of 2008.

3    Q.    Are you paid for that?

4    A.    I am.

5    Q.    Okay.  What does Troy State pay you for

6 the work you do there?

7    A.    It's based on the hours of the class, if

8 it's going to be a one- or two-day class.  I think

9 that their current rate right now is $800 a day, is

10 what they pay.

11    Q.    And the classes that you teach, are they

12 Tuesday, Thursday; Monday, Wednesday, Friday?

13    A.    It would vary.  It depends on whatever

14 the schedule is at the college.

15    Q.    And how about Jacksonville State, what

16 are you paid there?

17    A.    It would be the same.

18    Q.    Now, let me ask you a little bit about

19 your employment at Hartsville, South Carolina.  At the

20 time you sought the employment at the City of

21 Hartsville -- that was your first position after

22 leaving the FBI, correct?

23    A.    Correct.

24    Q.    At that time, besides the City of

25 Hartsville, were there other agencies that you were

1 seeking employment with?

2     A.     Could you rephrase your question?  I

3 don't think I follow you.

4     Q.     Sure.  Other than the City of

5 Hartsville, did you have other employment applications

6 out?  Were you seeking to be the chief of police or

7 have some other position in any other agency when you

8 decided to leave the FBI?

9     A.     Yes.

10     Q.     What besides the City of Hartsville?  Do

11 you recall where else you put in applications?

12     A.     No, sir, I do not.

13     Q.     Do you recall approximately how many

14 places you had put in applications?

15     A.     No, sir, I do not.

16     Q.     When you were with the FBI, where were

17 you stationed or --

18     A.     I worked out of the Dallas field office.

19 The office I worked out of was Texarkana R.A.,

20 Texarkana, Texas.

21     Q.     And why did you leave the FBI after, it

22 looks like only three years?

23     A.     I actually put in for my first police

24 chief position back in 1992, and that was with the

25 City of Charleston, South Carolina.  I've always had

1 an interest in management, and had an opportunity back

2 in 1992 to make application with Charleston. That was

3 upon the completion of my four-year degree. I was not

4 successful in obtaining that. I was advised at that

5 time, by some very close friends, that I needed to

6 enhance my exposure, and then this opportunity came

7 along in 1999 to make application with the City of

8 Hartsville.

9     Q.    How did you find out about that position

10 being open? It sounds like a long way from Texas.

11    A.    The chief of police -- international

12 chief of police magazine, IACP magazine.

13          (Defendants' Exhibit Number 1

14          was marked for identification

15          and hereto attached.)

16    Q.    Let me show you a document we're going

17 to mark as Exhibit Number 1 to this deposition. We

18 can sticker it later on. This is Exhibit B-1 and B-2

19 to your complaint. Do you recognize those documents?

20    A.    They appear to be a copy of the document

21 that was circulated during the campaign.

22    Q.    Now, Danny Watson, do you recall

23 Mr. Watson?

24    A.    Yes, sir, I do.

25    Q.    And Mr. Watson, was he a lieutenant

1 while you were the chief at the police department in

2 Hartsville?

3     A.     I don't recall his rank.

4     Q.     Was he ever employed with --

5     A.     He did not work with Hartsville.

6     Q.     He didn't work with Hartsville, he

7 worked with Darlington?

8     A.     Correct.

9     Q.     How would you interact with Mr. Watson,

10 as the chief of police in Hartsville?

11     A.     Sporadically, at best.  I mean, I would

12 see him on occasion.  I mean, it wasn't an everyday

13 occurrence.

14     Q.     What kind of situations would cause you

15 to interact with Mr. Watson?

16     A.     Darlington has the Darlington

17 International Speedway, where they hold races there a

18 couple of times a year.  The City of Hartsville would

19 supply extra manpower for those periods.  During

20 security meetings, we would meet.  I think he would be

21 in attendance at those security meetings.

22           If there was a conference, a law

23 enforcement conference in the area, we could have the

24 occasion of running into each other there at the

25 meetings.

1          I want to say that I think he taught at

2  Florence-Darlington Technical College, which I also

3  did some teaching for the college, and although I

4  don't think we -- because it was online, I don't think

5  we ever met in that environment, I think we may have

6  had some conversations over the telephone concerning

7  that.

8      Q.     How close is Darlington to Hartsville?

9      A.     Twenty miles.  That would be an

10 estimate.

11     Q.     Did you ever speak with Mr. Watson about

12 this statement?

13     A.     I have not.

14     Q.     When was the last time you had contact

15 with Mr. Watson?

16     A.     I don't have an exact date, but it would

17 be during the time I was employed with the City of

18 Hartsville.

19     Q.     Okay.  So you don't know whether this is

20 an accurate recitation of what he told whoever

21 authored this document?

22     A.     I have not talked with Mr. Watson.

23     Q.     Mark Face, how do you know Mr. Face, or

24 do you know Mr. Face?

25     A.     I know that he is employed with the

1 City of Darlington, and I have had an occasion to be

2 introduced to him.  As far as having a relationship

3 with him, I do not.

4      Q.     You don't have a recollection of ever

5 working with him on a case or having any of that kind

6 of contact with him?

7      A.     No, sir.

8      Q.     In this portion of Exhibit 1 that's

9 marked Exhibit B-2, he makes reference to an incident

10 where he asked for assistance from you to assist with

11 the Special Olympics.  Do you have any recollection of

12 that event, having that conversation with him?

13      A.     Not independent, no, sir.

14      Q.     When you say -- by "not independent,"

15 what do you mean by that?

16      A.     Our department was involved in the

17 Special Olympics, but as far as having an independent

18 conversation with him, I do not.

19      Q.     So to make sure I'm clear, are you

20 saying you did not have a conversation, or you just

21 don't recall it as you sit here today?

22      A.     I do not recall it.

23      Q.     As you can see in the -- I guess it's

24 the third paragraph there, he makes reference to

25 issues involving some grants while you were the chief

1  in Hartsville.  While you were the chief in

2  Hartsville, do you recall there ever being any

3  problems with the grants that the city was receiving?

4      A.      We did not have any problems with any

5  grants that we were receiving.

6      Q.      Were you receiving grants?

7      A.      We were.

8      Q.      What kind of grants were you receiving

9  while you were the chief in Hartsville?

10      A.      We received grants concerning equipment

11  from the federal government, and I don't recall

12  specifically what the name of the grant was.  Also, we

13  were finishing up grants that had been received under

14  a prior administration concerning the hiring of police

15  officers under COPS.

16      Q.      Were there ever any grants that you lost

17  while you were the chief of police in Hartsville?

18      A.      Can you rephrase your question?

19      Q.      Sure.  Were there any grants that --

20  well, were there any grants that were terminated by

21  the grant writer, by the grant provider?

22      A.      Terminated because the duration run out,

23  or -- I don't think I understand --

24      Q.      Either way.

25      A.      I think that there was termination of

1 some grants because the time frame ran out on the

2 grants. I mean, they run their course, they were

3 expired. Like any other agency, there were grants

4 that we had made application for that we did not

5 receive, because of being competitive on the grants.

6          Does that answer your question?

7     Q.    Sure, that's fine. Now, did you ever

8 speak with Mr. Face about what's contained in this

9 exhibit?

10    A.    I have not.

11    Q.    When was the last time you had any

12 conversation with Mr. Face, that you recall?

13    A.    Once again, it would have to be during

14 my employment with the City of Hartsville.

15    Q.    While you were the chief at Hartsville,

16 did you ever have similar type of employment suits

17 like you mentioned earlier involving Mr. Baggett from

18 the City of Wilson?

19    A.    No, sir.

20    Q.    Now, I see that you only stayed at

21 Hartsville a little under two years. Why did you

22 leave the City of Hartsville?

23    A.    I made application with the City of

24 Wilson to participate in an assessment center that was

25 being put on by the city for the position of police

1  chief.  The application initially was basically to

2  gain the experience of an assessment center, because I

3  had not participated in one.  This particular

4  assessment center was being put on, I believe, by the

5  North Carolina university.  I made application.

6  Originally, I did not make the cutoff for

7  participation, and I believe that their cutoff was at

8  seven applicants.  I was later contacted by the

9  assistant city manager, who said that one of their

10 candidates had dropped out, and offered me an

11 opportunity to participate.

12              I participated in the event, which was,

13 as I recall, three days, went back to the City of

14 Hartsville, was later contacted by the City of Wilson,

15 North Carolina, who -- by the assistant city manager

16 and the city manager, who wanted for me to come back

17 up so they could talk to me because of the -- I guess

18 the way that I ranked on the assessment center.

19              Later on, there was an offer of

20 employment with the City of Wilson, North Carolina, a

21 pretty substantial pay increase was involved, and I

22 made a decision to take the offer.

23     Q.     So other than there being a substantial

24 pay increase, was that the only reason that you left

25 the City of Hartsville?

1    A.    That is correct.

2    Q.    Is the City of Wilson a larger city than

3 the City of Hartsville?

4    A.    It is.

5    Q.    Compare the two for me.  What's the

6 population and the size of the force?

7    A.    If I recall, the City of Hartsville,

8 South Carolina, the population base was about 10,000.

9 The police department had, I believe it was 39 or 40

10 sworn employees, had a total of 50 employees by the

11 time you calculate the civilian staff.

12          The City of Wilson, North Carolina, by

13 contrast, had 113 sworn employees, I want to say it

14 was 25 or 30 civilian staff.  And the population base

15 for the City of Wilson, North Carolina, if I recall

16 correctly, was 50,000 or 55,000.  And once again,

17 that's from memory.

18          Did you want me to give these to --

19    Q.    Sure.  Thank you.

20          Now, at the time that you participated

21 in this process with the City of Wilson, did you have

22 any other employment applications out?

23    A.    Not that I recall.

24          (Defendants' Exhibit Number 2

25          was marked for identification

1              and hereto attached.)

2      Q.     Let me show you what I'm going to mark

3 as Exhibit 2 to this deposition, which is a document

4 that was attached to the complaint as Exhibit C.  Do

5 you recognize that document?

6      A.     (Witness reviews document.)

7              MR. PETERSON:  Is this Composite

8         Exhibit C to the complaint --

9              MR. TISCHLER:  It is.

10             MR. PETERSON:  -- in its totality?

11             MR. TISCHLER:  It is.

12             (Off-the-record discussion was

13             held.)

14     Q.     (By Mr. Tischler)  Do you recognize

15 Exhibit C?

16     A.     It appears to be a copy of the document

17 that was circulated during the election.

18     Q.     I want to ask you about some of the

19 statements that are in these various summaries.

20 First, Terry Adams.  Let's look at Exhibit C-1.  Who

21 is Terry Adams, as it relates to the Wilson Police

22 Department?

23     A.     She, at the time of my employment, was a

24 lieutenant with the City of Wilson Police Department.

25 She worked under my command.

1      Q.      Now, was she a lieutenant when you first

2  were appointed?

3      A.      Yes.

4      Q.      Was she promoted at all under your time

5  as chief of police?

6      A.      She was not.

7      Q.      Was she transferred or reassigned while

8  you were the chief of police?

9      A.      I believe that she was assigned to work

10  on accreditation, but I don't recall if that was a

11  reassignment or was that a continuation of the duties

12  she already had.

13      Q.      The statement that she was in charge of

14  support services at Wilson Police Department, was

15  there a support services division at Wilson Police

16  Department?

17      A.      I believe so.

18      Q.      And what did support services involve?

19      A.      It would involve the accreditation,

20  working on grants, handling the records division for

21  the police department, and other tasks as identified

22  that may come up and be assigned, you know, to that

23  section.

24      Q.      Does support services at all involve

25  equipment, uniforms, patrol vehicles, those sort of

1 things, weapons, things that provide law enforcement

2 physical support?

3      A.      I don't recall if they -- if that

4 particular area handled that or if that was actually

5 handled out of the training section.  I believe the

6 vehicles were actually handled by the city themselves,

7 for the assignment, I believe.

8      Q.      Do you know if Ms. Adams still works at

9 the Wilson Police Department?

10      A.      It's my understanding that she has

11 retired.

12      Q.      When was the last time you spoke with

13 Ms. Adams or had any contact with her?

14      A.      Probably a year or more ago.  I made

15 contact with her in regards to the accreditation

16 process that the City of Dothan has undertaken.

17      Q.      And when you last made contact with her,

18 she was still working at the City of Wilson?

19      A.      I don't know if we talked about that or

20 not.  I don't recall, you know, discussing that issue.

21      Q.      Do you know where she's living now?

22      A.      I would have to assume that she's still

23 living in Wilson.  Once again, that would be an

24 assumption.  I don't have an address for her.

25      Q.      Okay.  As chief of police, I gather you

1 would have been familiar with what the law in North

2 Carolina provides in terms of civilian access to

3 records of a law enforcement agency.  Would that be

4 correct?

5      A.      If I had any question, I would contact

6 the city attorney to verify what's accessible and

7 what's not.

8      Q.      Does North Carolina have a public

9 records law, like Florida does?

10      A.      Somewhat, but I don't recall the

11 specifics of it.  But there are certain information --

12 or there is certain information that would be

13 available to the public, but I don't recall what the

14 parameters are.

15      Q.      Do you recall the extent to which

16 personnel files of employees are available to the

17 public?

18      A.      No, sir, I do not.

19      Q.      Did you ever speak with Ms. Adams about

20 this statement that's marked as Exhibit C-1, as a part

21 of Exhibit 2?

22      A.      I believe we had contact telephonically

23 back in 2004, when I received a copy of the document.

24      Q.      And at that time, had she -- is your

25 recollection, did she indicate that she had ever seen

1 this document?

2      A.      It's my recollection that she was

3 extremely upset about it, and she actually generated a

4 document contrary to what's said on here.

5      Q.      That's not my question, though.  My

6 question was, did she indicate to you whether she had

7 ever seen this document?

8      A.      I took it that she had seen it, because

9 she was upset when I talked to her.

10     Q.      Okay.  So when you spoke with her, she

11 was already aware of the contents of this document?

12 That's your recollection of the conversation?

13     A.      That's my recollection of it, yes, sir.

14     Q.      And did she indicate to you how she had

15 come to obtain possession of this document?

16     A.      If I recall correctly, sir, I believe it

17 was through an assistant city attorney by the name of

18 Slade Rand, who works with Rose Rand Attorneys.  I

19 believe he's the one who actually gave her -- or

20 provided a copy to her.

21     Q.      Do you know how Mr. Rand became in

22 possession of that?

23     A.      Yes, sir, I do.

24     Q.      How is that?

25     A.      I sent him a copy of it.

1    Q.    When you had this conversation with

2 Ms. Adams about this document, did you call her or did

3 she call you?

4    A.    I don't recall.

5    Q.    And did you speak with her about this

6 document, for lack of a better term, point by point?

7    A.    No, sir, my recollection of the

8 telephone contact I had with her is that she was

9 upset, and that she was sending a letter out to the

10 individual that's attributed to having put this

11 document together.

12    Q.    And did you ever see that letter?

13    A.    I did.

14    Q.    Did she provide you a copy of it?

15    A.    No, sir, Slade Rand provided me a copy

16 of the document.

17           (Defendants' Exhibit Number 3

18           was marked for identification

19           and hereto attached.)

20    Q.    And I'll mark this as Exhibit 3.  Is

21 Exhibit D a copy of that letter?

22    A.    Yes, sir, it's a copy of the document.

23    Q.    Now, I notice as I look through the

24 letter that she wrote, that we've marked as Exhibit 3,

25 she says statements had been taken out of context or

1 added that she did not say, but she doesn't identify

2 which statements.  When you spoke with her, did she

3 identify which statements were taken out of context or

4 that she denied saying?

5    A.    No, sir, I don't recall her making the

6 comment.

7    Q.    Okay.  Let me ask you some questions

8 about what she says in here.  Do you recall Ms. Adams

9 ever telling you that there were decisions that you

10 had made that she did not agree with?

11         MR. MURRAY:  Are you referring to

12    Exhibit --

13         MR. TISCHLER:  Exhibit C-1, I'm sorry,

14    the second paragraph.

15    A.    Could you restate your question, please?

16    Q.    (By Mr. Tischler)  Looking at the first

17 page of Ms. Adams' -- the summary of Ms. Adams' --

18 that's marked as Exhibit C-1 to Exhibit 2, in the

19 first paragraph there, she indicates that you made

20 decisions she did not agree with.  Do you recall

21 Ms. Adams ever expressing to you that there were

22 decisions that you had made as chief that she did not

23 agree with?

24    A.    I think that, specifically, I don't

25 recall any discussions, but I will tell you that it's

1 not uncommon for staff officers to voice their

2 opinions, as far as -- when you have meetings to get

3 discussion, they will voice their opinion on how they

4 think something should be done or handled, and that's

5 certainly taken into consideration before a decision

6 is made.

7    Q.    Okay.  She says early on -- at least the

8 summary says early on she did not have a lot of

9 interaction with you.  Is that an accurate statement,

10 there in the first paragraph?

11   A.    I'm not really sure what she meant by

12 that, when you say "interaction."

13   Q.    Well, what was the nature of interaction

14 that Ms. Adams would have with you, as lieutenant in

15 charge of support services, on a daily basis?

16   A.    On a daily basis?

17   Q.    Yes, sir.

18   A.    Are you talking about beyond the casual

19 seeing somebody at the office, or actually sitting

20 down to have a meeting with them?  Is that what you --

21   Q.    I'm talking about anything at all.

22   A.    Her office was just up the hallway from

23 where my office was at, and I would see her on a daily

24 basis going -- you know, going into the office.

25   Q.    Now, in terms of more substantive

1 interaction, that would involve issues involving the

2 operation of the police department, how often would

3 you have contact with her?

4      A.      It would be on a frequent basis, in

5 particular once she started working on the

6 accreditation for the department.  It was -- issues

7 had to be covered in regards to the realm of items

8 that had to be covered for the accreditation process.

9      Q.      Was the department accredited when you

10 first started there?

11      A.      It was.

12      Q.      So this was re-accreditation --

13      A.      Yes, sir.

14      Q.      -- or keeping the accreditation?

15              Let me ask you about the next paragraph

16 there, which is number 1.  Desiree Dampier, do you

17 know who she is?

18      A.      I do.

19      Q.      And how is it that you came to know

20 Ms. Dampier?

21      A.      Initially, I was contacted by a

22 professor from Barton College -- I can't recall his

23 name currently.  I apologize, I can't recall his name.

24 But it was the individual who was over -- had

25 oversight of the criminal justice program for Barton

1 College, which is a private four-year college that's

2 located in the City of Wilson.

3     Q.     And what contact did you have with this

4 person about Ms. Dampier?

5     A.     We had made advertisement in the

6 community, as far as trying to hire and have

7 interaction with the colleges, to hire student

8 interns, I guess is the best way to describe it, and

9 he had come to the police department and recommended

10 her for a position as a student intern because she was

11 involved in the criminal justice program with Barton

12 College.

13     Q.     Was that recommendation made directly to

14 you, or would that have gone through an HR director or

15 someone else?

16     A.     It was made directly to me.

17     Q.     Did you usually get involved in

18 decisions of this nature, hiring student interns?

19     A.     It was not uncommon for citizens in the

20 community to make contact, not just for citizen

21 interns but with all positions with the police

22 department, to make recommendations for individuals.

23     Q.     Were there any other student interns

24 that this professor spoke with you directly about

25 besides Ms. Dampier?

1    A.    Yes.  Once again, it was a student in

2 the criminal justice program, but I don't recall the

3 name.  And she was actually hired on a part-time basis

4 to fill in for one of the administrative secretaries

5 at the department.

6    Q.    As a student intern, would Ms. Dampier

7 have proceeded through the same employment application

8 process as a regular employee?

9    A.    Yes.

10    Q.    She would fill out an application and

11 you do a background investigation and so forth on her?

12    A.    Correct.

13    Q.    And who at the police department back

14 then was responsible for that process?

15    A.    I believe it was Thomas Hopkins at that

16 particular time.

17    Q.    And was Mr. Hopkins in your HR part of

18 the police department, or internal affairs, or how was

19 that handled?

20    A.    He worked in the training and

21 recruitment section of the police department.

22    Q.    Now, did you interview Ms. Dampier

23 yourself?

24    A.    I met her.  I don't think I interviewed

25 her, but I did meet her.

1    Q.    So for a student intern, walk me through

2 the employment process at Wilson Police Department

3 back then.  Do you recall?

4    A.    As I recall, it was the same process as

5 we would for any employee that would make application.

6 The applications were taken by the department, there

7 was initial screening done of the applicant, and then,

8 of course, the paperwork, there was a follow-up on it.

9 And when I say "follow-up," I'm talking about a

10 background conducted.  And I believe it was at that

11 point in time -- and please keep in mind I'm trying to

12 recall all of this from memory.  But I believe at that

13 point in time, after the application and the initial

14 background was done, I think that HR was contacted to

15 ensure that they met the qualifications and the

16 requirements as advertised.

17         If, in fact, all the requirements were

18 met, there was a vacant position, then the offer of

19 employment could be made, which had to be supported or

20 approved by the city manager's office once the offer

21 was made.

22    Q.    Now, when you say through HR, did the

23 police department have its own HR, or would that go

24 through the city HR?

25    A.    The city had the HR department.  What

1 each individual department would do, as I recall, is

2 they would actually identify an individual for a

3 position, they would conduct the initial reference

4 check, background check, put the file together, for

5 lack of a better term.  It would be submitted to HR

6 for review and approval, and then that's -- I think

7 that's how it got moved up to the city manager's

8 office for the final approval for hire.

9      Q.     So the police department didn't have its

10 own HR department, per se?

11      A.     No, sir.

12      Q.     Okay.  So what kind of student intern

13 position was Ms. Dampier a candidate for?

14      A.     We had a number of them come open in the

15 records department.  And the reason those positions

16 came open is because the police department assumed law

17 enforcement responsibility for the college campus

18 itself.  They disbanded the private security.  With

19 the assumption of those duties, we had several

20 positions because of the extra workload that was

21 coming into the department.

22      Q.     Okay.  Now, how long did Ms. Dampier

23 work for the Wilson Police Department?

24      A.     She was still employed when I left.  I

25 don't have any idea.

1    Q.    Did her employment ever change from

2 student intern status to full-time or law enforcement

3 officer or anything else?

4    A.    She made application for a law

5 enforcement officer position just prior to me leaving

6 the City of Wilson, and I believe that she was

7 accepted for police officer, and then she was enrolled

8 into the academy just like any other applicant would

9 be.

10    Q.    Do you know if she still works for the

11 City of Wilson?

12    A.    I do not.

13    Q.    When was the last time you had any

14 contact with Ms. Dampier?

15    A.    Probably the end of 2003 or just the

16 beginning of 2004.

17    Q.    So that would be before you left?

18    A.    Correct.

19    Q.    Once she began working as a student

20 intern, what kind of day-to-day contact would you have

21 with her?

22    A.    The records division was a section that

23 as you walked into the front door of the police

24 department, you faced the records division.  If on

25 duty, I would -- you know, I would see her the day

1 that she was working.

2    Q.    Did you ever have any contact with her

3 outside of work?

4    A.    No.

5    Q.    Now, as she went through this prehiring

6 process, would her application -- would her background

7 investigation cross your desk, as the chief of police?

8    A.    I don't recall if the actual background

9 would come up or if a recommendation would just come

10 up on a memorandum.  I don't recall if the actual

11 background would come in or not.

12    Q.    Would you have the authority to veto a

13 potential hire of a student intern?

14    A.    I would make -- if I did not recommend

15 the individual based on the information that had been

16 collected, absolutely.  But once again, that would be

17 a recommendation.  The actual hiring authority was

18 with the city manager's office.

19    Q.    Do you have any recollection at all

20 about any information that was disclosed to you about

21 Ms. Dampier's background as a result of the

22 investigation that was done?

23    A.    Yes, there was a discussion about her

24 working in an adult entertainment facility as a

25 waitress.  And the reason that that sticks out so

1 vividly in my mind is because during the polygraph

2 phase of the hiring, I instructed the training unit to

3 make sure that there were specific questions asked

4 concerning that activity.

5     Q.     So presumably, then, you would have seen

6 her application before that polygraph process began,

7 to become aware of that information?

8     A.     Once again, I don't know if I saw the

9 application or if it was provided in memo form.  A

10 summary, I guess would be the best way to describe

11 that.

12     Q.     And did you ever see the results of the

13 polygraph?

14     A.     Other than the fact I was advised that

15 she had passed the polygraph, I didn't actually see

16 the results of the polygraph itself.

17     Q.     Were you aware of any additional

18 questions that were asked about her working

19 relationship with this adult entertainment

20 establishment, as you referred to it?

21     A.     I'm going to need you to rephrase the

22 question.  I don't understand what you're asking.

23     Q.     Sure.  Do you know whether as a part of

24 the investigation process –– whether it was the

25 polygraph or otherwise –– shall we say more probing

1 questions were asked of her in terms of what she

2 actually did at this adult entertainment

3 establishment?

4      A.      Based on my instructions, I make the

5 assumption there were additional questions asked,

6 because that was part of the instructions that I had

7 provided.

8      Q.      And what kind of questions did you

9 expect to be asked?

10      A.      Well, there was a question of whether or

11 not she was dancing or she was a waitress at the club,

12 and I wanted that cleared up.

13      Q.      And do you have a specific recollection

14 as to whether that was asked and whether it was

15 cleared up?

16      A.      As I recall, the questions about her

17 dancing was, in fact, asked, it was cleared up, and it

18 was determined that she was a waitress at the club.

19      Q.      Do you know whether, as a part of the

20 background investigation process, anyone ever

21 contacted the club to see if, in fact, what she was

22 telling you was truthful and accurate?

23      A.      I can only base that decision on the

24 information I was provided by the individuals I

25 assigned to work that task.

1    Q.    What is your understanding of what they

2 did?

3    A.    That she was provided questions on a

4 polygraph, and that she cleared up on the polygraph as

5 far as her activity at the club.

6    Q.    So they never did any independent

7 inquiry of the club to find out what she did at the

8 club?

9    A.    I can't answer that.

10    Q.    Under circumstances such as this, would

11 you expect your investigator to do a little deeper

12 inquiry?

13    A.    I would have no reason to doubt that

14 they would not.

15    Q.    You would agree that hiring someone with

16 that kind of a background would be an area of

17 legitimate concern within a law enforcement agency?

18    A.    Absolutely.  Which is why I made the

19 instructions for them to do a more extensive

20 questioning on the background.

21    Q.    Okay.  And you're also aware that some

22 people are able to, for lack of a better term, beat

23 polygraph examinations, aren't you?

24    A.    I'm also aware that some people can't

25 pass polygraphs, also.

1    Q.    So the answer to my question is yes,

2 some people can beat polygraphs?

3    A.    Yes.

4    Q.    Just based upon her background having --

5 well, you would agree with me that adult entertainment

6 establishments -- it's not uncommon for adult

7 entertainment establishments to also have connections

8 with other criminal activity?

9    A.    Absolutely.

10    Q.    Prostitution, drugs, gambling, any

11 number of other vices, so to speak?

12    A.    Yes.

13    Q.    At the time that this discussion was

14 going on involving the hiring of Ms. Dampier, do you

15 recall whether any of your staff recommended against

16 hiring her because of this background that she had in

17 this field?

18    A.    I recall that there was some concern

19 about hiring her, but as I recall, the concern was

20 prior to the additional background that was done to

21 clarify the actual activity at the club.  I don't

22 recall exactly who all had a concern, though.

23    Q.    Do you recall anybody saying to you,

24 "You know, we really shouldn't hire this person,

25 Chief"?

1    A.    No, I recall receiving a document, once

2 the initial background was completed, recommending her

3 for hire, which was then forwarded over to the city

4 manager's office.

5    Q.    And who was the city manager that would

6 have been involved in this process?

7    A.    The assistant city manager was Charles

8 Pittman, the city manager was Ed Wyatt.  I would not

9 know which one gave the final okay on that.

10    Q.    And are Mr. Pittman and Mr. Wyatt still

11 at Wilson?

12    A.    It's my understanding that Mr. Ed Wyatt

13 has retired from the City of Wilson, but I do believe

14 that Charles Pittman still works for the City of

15 Wilson.

16    Q.    Do you know whether Mr. Wyatt still

17 lives in the Wilson area?

18    A.    I do not.

19    Q.    You don't have an address for him?

20    A.    No, sir, I do not.

21    Q.    Now, while you were the chief of police

22 at the City of Wilson, did you ever hear any rumors --

23 was it ever brought to your attention that there were

24 rumors alleging that you and Ms. Dampier were having

25 an affair or any other form of inappropriate

1 relationship?

2    A.    Yes.

3    Q.    Okay.  And when did those rumors first

4 surface?

5    A.    If I had to guess -- and it would

6 strictly be a guess -- it would be 2003, but I don't

7 recall what month specifically.

8    Q.    Okay.  And what were the nature of those

9 rumors?  Can you provide any more detail, that you

10 heard about what was being alleged?

11    A.    There was an allegation that there was

12 an affair going on between Ms. Dampier and myself.

13 Upon hearing the information, I immediately reported

14 it to Charles Pittman, the assistant city manager.

15    Q.    Were there any -- was there any form of

16 investigation done as a result?

17    A.    Yes, sir, at my insistence with

18 Mr. Charles Pittman, he asked, at the time it was

19 Captain Tim Johnson, to conduct an internal

20 investigation, which Tim Johnson did conduct one.

21    Q.    And Mr. Johnson was a police captain?

22    A.    He was a police captain.

23    Q.    So he was under your command?

24    A.    He worked for the police department and

25 was under my command, with the exception of this --

1 the direct order from the assistant city manager.

2    Q.    Well, as a police captain, you would

3 have hire and fire authority over him, wouldn't you?

4    A.    Well, I need to expound on that, if I

5 can, to answer this question.  It's going to take a

6 second.

7    Q.    Sure.

8    A.    In the City of Wilson, the police chief

9 does not have the ability to terminate or to hire, he

10 can only make a recommendation.  That recommendation

11 has to be reviewed by the assistant city manager and

12 the city manager at the time, who has the final

13 authority or the final say as far as any termination

14 or any hiring.

15    Q.    How about assignments and promotions and

16 so forth, does that go through the city government

17 also, or is that within the authority of the police

18 chief?

19    A.    The transfers or assignments do not.

20 Promotional opportunities, once the individual

21 participates in the process, the recommendation is

22 sent over for the authorization from the city

23 manager's office.

24    Q.    Now, as a captain -- what levels of

25 chain of command were between a captain and yourself

1 within that police department?

2     A.     There was a major.

3     Q.     How many majors were there?

4     A.     One.

5     Q.     Just one.  Majors serve, I presume, as

6 the number-two person?

7     A.     Yes.

8     Q.     Almost like the assistant chief?

9     A.     Yes.

10     Q.     Would that be a fair characterization?

11 Okay.

12           This investigation that Captain Johnson

13 conducted, do you know what he did as a part of the

14 investigation?

15     A.     I was not privileged to all the activity

16 that Captain Johnson participated in.  I do know that

17 there was a -- as I recall, there were a couple of

18 officers who were associated with starting the rumor

19 or making the allegation, and I think that eventually

20 there was action taken against those two officers.

21 And I say two.  There could have been more, but I

22 think there were just two officers.

23     Q.     And who were these two officers?

24     A.     The last name is Boykin.

25     Q.     Okay.  And?

1    A.    It was a husband and wife.

2    Q.    So the wife's name was Boykin also?

3    A.    Well, that's the last name, and I can't
4 recall the first name, but it was a husband and wife
5 that worked with the city police department.

6    Q.    Did you come to find out that there were
7 any other persons who had spread that rumor?

8    A.    Other than seeing the documents from the
9 election campaign, I was not aware that the rumor had
10 circulated like it had.

11    Q.    Okay.  Was there a report generated as a
12 result of Captain Johnson's investigation?

13    A.    I'm not sure.

14    Q.    You never saw it?

15    A.    No, sir.

16    Q.    Did you have an internal affairs
17 division set up within the police department?

18    A.    I did.

19    Q.    Was Captain Johnson assigned to that?

20    A.    He was.

21    Q.    As a matter of routine procedure for the
22 conducting of internal affairs investigations, were
23 reports generated?

24    A.    Yes, sir.

25    Q.    And during the internal affairs

1 investigation process, were interviews tape-recorded?

2 　　A.　　Yes, sir.

3 　　Q.　　Were you interviewed as a part of this

4 investigation that Captain Johnson did?

5 　　A.　　I was.

6 　　Q.　　Do you know whether Ms. Dampier was

7 interviewed as a part of the investigation?

8 　　A.　　I do not.

9 　　Q.　　Can you think of any interaction that

10 you had with Ms. Dampier that would have created this

11 rumor that you say the Boykins initially spread?

12 　　A.　　No, sir, I do not.

13 　　Q.　　Was Ms. Dampier ever in your office

14 after 5 p.m., it being a normal working day?

15 　　A.　　I can say that she was not in my office

16 after normal work hours.  As far as putting the 5 p.m.

17 on there, I cannot say that.  There could have been an

18 occasion when we were working after-hours,

19 collectively, that it could have been after 5:00, but

20 I can't put 5:00 on it.

21 　　Q.　　And if Ms. Dampier was a student intern

22 primarily working in records, what would cause you to

23 have an after-hours meeting with her?

24 　　A.　　And once again, I want to preface it, I

25 can't say that there was an after-hours meeting.  But

1 it was not uncommon for the police department, through

2 investigative activities, to call upon and use

3 employees that were not well known on the street,

4 whether it would be a new hire for a law enforcement

5 position or if it was individuals that was working in

6 our records section, to work a tobacco sting, alcohol

7 sting, prostitution sting, any type of reverse law

8 enforcement activity, to further the investigation.

9      Q.     And was Ms. Dampier doing that?

10      A.     She was involved in a couple of

11 operations where she was utilized to purchase either

12 alcohol or tobacco.

13      Q.     And you would even use student intern,

14 part-time employees for this purpose?

15      A.     Yes, sir, we would.

16      Q.     Besides Ms. Dampier, were there any

17 other part-time employee, student interns that were

18 used for that purpose?

19      A.     Yes, sir.

20      Q.     Who else?

21      A.     I don't recall the names, but it was a

22 common practice.

23      Q.     Now, in the records division, under

24 whose supervision would Ms. Dampier have worked?  Do

25 you recall?

1    A.    Lieutenant Terry Adams.

2    Q.    And when she was doing this sting work,

3 who would she work under?

4    A.    The individuals who were assigned to the

5 narcotics and vice units.  If I recall correctly, it

6 was Reggie Branch, and there was another officer, last

7 name is Hasty, but I don't recall the first name.

8    Q.    Did you ever use Ms. Dampier as an

9 informant for purposes of working drugs?  Other than

10 alcohol, I guess, is -- you could debate whether

11 alcohol is a drug or not.

12    A.    I don't recall if they used her or not.

13 It would not be uncommon if they did, but I don't

14 recall specifically if they used her for that activity

15 or not.

16    Q.    And so, do you have a recollection of

17 ever meeting Ms. Dampier in your office after 5:00,

18 normal working hours, with regard to any of these sort

19 of activities, the sting activities?

20    A.    I do not have a recollection of a

21 meeting, no.

22    Q.    Would there have been any reason for you

23 to have met with her alone for that purpose?

24    A.    The way the office is set up, it's --

25 and I hate to use the term, but the gatekeeper is the

1 secretary for the police chief.  There's one way in

2 and one way out of that particular office.  All

3 appointments are scheduled through her, of individuals

4 who come in.  The meetings are controlled -- or she is

5 apprised of the meetings that's going to take place

6 when people come into the office.

7             I don't recall meeting her after-hours,

8 and I don't recall meeting her to -- individually, to

9 discuss, you know, those type of activities.

10      Q.    Who was the secretary back then?

11      A.    Melissa Mincey.

12      Q.    M-I-N-C-Y?

13      A.    I believe it's M-I-N-C-E-Y.

14      Q.    Okay.  Do you know whether she still

15 works at Wilson?

16      A.    I understand -- it's my understanding I

17 believe she still works there, but she's no longer the

18 police chief's secretary.

19      Q.    And back during this time period in 2003

20 or so, what were her hours, eight to five?

21      A.    Or it could go beyond 5:00, depending on

22 what was going on.

23      Q.    She would not necessarily stay after

24 five just because you were meeting with someone

25 after-hours; would that be a correct statement?

1    A.    It would depend on what the meeting was

2 involving and if -- you know, if she would be needed

3 to pull a file or to run something out or make copies.

4    Q.    If you were meeting about a sting

5 operation involving purchase of illegal alcohol or

6 tobacco or drugs, you generally wouldn't have your

7 secretary involved in that, would you?

8    A.    No, it would be the individuals who's

9 working on the particular operation.

10    Q.    Do you recall there ever being an issue

11 raised about the way Ms. Dampier dressed at work?

12    A.    Yes.

13    Q.    What was the nature of the issue?

14    A.    The issue was brought to my attention by

15 Lieutenant Terry Adams.  I'm not aware if it was

16 brought to her by somebody else or not.  And her

17 comment was that she felt uncomfortable with the way

18 that Ms. Dampier was dressed, working in the

19 environment that she was working in.

20    Q.    What about her dress did Lieutenant

21 Adams indicate was inappropriate?  Do you recall any

22 specifics?

23    A.    Yeah, if I recall, I think she felt like

24 the skirts were too short.  Ultimately, Terry Adams,

25 myself, and Ms. Dampier had a meeting on the way that

1 she was dressed.

2          MR. TISCHLER:  If you don't mind, I

3     would like to take a break for a moment.

4          THE WITNESS:  Yes, sir.

5          (A break was taken.)

6     Q.     (By Mr. Tischler)  Just a couple more

7 questions about Ms. Dampier, Mr. Powell.  As a part of

8 this whole process involving these rumors and this

9 investigation and so forth, did anyone within the

10 department ever express concerns to you that there

11 were rumors going around, that people might get the

12 wrong impression based upon what they observed of your

13 interaction with Ms. Dampier, or anything of that

14 nature?

15     A.     No.

16     Q.     As a result of this investigation that

17 was done, I presume you were cleared of any

18 wrongdoing?

19     A.     Correct.

20     Q.     Besides being cleared of any wrongdoing,

21 did you have any conversations with the city manager

22 or anyone else about this investigation and what it

23 revealed?

24     A.     Just other than Mr. Pittman was

25 appreciative of the fact that I came to him

1  immediately upon hearing it.  Mr. Pittman would be the

2  assistant city manager, once again.

3      Q.    And were there any cautions given to you

4  about just being careful about how you interacted with

5  employees?

6      A.    No, sir.

7      Q.    Was there a police chaplain at Wilson

8  Police Department by the name of Reverend Suggs?

9      A.    Yes.

10      Q.    And was he brought on when you became

11  the chief of police?

12      A.    He was actually associated with the

13  department prior to me being appointed.  I think his

14  affiliation was rekindled after my appointment, and he

15  held the chaplain's position with the department.

16      Q.    Was he a sworn law enforcement officer?

17      A.    No.

18      Q.    Was he an employee of the department?

19      A.    No.

20      Q.    And why was he given a captain's rank?

21      A.    He was not.

22      Q.    I thought you just told me he was given

23  the captain's position.

24      A.    Chaplain's position.

25      Q.    I'm sorry, I misunderstood you.  I

1 thought you said "captain."

2          Now, prior to your becoming the chief,

3 did he have an office in the department?

4     A.     I don't know.

5     Q.     Did you provide office space for him

6 within the department?

7     A.     I did.

8     Q.     Was he a full-time chaplain?

9     A.     I don't think you would classify it as

10 full time.  He was on call and he was available for

11 the department needs if he was called upon.

12     Q.     What kind of department needs would

13 Reverend Suggs attend to?

14     A.     If there was a death in one of the

15 members' families, he would be available.  If we had

16 to make death notifications due to a car wreck or

17 something of that nature, he would be available.  If

18 the officers wanted to reach out to him and talk to

19 him about personal circumstances, he would be

20 available for that.

21     Q.     Aside from those kind of needs, do you

22 know what he did on a day-to-day basis when there

23 weren't those kind of needs arising?

24     A.     Yes, sir, he was a preacher in the

25 community, and I believe he also was involved in a

1 gospel group.

2    Q.    And was there a church in Wilson that he
3 was affiliated with?

4    A.    Yes.

5    Q.    Do you recall the name of the church?

6    A.    No, sir, I do not.

7    Q.    Do you know if he's still in Wilson?

8    A.    The last conversation I had with him,
9 which was a few months ago, he was still in the city
10 of Wilson.

11    Q.    Do you know if he's still the police
12 chaplain?

13    A.    I do not.

14    Q.    Was he still the police chaplain when
15 you left?

16    A.    Yes.

17    Q.    So how often would Reverend Suggs occupy
18 the office that you provided for him in the
19 department?

20    A.    The only way I could describe it would
21 be as needed.  I don't know if there was a regular
22 schedule that he had, but it would be as needed.

23    Q.    Did anyone ever indicate to you
24 disagreement with your decision to give him an office?

25    A.    Yes.

1    Q.    And who expressed that disagreement to

2 you?

3    A.    There was some disagreement from several

4 members of the police department, but it had to do

5 with the fact that he had gone through the law

6 enforcement academy prior to my arrival, and there was

7 a dispute over his attendance at the academy, but I

8 don't recall all the circumstances on that attendance.

9    Q.    Was he given a uniform?

10    A.    He was.

11    Q.    Even though he wasn't a sworn law

12 enforcement officer?

13    A.    That's correct.  It was not a standard

14 police uniform.

15    Q.    How did the uniform differ?

16    A.    The uniform that he wore was a white

17 shirt, with black or navy trousers.  The badge, if I

18 recall correctly, had "chaplain" across it.  And he

19 wore the cross symbol on each one of his collars,

20 instead of the normal insignia of the police

21 department.

22    Q.    Was it the same style badge that

23 everyone had?

24    A.    If I recall correctly, it was.

25    Q.    And did his shirt have any of the

1 other -- I'm not sure of the right word -- any of the

2 other dressings on it that law enforcement officers

3 wear?  Sometimes there's the shoulder things, what

4 they're called escapes me.

5      A.     I don't recall if it had any patches on

6 the uniform or not.  I don't recall if it had that on

7 there.

8      Q.     Do you recall Lieutenant Adams ever

9 expressing to you disagreement with your decisions

10 about Reverend Suggs?

11      A.     She did not like Reverend Suggs.

12      Q.     So the answer to my question is yes, she

13 did express to you disagreement?

14      A.     That is correct.

15      Q.     Was there a point in time when captains

16 and detectives were placed on four-day workweeks,

17 working ten hours a day -- I'm sorry, ten hours per

18 shift?

19      A.     I don't recall if it was or not.  I

20 don't recall.  I would have to research the records on

21 that.  I don't remember if there was a shift schedule

22 change or not.

23      Q.     What shifts did your law enforcement

24 officers work?

25      A.     Well, you're having me go back with

1 memory recall, and you're talking about three

2 different departments.  And the normal activity for

3 law enforcement, you have a variation of shifts.  You

4 can either work twelves, tens or eights, and I don't

5 recall in particular which rotation the City of Wilson

6 was utilizing at the time.

7             If I could give you an example, the City

8 of Dothan, our patrol division works a twelve-hour

9 rotation, whereas investigations works a ten-hour

10 rotation.

11     Q.     Now, was that something in place when

12 you became the chief up there, or was that something

13 that you instituted?

14     A.     In Dothan?

15     Q.     Yes, sir.

16     A.     Patrol was working a ten-hour (sic)

17 rotation when I arrived; however, it was an extended

18 twelve-hour rotation, they were working four twelves,

19 with very little off time.  Investigations was working

20 eight-hour rotations.

21     Q.     So you changed the investigations to ten

22 hours?

23     A.     And also changed patrol to a rotation

24 where they have every other weekend off, and the most

25 that they work is three days in a row.

1    Q.    As a matter of your general philosophy

2 in law enforcement, do you like to have your

3 investigators working four ten-hour days?

4    A.    I have found that the investigators are

5 able to make more contact with their assignments for

6 their cases, with the individuals on the cases,

7 because of the fact they're not working normal

8 business hours and they're able to make contact with

9 the victims or the witnesses on those cases.

10    Q.    But in terms of Wilson, you just don't

11 recall whether you followed this philosophy there and

12 placed the captains and detectives on four-day

13 workweeks of ten hours?

14    A.    I don't recall.

15    Q.    Do you think it's likely that you would

16 have, since that seems to be your philosophy of that

17 area of law enforcement?

18    A.    There is a possibility that that took

19 place, but once again, without reviewing the

20 documents, I wouldn't be able to answer that.

21    Q.    Okay.  So then you wouldn't recall

22 whether doing so was the subject of disagreement or

23 dissension at Wilson PD?

24    A.    There was disagreement -- there was some

25 disagreement on shift assignments, but I don't recall

1 if it was in relation to the hours of assignment or if

2 it was in relation to a rotation of the shift itself.

3 When I say -- when I mention rotation, I don't recall

4 if they worked a series of day shifts and then they

5 flipped and worked a series of night shifts, or if

6 everybody was assigned to a permanent shift.  I don't

7 recall that part.

8      Q.     Do you recall Lieutenant Adams ever

9 expressing to you disagreement with the way the shifts

10 were being done?

11     A.     Not in particular, no, I do not.

12     Q.     Who is Jimmy Tant?

13     A.     He is a retired law enforcement officer.

14 Actually he held the chief deputy's position with the

15 City of Wilson -- or pardon me, with the County of

16 Wilson, North Carolina.

17     Q.     And did you know Mr. Tant before you

18 became the chief of police at Wilson?

19     A.     I did not.

20     Q.     And did Mr. Tant have an association

21 with the uniform company?

22     A.     After his retirement, he did.

23     Q.     And at the time that you began work at

24 the City of Wilson, who were the uniforms purchased

25 from?

1    A.    I don't recall.  It would have to be out

2 on bid, but I don't know who the vendor was.

3    Q.    Does American Uniform Company sound

4 familiar?

5    A.    I've heard of American Uniform, but I

6 can't tell you if that's who had the bid or not.

7    Q.    Was there a point in time while you were

8 the chief at Wilson when the uniforms were purchased

9 from a different company, the uniform purchase company

10 was switched, changed?

11    A.    Yes.

12    Q.    Was it changed to the company that

13 Mr. Tant was associated with?

14    A.    Yes.

15    Q.    And it's your testimony that that was

16 done pursuant to a competitive bid process?

17    A.    If I recall correctly, all our purchases

18 under a certain dollar amount, and I don't recall the

19 dollar amount, had to be done by bid process.

20    Q.    Under a certain amount --

21    A.    Yes, sir.

22    Q.    -- or over a certain amount?

23    A.    Well, let me restate it.  If it's under

24 a certain amount, you do not have to do a bid.  If it

25 reaches a certain dollar amount and it goes beyond

1 that amount, you have to open it up for bid.

2     Q.     Do you recall what the amount was?

3     A.     No, sir, I do not.

4     Q.     Do you recall, as you sit here today,

5 whether the purchase of uniforms was put out for bid

6 or not?

7     A.     If I recall correctly, it was put out

8 for bid.

9     Q.     Okay.  And how did that bid process

10 work, particularly for uniforms?

11     A.     I don't think I understand the question.

12     Q.     Kind of when it comes time to -- I

13 presume you have a contract with a uniform company for

14 a particular period of time?

15     A.     Yes.

16     Q.     And then when that contract runs out,

17 then you re-bid it?

18     A.     Correct.

19     Q.     Is that correct?  Okay.  We're talking

20 about the City of Wilson.  When it came time to re-bid

21 the uniforms, how did that process work?

22     A.     We do the specifications for the type of

23 uniform that we want, the bid process -- and once

24 again, you're asking me to do memory recall for city

25 policy and procedure.  The policy, as I recall it,

1  would be to turn it over to the purchasing department

2  with the city, the bid in and of itself.  It would

3  then, in turn, advertise that bid.  And then there

4  would be a bid opening, and the bid would be awarded

5  to the person with the smallest bid, the award would

6  be issued to them.

7      Q.     Was there any process by which someone

8  other than the low bidder could be selected?

9      A.     I don't recall if Wilson had a variance

10 as far as if it was a local company or not, you know,

11 inside the city limits.  I don't recall if they had

12 that or not.  I do recall that the fire department and

13 the police department both switched at the same time,

14 with the uniform company.

15     Q.     And did you have any say in that at all,

16 other than setting the specifications?

17     A.     Just the type of uniforms that we would

18 switch to.  Obviously, I would have discretion on what

19 would be worn on the uniform, such as the type of

20 leather gear, the patches or any kind of implements

21 that would be on the uniform.

22     Q.     Apart from Mr. Tant being associated

23 with Century Uniform Company, did you have any other

24 form of relationship with Mr. Tant?

25     A.     He's a personal friend of mine.

1    Q.    Did he contribute to your campaign?

2    A.    Yes.

3    Q.    Did you ever go on vacations with

4 Mr. Tant?

5    A.    I did.

6    Q.    Where to?

7    A.    We took one trip to Key West, Florida, I

8 don't recall the year.  We took one trip to Jamaica.

9 It was not just us independently, it was a -- a group

10 of several couples.

11    Q.    On both occasions?

12    A.    Yes, sir.

13    Q.    Were any of the other couples affiliated

14 with the Wilson Police Department?

15    A.    There was a couple that was affiliated

16 with the Bureau of Investigations, State of North

17 Carolina Bureau of Investigations.  There was a

18 couple, he was a captain with the Wilson County

19 Sheriff's Office, he and his wife attended.  It seems

20 like there was a couple of deputies, and I believe

21 there was a couple of other police officers, if I

22 recall.

23    Q.    From Wilson PD?

24    A.    Yes, sir.

25    Q.    And what other police officers went?

1    A.    Amsy Hoffner, I believe was the last

2 name, and I don't know how to spell that name.

3    Q.    Amsy Hoffner?

4    A.    Hoffner.

5    Q.    And what was -- is that a man or a

6 woman?

7    A.    It's a man.  He and his wife attended.

8    Q.    Okay.  An unusual name, I wasn't sure.

9          And what was his relationship with the

10 police department, what was his job?

11    A.    He worked in investigations.

12    Q.    And did he go on both the Key West and

13 the Jamaica trip, or just one?

14    A.    I believe he just went to Key West, if I

15 recall correctly.

16    Q.    Any other police -- people associated

17 with the police department that you recall going?

18    A.    No, sir.

19    Q.    And when you went to Key West and

20 Jamaica, did you fly?

21    A.    When we went to Key West, my wife and I

22 flew in -- we flew by ourselves, and we flew into

23 Miami, we rented a car and we drove down to Key West.

24          And then when we went to Jamaica,

25 obviously we flew into Jamaica.

1    Q.    It's a little hard to drive.

2    A.    Yeah.

3    Q.    Was any part of that vacation at all

4 paid for by Mr. Tant?

5    A.    No, it was not.

6    Q.    Not even a meal or anything of that

7 nature?

8    A.    No, sir.

9    Q.    While you worked at the -- while you

10 were still the chief of police with Wilson, do you

11 recall anyone raising any concerns about your

12 relationship with Mr. Tant and the uniforms being

13 purchased from the company he worked for?

14    A.    There was one question brought up, and I

15 think it was pursuant to a question that was asked, I

16 think it was by the city manager.  And if I recall

17 correctly, it was the trip to Jamaica.  And I produced

18 the travel documentation for that.  There was not any

19 type of investigation or anything like that.  It was

20 just what you just did, just basically a question was

21 asked.

22    Q.    That would have been Mr. Wyatt?

23    A.    Correct.

24          And just for the record, his name is

25 spelled W-Y-A-T-T, to make sure.  I thought you said

1 "White."  It's "Wyatt."

2     Q.     I'm sorry, I didn't articulate it
3 clearly.

4          So did your friendship with Mr. Tant
5 develop as a result of his association with Century
6 Uniform Company, or was there some other way that you
7 got to meet him through some other relationship?

8     A.     Jimmy Tant's wife was a captain with the
9 Wilson County Sheriff's Office.  My wife was a deputy
10 with the Wilson County Sheriff's Office.  Jimmy Tant's
11 wife was her direct supervisor.  And that's how the
12 friendship got started.  I actually met Jimmy Tant in
13 his capacity as chief deputy while he was with
14 Wilson County, but the friendship actually started
15 through the relationship I just mentioned.

16     Q.     Do you recall whether the uniforms that
17 were purchased from Century were more expensive than
18 the uniforms that had previously been utilized?

19     A.     I think initially -- and once again,
20 this is from memory.  I think initially, I believe
21 they were cheaper.  Then there was an order that came
22 out, an NFPA order came out in regards to using a
23 polyester uniform for public safety, and we had to
24 switch the type of fabric that was being utilized, and
25 I think that changed the cost of the uniform.  But

1 that was driven by NFPA.

2    Q.    What's NFPA?

3    A.    The National Fire Protection Agency, I

4 think that's what it stands for.

5    Q.    What were your uniforms made of

6 previously, cotton?

7    A.    They were made out of polyester.  There

8 was concern about the polyester melting on the public

9 safety officer, so there was a drive to change the

10 type of material that the uniform was made out of.

11    Q.    Who was Kendra Powell at the police

12 department?

13    A.    We did not have a Kendra Powell, we had

14 a Kendra Howell.

15    Q.    Howell?

16    A.    H-O-W-E-L-L.

17    Q.    And what was her role at the police

18 department?

19    A.    She was a sergeant with the police

20 department.

21    Q.    Was she associated with the uniforms?

22    A.    She was associated with the uniforms

23 later in my tenure with the police department, but I

24 don't recall specifically what period.  But it was

25 towards the end of my tenure with the police

1 department.

2     Q.     Do you recall her ever expressing

3 concern to you about the uniform purchase process and

4 the involvement of Mr. Tant?

5     A.     Not the uniform process.  She had some

6 concern about the -- about the service level that was

7 being received from the company.

8     Q.     Now, was there ever a time when your

9 wife was alleged to have made a derogatory comment

10 about the city manager, Ed Wyatt?

11     A.     Yes.

12     Q.     Was there an internal investigation

13 conducted?

14     A.     I don't think there was an internal

15 investigation conducted on it.

16     Q.     I'm not talking just -- I'm not talking

17 about the police department, I'm talking about the

18 sheriff's office, or either.

19     A.     Not that I'm aware of, no.

20     Q.     And do you know what it is alleged that

21 your wife said about Mr. Wyatt?

22     A.     Something to the fact that he didn't

23 have the -- well, if I can paraphrase, because

24 obviously I did not hear the comment, but something to

25 the fact he didn't have the balls to make a decision.

1      Q.      And do you know the outcome of that

2 dispute?

3      A.      I don't think I follow your question.

4      Q.      Well, was there any ramifications as a

5 result of the allegations that your wife had made this

6 derogatory remark about Mr. Wyatt?

7      A.      The remark came out during the time when

8 disciplinary action had been taken against Captain

9 Phil Baggett, which we discussed earlier.  My wife

10 made the comment over frustration about how long it

11 was taking the process to basically take.  Mr. Wyatt

12 was very understanding about that.  As far as any

13 action being taken, she was not a city employee, and

14 the comment was not made in the capacity of being a

15 city employee or a county employee, it was made in the

16 capacity of her being my wife.

17      Q.      And do you recall whether at the time

18 she denied making the remark?

19      A.      She met with the city attorney, and it's

20 my understanding that she told the city attorney she

21 did make the comment, and the circumstances behind the

22 comment.

23      Q.      Who is Bert Garris?

24      A.      A sergeant with the police department,

25 assigned to the patrol division.

1    Q.    And was he at all involved in these

2 allegations about these derogatory remarks involving

3 Mr. Wyatt?

4    A.    It's my understanding that my wife made

5 the comment to Bert Garris's wife in a personal

6 conversation that they were having.

7    Q.    And while you were the chief of police,

8 was Mr. Garris ever subjected to disciplinary action?

9    A.    He had disciplinary action that was

10 derived out of the event that caused Captain Baggett

11 to be terminated.

12    Q.    What was that?

13    A.    It was an event where Captain Baggett

14 was off duty and had been drinking, and he called a

15 number of police officers to his residence.  They had

16 a meeting.  During the course of the meeting, Captain

17 Baggett tried to underline ways and methods to

18 basically run me out of town, to get rid of me.  And

19 Sergeant Bert Garris was involved in that.

20    Q.    And was he suspended without pay as a

21 result, Sergeant Garris?

22    A.    If I recall correctly, he was suspended.

23    Q.    Now, these events involving Mr. Baggett,

24 you talked about this meeting involving some efforts

25 on his part to run you out of town.  Prior to that

1 time, had he suffered any form of adverse employment

2 action, demotion, transfer, that he didn't like?

3    A.    I think he was transferred, but I don't

4 think there was ever an expression that he didn't care

5 for being transferred.

6    Q.    And I know earlier I think you talked

7 about there being some procedural action involving

8 Mr. Baggett with the city, and then a lawsuit?

9    A.    Correct.

10    Q.    Okay.  And do you recall that he did

11 place the city on notice that he intended to sue for

12 wrongful termination, before he sued?

13    A.    Yes.

14    Q.    Who is Scott Bissette, with the police

15 department?

16    A.    He was an employee, I don't recall his

17 rank.  I don't know if you've been notified yet, but I

18 believe Mr. Bissette has passed away.

19    Q.    Uh-huh (indicating affirmatively).  And

20 what was his specific assignment or role at the police

21 department?

22    A.    I believe he worked in investigations.

23    Q.    And did you reassign him to patrol while

24 you were the chief of police?

25    A.    I don't recall if he was assigned to

1 patrol or not.  He could have been, but I don't recall

2 specifically.

3     Q.     I think earlier you said, in connection

4 with our discussion about Ms. Dampier, that Reggie

5 Branch would have been one of the detectives she would

6 have -- investigators she would have worked with?

7     A.     He worked in narcotics, he did.

8     Q.     Do you recall Mr. Branch ever expressing

9 to you any concerns about Ms. Dampier serving in the

10 role of assisting in undercover operations or sting

11 operations?

12     A.     No.

13     Q.     And how was Ms. Dampier paid when she

14 worked for the police department?

15     A.     If it was her normal duty hours, she

16 would not receive any regular compensation other than

17 the compensation she would get from a regular workday.

18 If it was after-hours, like an off-duty job, then she

19 would receive compensation out of the -- I hate to --

20 you know, informant fund, I guess is what you would

21 call it, where they would have to document the

22 expenditure on a report, and that report would go into

23 the case file.

24     Q.     So she wouldn't be paid as an employee

25 at a regular employee rate?

1    A.    No, sir, she would not.

2    Q.    Was that unique to her or was that done

3 with all of your employees that were working sting

4 operations?

5    A.    That would be for all the employees,

6 unless it was during the normal course of their

7 business hours.

8    Q.    And do you recall how many sting

9 operations Ms. Dampier actually worked in?

10    A.    No, sir, I do not.

11    Q.    Do you recall ever telling Mr. Branch

12 that Ms. Dampier was in a tight spot and needed money,

13 and this was a way for the department to help her?

14    A.    No, sir.

15    Q.    Was there something unique about

16 Ms. Dampier that would make her a good candidate to

17 work these sting operations?

18    A.    Other than the fact she would be like a

19 new -- any other new employee with the department, not

20 known on the street, young in appearance, and the

21 ability to be able to mingle with particular crowds

22 that they were working.

23    Q.    Do you have any knowledge as to whether

24 Mr. Branch ever spoke with Mr. Bissette about concerns

25 he had about Ms. Dampier serving in that capacity?

1    A.    Other than the information that I read

2 in the document that you've got marked as Exhibit C-1.

3    Q.    Did you ever speak with Mr. Bissette

4 after you became aware of this document?

5    A.    No, sir, I haven't talked with

6 Mr. Bissette or most of the employees since I left the

7 City of Wilson.

8    Q.    So you don't know whether Mr. Bissette

9 contested that anything in this two-page statement --

10 two-page report containing statements that are

11 attributed to him, that he denied any of them?

12    A.    I have not talked -- no, sir, I have not

13 talked with him.

14    Q.    Were you and Mr. Bissette at odds when

15 he was the -- when you were the chief and he was an

16 employee?

17    A.    I wouldn't say at odds.  I mean, he was

18 an employee and I was running the department, whatever

19 type of relationship can be assigned to that.

20    Q.    Was there any employment action taken as

21 it pertained to Mr. Bissette while he was serving

22 under you as -- when you were the chief?

23    A.    I think there was some type of action,

24 but I would have to look at the reports from the

25 department to be specific on it.

1    Q.    Okay.  Do you know whether he was at

2 this meeting involving Mr. Baggett?

3    A.    I don't recall.

4    Q.    Was Mr. Bissette at all in a position of

5 supervision involving these investigative functions

6 that Ms. Dampier was involved in?

7    A.    It seems like he was a sergeant with the

8 department.  And once again, that's without having to

9 read the document that's marked Exhibit C-1 or without

10 having any kind of reports from the department.  If I

11 recall correctly, he was a sergeant, and he did work

12 in investigations, so indirectly he would have some

13 investigative supervision over the narcotics and vice

14 unit.  But, now, as far as what level, I don't have

15 any idea.

16    Q.    Do you know whether prior to your

17 becoming the chief of police, this same tactic of

18 using new employees to work stings and undercover had

19 previously been utilized?

20    A.    Particularly for the City of Wilson, I

21 do not.

22    Q.    And this drug enforcement fund that

23 Ms. Dampier was paid out of, I presume there were

24 department policies that governed how that money was

25 used?

1      A.      Yes.

2      Q.      Were those written?

3      A.      Yes.

4      Q.      Were those just a matter of department
5 policy, or were there also state mandates or any other
6 legal requirements that governed the use of that
7 money, that you're aware of?

8      A.      The policies would be written in
9 accordance with the state and any federal laws that
10 would apply.  In addition, because the department was
11 accredited with CALEA, it followed the CALEA
12 standards.

13     Q.      Do you know whether when Ms. Dampier was
14 paid with these monies out of the drug enforcement
15 funds, whether she was given a W-2 for that, whether
16 that was included on her W-2?

17     A.      I'm not aware of that, sir.

18     Q.      Do you recall whether the payment from
19 those funds was a flat amount or an hourly rate or how
20 that worked?

21     A.      Normally it was a flat amount, and I
22 don't recall exactly how much it was.  It wasn't a
23 substantial amount, but it was a flat rate, you know,
24 based on when they -- you know, they go out and do the
25 operation, and then they would just give them the

1 rate.  It didn't make any difference how long it took,

2 it was an amount that was given depending -- the

3 investigator would make the determination of what the

4 amount would be.

5      Q.      Did that require approval up the chain

6 of command?

7      A.      It required the documentation, and then

8 there was a working policy or a standard based on the

9 information that was received from the operation or

10 from the informant, but I don't recall what the

11 numbers were.

12      Q.      Would you have considered Mr. Bissette a

13 friend or a -- I'm not sure if enemy is the right

14 word, but not a friend, when you were the chief of

15 police?  Or shall we say supporter or not a supporter?

16      A.      He was an employee with the police

17 department.  I don't know whether I could classify

18 whether -- I don't know if I can put it in that term,

19 whether being a friend or a supporter.  I mean, he was

20 an employee of the police department.

21      Q.      Can you think of any reason that he

22 would have to be untruthful about things that occurred

23 under your administration as chief?

24      A.      There were several individuals that were

25 upset because of the situation with Phil Baggett that

1 had taken place.

2     Q.     Do you know whether Mr. Bissette was one

3 of those?

4     A.     I do not.

5     Q.     Who is Jeff Chesson?

6     A.     A local businessman in the city of

7 Wilson.

8     Q.     And how is it that you know Mr. Chesson?

9     A.     I purchased my home from him when I

10 first moved to Wilson, North Carolina.

11     Q.     And did you remain an acquaintance of

12 his thereafter?

13     A.     As a business person in the city of

14 Wilson, yes.

15     Q.     Did Mr. Chesson provide you support in

16 your campaign for sheriff in 2004?

17     A.     I don't believe so.

18     Q.     Besides the purchase of the home, did

19 you engage in any other business transactions with

20 Mr. Chesson?

21     A.     Mr. Chesson was also a pilot, and had

22 been used in the past by the police department to help

23 move employees of the agency, to expedite their

24 movement when there was an investigation going on.

25 And he was utilized one time when I was there on a --

1 I believe it was a homicide investigator, to fly some

2 employees from the city of Wilson up to the

3 destination where the investigation was taking place,

4 and then the employees rented a vehicle to come back

5 to the city of Wilson.

6     Q.     Was that flight to a location in

7 Georgia?

8     A.     I don't recall where it went, but it was

9 to a location.

10     Q.     Did you fly as well?

11     A.     I did not.

12     Q.     Did Mr. Chesson ever fly you anywhere?

13     A.     He did not.

14     Q.     Do you recall there being any

15 disagreement about paying Mr. Chesson to fly, as

16 opposed to driving?

17     A.     No, as a matter of fact, I recall the

18 comments were that it was a -- it was a good idea to

19 do that, so the investigators would not be burned out

20 when they got on the scene, from having to drive, you

21 know, for several hours to the location.

22     Q.     And do you know how much Mr. Chesson was

23 paid for flying these folks?

24     A.     I don't recall specifically.  I want to

25 say a thousand dollars, but that would be off the top

1 of my head.

2    Q.    Were there any other persons in the city

3 of Wilson that provided similar services to the police

4 department, in terms of flying people to locations?

5    A.    There was an attorney in town, and I

6 don't recall his name, but he had rendered services to

7 the city in the past when they were working on

8 economic issues.  But I don't recall his name right

9 off the top of my head.

10    Q.    Did he ever provide similar services

11 while you were the chief of police?

12    A.    To the city as a whole?

13    Q.    Yes, sir.

14    A.    Yes, but not to the police department.

15    Q.    So Mr. Chesson is the only person who

16 provided flight services to the police department?

17    A.    Yes, and he had flown prior to my

18 arrival at the city of Wilson, he had flown officers

19 back and forth to Quantico, Virginia.  That's how I

20 was made aware of the fact that he would do that type

21 of activity.

22    Q.    It's your testimony that besides

23 purchasing your -- with him being the real estate

24 agent when you purchased your home, and then just him

25 being a businessman in town, you had no other

1 acquaintance with him?

2      A.      Well, I mean, we were friends, we had

3 been out to lunch a couple of times.  But once again,

4 as a business person in the city of Wilson, that was

5 not uncommon.

6      Q.      Now, what was -- I think earlier we

7 mentioned Mr. Boykin's name in conjunction with

8 Ms. Dampier.  What was Mr. Boykin's position with the

9 police department?

10      A.      He was a sergeant with the police

11 department.

12      Q.      Any particular assignment, area where he

13 worked?

14      A.      I believe he was assigned to patrol.

15      Q.      And do you recall a point in time when

16 he was on the lieutenant list, list for promotion to

17 lieutenant?

18      A.      I think he was on the roster for

19 lieutenant.

20      Q.      Was he promoted to lieutenant?

21      A.      No, sir.

22      Q.      Did you -- was it your decision not to

23 promote him to the rank of lieutenant?

24      A.      I did not recommend him for the rank of

25 lieutenant.

1    Q.    Okay.  Why not?

2    A.    The other individuals that were

3 recommended, based on the limited number of positions

4 that we had at the time when I reviewed the personnel

5 files, were more qualified.

6    Q.    Do you know whether those persons who

7 were promoted to lieutenant ranked below him on the

8 list that was created as a result of the exam?

9    A.    I don't recall the ranking.

10    Q.    I presume that after the department went

11 through this process of examining and interviewing,

12 and so forth, people for promotion, that a list would

13 be generated?

14    A.    That's correct.

15    Q.    And the people would be ranked one, two,

16 three, four; number one being the highest scoring, or

17 highest ranking person?

18    A.    Correct.

19    Q.    Do you recall Mr. Boykin ever expressing

20 to you dissatisfaction that he had not been promoted

21 to lieutenant?

22    A.    I don't recall meeting with him and him

23 expressing that.  I knew he was dissatisfied, much

24 like the other candidates who were not successful in

25 being promoted during that particular period of time.

1    Q.    Was there a point in time when

2 Mr. Boykin became the subject of a disciplinary

3 matter?

4    A.    Yes.

5    Q.    What did that relate to?

6    A.    The same incident -- as I recall, the

7 same incident involving Captain Baggett.

8    Q.    Okay.  And what discipline did he

9 receive?

10    A.    It seemed like it was suspension without

11 pay, but I don't recall how many days.

12    Q.    Would you dispute it being 40 hours?

13    A.    I couldn't dispute it.  Without looking

14 at the record, I couldn't say how many days it was,

15 how many hours.

16    Q.    I'm not sure I understand exactly what

17 it is that Mr. Baggett and the others at this meeting

18 did that caused them to be disciplined.  Can you

19 explain that for me?

20    A.    There was a meeting, once again, where

21 Phil Baggett was off duty, there was a debate whether

22 or not he was intoxicated or just drinking, but he

23 was, in fact, drinking.  He came on the radio and he

24 called on-duty personnel to come to his residence.  He

25 also had off-duty personnel come by his house.  During

1 this meeting, he had discussions about how to

2 basically push me out or get rid of me from the City

3 of Dothan. This was reported --

4     Q.    I'm sorry, sir, you said "Dothan."

5     A.    I'm sorry, Wilson. I apologize. Thank

6 you for catching me.

7          This was reported to -- I believe

8 initially to Captain Tim Johnson, who was the internal

9 affairs commander. He, in turn, reported it to me.

10 There was an investigation conducted, and there were

11 recommendations made to the city manager. The

12 recommendation for Captain Baggett was for him to be

13 dismissed. And then there were some suspensions

14 handed out to the other individuals who were involved.

15     Q.    And just what rule or policy or -- you

16 know, what did they do wrong by having this meeting?

17     A.    You had an issue of conduct unbecoming

18 an officer, conduct unbecoming a supervisor with the

19 police department, utilization of department assets --

20 or misuse, should I say, of department assets. And I

21 don't recall all the specific charges on the document

22 that was rendered for it.

23     Q.    Besides Mr. Boykin, Mr. Baggett, and

24 Mr. Garris, what other persons were involved or

25 received discipline as a result of this whole matter

1 involving Mr. Baggett?

2      A.      I don't recall who else was involved in

3 it.  I don't recall any other -- the other persons

4 that were involved.

5      Q.      Besides Mr. Boykin being suspended, was

6 he also transferred thereafter?

7      A.      I don't know if there was a transfer

8 associated with his disciplinary action or not.

9      Q.      And even if there wasn't, do you recall

10 whether thereafter he was transferred within the

11 police department?

12      A.      No, sir, I do not.

13      Q.      Who is Lori Rivera, as it relates to the

14 Wilson Police Department?

15      A.      A police officer with the department.

16      Q.      And do you know whether she was

17 interviewed in conjunction with the issues involving

18 Ms. Dampier?

19      A.      I believe she was interviewed by Captain

20 Tim Johnson.

21      Q.      You have no idea what she told Captain

22 Johnson?

23      A.      No, sir, I do not.

24      Q.      Did you ever speak with her at all about

25 your relationship with Ms. Dampier?

1    A.    No, sir, I did not.

2    Q.    Did she ever speak to you?

3    A.    No, sir.

4    Q.    Does North Carolina, like Florida, have

5 a law involving internal affairs investigations, that

6 the employee has a right to read the entire

7 investigation and all the interviews and so forth?  Or

8 I should say when you were the chief, did they have

9 one?

10    A.    As I recall it, they do have the right

11 to come in and review everything.  And I don't think

12 that they can copy anything, but they can take notes.

13 And, of course, the review has to be supervised by an

14 employee with the police department.

15    Q.    Okay.  But you didn't avail yourself of

16 that while you were the chief, as it pertained to this

17 investigation about Ms. Dampier?

18    A.    No, sir, that was an investigation that

19 was directed by the assistant city manager, and he had

20 purview over that.

21    Q.    Do you have any knowledge of any

22 allegations allegedly made by Ms. Rivera about your

23 relationship with Ms. Dampier or what she had been

24 told about it?

25    A.    The information that I have concerning

1 Ms. Rivera -- not specifically to answer your

2 question, but I do know that during the course of the

3 investigation there were some violations identified by

4 Tim Johnson against her, but it wasn't in regards to

5 anything associated with me.  But I don't recall what

6 the violations were.

7     Q.    Violations by Ms. Rivera?

8     A.    Correct.

9     Q.    Were there any violations identified as

10 it related to Ms. Dampier as a part of that

11 investigation, that you're aware of?

12     A.    I would have to say that there were not,

13 and the reason I base that comment is by the fact that

14 she was hired in a full-time status as a police

15 officer.  And that's -- that's speculation on my part.

16     Q.    After this investigation was completed

17 involving Ms. Dampier, did her status with the

18 department change at all?

19     A.    Her status in the department?

20     Q.    Yes, sir.  Did she remain a part-time

21 intern?

22     A.    She was still employed there and was

23 given a full-time job as a police officer.

24     Q.    Okay.  After this investigation was

25 conducted, based upon these rumors, did Ms. Dampier

1 continue to work as an informant in these sting

2 operations?

3     A.    Not that I recall.

4     Q.    Do you know whether her --

5     A.    Not that I recall.

6     Q.    Do you know whether her ceasing working

7 with these sting operations was an outgrowth of this

8 investigation or a result of it?

9     A.    No, sir, I do not.

10     Q.    Did you ever come to find out that

11 during the course of the investigation, allegations

12 were made that you and Ms. Dampier had had rendezvous

13 in a hotel in Raleigh, North Carolina?

14     A.    I heard the allegations were that we had

15 rendezvous, but I did not know the location.

16     Q.    Had you ever heard a rumor that there

17 was an allegation that Ms. Dampier had had an abortion

18 of a child fathered by you?

19     A.    Yes.

20     Q.    And do you know the source of that rumor

21 or allegation?

22     A.    I don't know the source of the rumor.  I

23 can tell you that I heard it -- it seems like I heard

24 it from -- and I can't recall the guy's name, but he

25 was actually associated with Lori Rivera.  He was an

1 investigator with the police department, and during

2 the course of the investigation that I was -- what I

3 was alluding to earlier, Tim Johnson learned that

4 Rivera and this investigator were having

5 relationships. And I heard it from him, and I cannot

6 think of his name, and I apologize for that. It

7 seemed like his first name was Tim, but I don't

8 know -- I don't know for sure.

9      Q.      And I presume the allegation that you

10 met Ms. Dampier at a motel in Raleigh, North Carolina,

11 is untruthful?

12      A.      That's untrue.

13      Q.      Okay. And I presume that the allegation

14 that Ms. Dampier had an abortion of your child is

15 untrue?

16      A.      That's untrue.

17            MR. PETERSON: Are you about to move to

18      the Bert Garris' statement?

19            MR. TISCHLER: Yes.

20            MR. PETERSON: May I take a break real

21      quick?

22            MR. TISCHLER: Oh, sure, yeah.

23            (A break was taken.)

24            (At this time, Ms. Dickey is

25            no longer present for the

1          deposition.)

2     Q.     (By Mr. Tischler)  Mr. Powell, do you

3 recall having discussions and disagreements with

4 Mr. Garris while you were the chief of police?

5     A.     Many discussions.  I certainly would

6 allow him to provide his input on any decisions that

7 had to be made.  And as a matter of fact, Bert Garris

8 sat on the interview panel when I made application for

9 police chief.

10     Q.     Now, was he a detective sergeant?

11     A.     He was a sergeant, but I don't know

12 where he --

13     Q.     Do you recall him having discussions

14 with you about a revised work schedule for the patrol

15 division?

16     A.     I do recall some discussion about a work

17 schedule for patrol, but I don't recall the specifics

18 about the scheduling.

19     Q.     So you don't recall telling him not to

20 discuss his work on revising the work schedule, with

21 anyone?

22     A.     I don't recall saying that to him, but

23 it would not be unusual to make that kind of comment,

24 because anytime you work with an idea or you may be

25 looking at implementing an idea, it's always wise to

1 ask that that be kept close to your chest or kept

2 confidential, because it will spread like wildfire

3 throughout the department, and before you have an

4 opportunity to implement it or to get all the facts

5 in, you're not able to accurately review it or make

6 any kind of decisions.

7       Q.      And do you recall subsequently finding

8 out that Sergeant Garris had discussions with his

9 captain about the work schedule?

10      A.      I don't recall.  I don't recall that.

11      Q.      Do you recall Sergeant Garris being the

12 subject of discipline?

13      A.      Sergeant Garris was a subject of

14 discipline.

15      Q.      And that all related to the Baggett

16 matter?

17      A.      I don't recall what it was in regards

18 to.

19      Q.      How long could you suspend someone, as

20 the chief of police, without them having some form of

21 review?

22      A.      All the suspensions had a form of

23 review.  Once again, under the -- the way that the

24 city operates, the -- any type of action that's taken

25 against an employee is reviewed by the city manager's

1 office, along with the facts and circumstances.  And

2 certainly the employee has a right to grieve, to file

3 a grievance in regards to whatever action is taken,

4 and they also have a right to review the facts and

5 circumstances that that decision was made on.

6      Q.      When Mr. Garris says that he received an

7 eight-day suspension that resulted from his

8 discussions with the captain about the work schedule,

9 do you disagree with that being a truthful statement,

10 or do you just not recall?

11      A.      I disagree with the statement in the

12 fact that I don't think that the discussion in and of

13 itself would have generated an eight-day suspension.

14 I do recall very vividly that Sergeant Garris actually

15 had received a much longer suspension for a violation,

16 although I don't recall what the violation was for,

17 and Sergeant Garris basically came to us and asked

18 that his suspension be reduced if he would agree to

19 enter into -- basically admit the wrongdoing, and the

20 suspension was reduced to eight days.

21      Q.      So he was suspended multiple times?

22      A.      No, sir.

23      Q.      Just one time?

24      A.      He was suspended one time, but the time

25 frame that you're looking at was less than what the

1 initial suspension was, and that was based on an

2 agreement that Sergeant Garris himself worked up.

3      Q.      But you don't believe the suspension was

4 as a result of him discussing with the captain the

5 proposed work schedule that you had told him not to

6 discuss?

7      A.      Not just the work schedule, no, sir.

8      Q.      Do you recall any other things that

9 Sergeant Garris did that were problematic while you

10 were the chief?

11      A.      Once again, without having the files to

12 review, it would be hard for me to recall that.

13      Q.      Do you recall during the course of the

14 discussions, the rumors and so forth involving

15 Ms. Dampier and yourself, there being an allegation or

16 a rumor that at some point in time you had walked into

17 a room at the police department with Ms. Dampier, just

18 the two of you, and shut the door?

19      A.      I recall seeing that, and I believe it

20 was in this document that I have in front of me.

21      Q.      Yes, sir.

22      A.      I don't recall hearing about that while

23 I was there.

24      Q.      So that's not something that you heard

25 about during the course of the investigation?

1    A.    I don't recall hearing that, no, sir.

2    Q.    So then you don't recall any allegation

3 that individuals heard you shuffling around inside

4 when they knocked on the door, and it took you a

5 couple of minutes to open the door?

6    A.    The first time I remember seeing that

7 information was in this document that I have before

8 me, which you have marked as C-1.

9    Q.    Actually I think it's C-4, isn't it, in

10 the lower right-hand corner?

11    A.    Yeah -- well, I'm sorry, the document

12 you have marked as Exhibit C.

13    Q.    Actually, it's Exhibit 2, but the stamp

14 is C-4.  It's Mr. Garris's statement?

15    A.    Correct.

16    Q.    Or the report of what Mr. Garris

17 allegedly said.

18          Do you recall having discussions with

19 Mr. Garris about your trips with Mr. Tant?

20    A.    No, sir.

21    Q.    So if Mr. Garris said you had a

22 discussion with him, you can't say whether he's being

23 accurate or not, you just don't recall?

24    A.    The only person I ever remember having a

25 discussion with about the trips that I took on my

1 personal time was with the city manager, Mr. Ed Wyatt,

2 going back to the incident I told you, when I produced

3 the documents that showed where I had purchased the

4 travel.

5      Q.      Mr. Garris speaks of some discussions

6 with you about intercepting telephone calls as a part

7 of a murder investigation.  Do you recall there being

8 an issue that arose in that regard?

9      A.      I recall that we had a murder

10 investigation that was ongoing, that my comments was

11 to get with the U.S. Marshals Service, that the

12 marshals service had the ability to track cell phone

13 information, telephonic information.  They have a unit

14 that actually comes in and they perform that kind of

15 task.  And that I was asking that they make contact

16 with the marshals service to bring the marshals in to

17 see if we could locate the bad guy.

18      Q.      Was that the Bailey murder case?

19      A.      I believe that was the murder case, yes,

20 sir.

21      Q.      But it's your testimony that any

22 discussions about intercepting cell phone calls was

23 related to the U.S. Marshals Office doing that?

24      A.      That's correct.

25      Q.      Did the police department have the

1 capacity, through any devices that were owned by the

2 department, to intercept cell phone calls?

3      A.      Not that I'm aware of.

4      Q.      Do you know what an 800 megahertz

5 scanner is?

6      A.      Only that it would be a scanner that

7 would scan 800 radios, I would assume.

8      Q.      In your experience, is that capable of

9 intercepting cell phone calls?

10      A.      No, sir, an 800 scanner would scan the

11 800 megahertz frequency that a lot of departments

12 utilize, and it would have to be specific to whatever

13 the range is for that department working off of.

14      Q.      Now, in order to intercept cell phone

15 calls by the police department, what action would have

16 to be taken to comply with the law?

17      A.      You would have to have a court order

18 outlining the reason for the interception of the

19 telephone calls and what you hope to derive out of

20 that.  Once again, that goes back to working with the

21 U.S. Marshals.  The individual in question on this

22 particular case was identified as the suspect, and it

23 was not uncommon to work with the U.S. Marshals

24 Service in a manhunt.

25      Q.      Do you recall whether -- as a part of

1 the Bailey murder case investigation, whether cell

2 phone calls were intercepted?

3     A.    I don't recall.

4     Q.    That being a big case, I presume -- I

5 presume y'all didn't have that many murder cases in

6 Wilson?

7     A.    We did not.

8     Q.    I presume that was a fairly high

9 profile, fairly big case for the city at that time?

10     A.    Well, I think any homicide case would be

11 high profile and it would be important.  And this was

12 given the same credibility as any other homicide case

13 that would be worked.

14     Q.    I presume as a result, then, you were

15 pretty much kept apprised of what was going on on a

16 pretty regular basis, if not daily?

17     A.    Yes.

18     Q.    Do you recall having any conversations

19 with the marshals service about intercepting cell

20 phone calls?

21     A.    I would not have had any conversations

22 with the marshals service.  That would have been done

23 on the investigation level.

24     Q.    So you just don't recall whether any

25 cell phone calls were intercepted or not, or whether

1 an effort was made to get a court order or anything of

2 that nature?

3      A.      No, sir, I do not recall.

4      Q.      Do you know whether Mr. Garris is still

5 employed at the Wilson Police Department?

6      A.      No, sir, I do not.

7      Q.      When was the last time you had contact

8 with Mr. Garris?

9      A.      It would be during my employment with

10 the City of Wilson.

11      Q.      And did you ever speak with Mr. Garris

12 about this report that attributed certain statements

13 to him?

14      A.      No, sir, I did not.

15      Q.      I neglected to ask you earlier about

16 Mr. Boykin.  Do you know whether he still works at the

17 police department in Wilson?

18      A.      I do not.

19      Q.      When was the last time you had any

20 contact with Mr. Boykin?

21      A.      When I was employed with the City of

22 Wilson.

23      Q.      And do you know whether -- or have you

24 had any conversations with Mr. Boykin about this

25 report attributing statements to him?

1    A.    I have not.

2    Q.    Did I understand you to say that he was

3 disciplined as a result of the rumors associated with

4 the Dampier matter?

5    A.    I didn't say that, and I don't recall if

6 he was or not.  I do recall that he received some

7 discipline, but I don't remember what it was for.

8    Q.    You said earlier that, I think it was

9 Mr. Rand spoke with at least Ms. Adams about this

10 report that attributes certain statements to her?

11   A.    Yes, sir.

12   Q.    After you sent it to him?

13   A.    Yes, sir.

14   Q.    Do you know whether he spoke -- did he

15 tell you whether he spoke with all of the people that

16 had statements attributed to them?

17   A.    It's my understanding that he has

18 thoroughly investigated this document that you have

19 marked Exhibit C, that he's thoroughly investigated

20 that, he and his office.

21   Q.    And do you know whether a report was

22 generated?

23   A.    I do not.

24   Q.    And have you conversed with him about

25 the results of his investigation?

1    A.    I have.

2    Q.    And what has he told you about the

3 results of his investigation?

4    A.    Pursuant to his investigation, that

5 there is no merit to these allegations that's in this

6 document.  He conducted that investigation prior to

7 the -- or should I say during the course and time that

8 Mr. Baggett had filed a lawsuit against myself and the

9 City of Wilson.

10    Q.    But he didn't tell you whether all of

11 these individuals denied making these statements that

12 are attributed to them, or did he?

13    A.    No, sir, he did not.

14    Q.    And do you know whether anyone other

15 than Ms. Adams produced or generated any

16 correspondence challenging the report and the

17 statements that were attributed to her?

18    A.    I do not.

19    Q.    As it relates to the Bailey murder case,

20 at the end of the report attributed to Mr. Garris,

21 there's reference to, I guess a stakeout at the

22 possible location of the murder suspect.  You're

23 calling them off, asked them to leave, and then they

24 returned and evidence was found that the subject might

25 have been there.  Did that happen?

1     A.     No, sir, it did not.

2     Q.     Did any of that happen at all or is that

3  all a fabrication?

4     A.     Are you referring to --

5     Q.     The last paragraph on page 2 of

6  Mr. Garris's statement.

7     A.     No, sir, it did not.

8     Q.     Nothing associated with that happened at

9  all?

10     A.     No, sir.

11     Q.     Were you ever at the scene where -- at a

12  residence where it was believed that the suspect was

13  located?

14     A.     No, sir, I was not.

15     Q.     Did you ever have conversations with

16  investigators or officers that were at a residence

17  where it was suspected that the suspect was located?

18     A.     I had conversations with the supervisors

19  during the course of the manhunt for this individual,

20  but I don't recall where they were located at.

21     Q.     Do you recall coming to have information

22  during those conversations that the subject had been

23  seen driving down some road?

24     A.     No, sir.

25     Q.     Was Mr. Garris involved in the

1 investigation involving the Bailey murder case?

2    A.    I don't know if he was or not, sir.  I

3 mean, there was multiple officers involved in the

4 investigation.

5    Q.    Do you recall who the lead investigator

6 was?

7    A.    No, sir, I do not.

8    Q.    Do you recall the names of any of the

9 investigators involved in that case?

10    A.    There was a number of officers involved,

11 but I don't recall specifically any of the officers.

12    Q.    Now, earlier we talked about, I think

13 briefly, Kendra Howell.  While you were the chief of

14 police, was she promoted to lieutenant?

15    A.    She was.

16    Q.    And did you recommend her promotion?

17    A.    I did.

18    Q.    And do you recall where she stood on

19 this list of promotion candidates for the lieutenant

20 promotion?

21    A.    No, sir, I do not.

22    Q.    Do you recall whether there were others

23 that were ahead of her on the list that were not

24 promoted?

25    A.    I recall that she was on the roster that

1 was eligible to be promoted, but I don't recall the

2 ranking.

3      Q.      Do you recall a Jacqui Boykin?

4      A.      Yes.

5      Q.      What was Ms. Boykin's position at the

6 police department?

7      A.      She was assigned to investigations.

8      Q.      And is that Jeff's wife?

9      A.      Yes.

10      Q.      And do you recall there being a point in

11 time when she left the department to go to work for a

12 bank, and then applied to be reinstated to the

13 department?

14      A.      She actually had left the employment of

15 the department prior to me being appointed police

16 chief.

17      Q.      And then did you rehire her?

18      A.      I did.

19      Q.      And what position was she assigned to

20 when you rehired her?

21      A.      She was hired as a police officer,

22 initially was assigned to the patrol division, later

23 was assigned to investigations.

24      Q.      Within the police department, was

25 investigations or a detective position considered to

1 be a promotion by the rank and file?

2      A.      You would be asking me to make an

3 assumption on that.  I mean, I -- it's not a promotion

4 as far as pay or title.  As far as what's assumed by

5 the officers, I couldn't tell you.

6      Q.      You've worked in law enforcement a long

7 time, Mr. Powell.

8      A.      Correct.

9      Q.      Isn't it true that detective positions

10 are generally considered to be ones of greater

11 prestige than road patrol?

12      A.      Depends on what agency you're working

13 for.

14      Q.      At the Wilson Police Department, was

15 that the case?

16      A.      I don't know.  I don't know how they --

17      Q.      As the chief of police, you have no idea

18 what your employees thought about being a detective

19 versus being assigned to street patrol?

20      A.      I had some employees who actually

21 refused to go to investigations.  To ask me to make a

22 general statement as far as how it's perceived by the

23 rank and file of the employees, I can't do that, sir.

24      Q.      Do you recall after Ms. Boykin was

25 placed in the position of detective, there being

1 unhappiness about that?

2      A.      There were some individuals who were

3 upset by the fact that she got put into

4 investigations.  I think that was driven by the fact

5 that they didn't particularly care for Ms. Boykin.

6      Q.      Do you recall Ms. Howell, Lieutenant

7 Howell expressing that disagreement to you?

8      A.      Not in particular her, no, sir.

9      Q.      You said that you recall the only

10 conversation you had about the trips taken with

11 Mr. Tant were with Mr. Wyatt, but do you recall that

12 being the subject of rumor within the department?  Did

13 it come to your attention that others were questioning

14 that?

15      A.      I don't recall anybody ever questioning

16 it.  I mean, it was common knowledge when I was away

17 from the office.  In particular, if I was taking a

18 vacation, particularly if I was in Jamaica because I

19 would be out of range of the contact by telephone.

20 So, I mean, it would be knowledge for the officers and

21 employees of the department that I was away from the

22 office for an extended period of time.

23      Q.      And was it common knowledge when you

24 were away from the office on vacation, that you were

25 with Mr. Tant?

1     A.     I don't know if it was common knowledge

2 or not.  It was not -- there was no effort to try to

3 keep it concealed or hide it.

4     Q.     Did the City of Wilson Police Department

5 purchase a fire truck under your watch as chief?

6     A.     They did not.

7     Q.     Was there any affiliation with the

8 department and a fire truck?

9     A.     No, sir, there was not.

10     Q.     Would Lieutenant Howell have been

11 involved in that process at all involving the purchase

12 of a fire truck, to your knowledge?

13     A.     No, sir, there was not a fire truck

14 purchased by the City of Dothan Police Department.

15          MR. PETERSON:  You said "Dothan" again.

16          THE WITNESS:  I apologize.  City of

17     Wilson.  Thank you.

18     Q.     (By Mr. Tischler)  Do you know whether

19 Lieutenant Howell was in charge of the department's

20 receptionists, including Ms. Dampier?

21     A.     There may have been a time when she was

22 in charge of them, but I don't recall a specific time

23 frame.  I do recall the specific time frame for -- or

24 period when Lieutenant Adams was in charge.

25     Q.     Did Ms. Dampier ever serve as a

1 receptionist in addition to her role in records?

2     A.     She could have.  I think they rotated

3 the duties at the front window.

4     Q.     And do you know whether Lieutenant

5 Howell ever had to send Ms. Dampier home to change her

6 clothes because of the way she was dressed?

7     A.     I think that may come out of the same

8 complaint that Lieutenant Adams addressed, that we

9 discussed earlier.

10     Q.     While you were the chief of police,

11 did -- were letters sent by members of the department

12 to the city manager complaining of your supervision as

13 chief?

14     A.     There were letters sent to the city

15 manager; however, I do not know if they were generated

16 by the department or not.

17     Q.     Did you see those letters?

18     A.     I did.

19     Q.     Did they appear to be generated -- did

20 they appear to relate to matters involving employees?

21     A.     In general, yes.

22     Q.     And did they purport to be generated by

23 employees?

24     A.     I think there was one of them that was,

25 and I'm not sure about the rest of them.

1    Q.    Are you aware of communications to the

2 EEOC about your actions as chief of police?

3    A.    I'm aware of a document, EEOC, that had

4 that language in there.  I was never notified and have

5 not been notified of any complaint from EEOC

6 personally.

7    Q.    But you're aware that someone complained

8 to the EEOC about your actions as chief?

9    A.    No, sir.  I'm aware that there was a

10 document written that said there would be a complaint

11 made, but I have not been contacted by the EEOC now or

12 in the past.

13    Q.    How is it that you came to see that

14 document, that there would be a complaint made?

15    A.    It was provided to me by the city

16 manager and the assistant city manager.

17    Q.    Are you aware of any other law

18 enforcement agencies complaining about any actions

19 that you took as chief of police?

20    A.    No, sir.

21    Q.    Were television stations and newspapers

22 at all critical of you in your actions as chief of

23 police?

24    A.    I believe the newspaper, and I can't

25 recall the name of the newspaper that was there in

1 Wilson, it was a locally owned newspaper, locally

2 printed newspaper, and there were editorials in that

3 newspaper.  I don't recall any TV stations.

4      Q.     Okay.  What kind of issues were raised

5 in the editorial in the local newspaper about your

6 work as chief of police?

7      A.     There were the normal comments made

8 anytime that there was an act of violence in the

9 community.  There was a comment written about

10 transferring of some officers.  I don't recall -- I

11 mean, they were sergeant and above.  I don't recall

12 who the officers were.  Vehicle pursuits, you would

13 see a letter to the editor about vehicle pursuits.

14 And I think that's pretty much it.

15           But on the other side of the coin, you

16 would also see letters of praise in the editorial

17 section, such as leaving the police department open

18 past 5:00, taking over the law enforcement detail of

19 the college, and the -- you know, the positive aspects

20 of the operation, also.

21      Q.     Let me direct your attention to the

22 portion of Exhibit 2 that's marked C-5, Lieutenant

23 Kendra Howell -- the report we were on, Lieutenant

24 Kendra Howell.

25      A.     What page did you say?

1     Q.     The second page, please.  The last

2 paragraph.  Read that for a moment.

3     A.     (Witness complies.)  Okay, sir.

4     Q.     Were there, in fact, meetings that City

5 Manager Wyatt and Attorney Rand held with members of

6 the department?

7     A.     As a matter of fact, there was a meeting

8 that was held at the local junior college.  It was a

9 meeting that I requested through the city attorney's

10 office and city manager's office.  In attendance were

11 every member of the police department.  Also, every

12 letter that had been received by the department was

13 displayed by the city attorney, and the city attorney

14 solicited comments from the members who were in

15 attendance at the meeting.  And the meeting was not

16 negative in any shape, form, or fashion, but it

17 actually was positive.  Slade Rand, the other attorney

18 whose last name is Rose, the assistant city manager

19 Charles Pittman, and Ed Wyatt was present, and they

20 have documentation of the meeting that took place.

21     Q.     Was this a mandatory meeting?

22     A.     It was -- yes, it was mandatory -- well,

23 once again, it was done at my request by the city.

24     Q.     And what is it that prompted you to

25 request that meeting?

1     A.     To try to put to bed the rumor and

2 speculation about the letters that had been

3 circulating, and let the department be aware of

4 exactly what had been said to the city manager's

5 office.  And once again, those letters were displayed

6 to the rank and file.

7     Q.     Do you have copies of those letters?

8     A.     I do not, but I believe the city

9 attorney's office or the city manager's office would,

10 for the City of Wilson.

11     Q.     Now, in terms of the time frame of your

12 tenure as chief of police at City of Wilson, where did

13 this fall when these letters started coming in and you

14 had this meeting?

15     A.     Well, I think the letters actually

16 started right after I was appointed as police chief.

17 As far as the meeting, I think that the meeting

18 actually took place -- and once again, it's a guess

19 off the top of my head, I think it was in 2003, but I

20 don't recall the month.

21     Q.     Well, you left in February of 2004.

22     A.     Correct.

23     Q.     Do you recall if it was the latter part

24 of the year 2003?

25     A.     I don't recall.

1      Q.      K. B. Pendergrass, what's his

2 affiliation with the police department?

3      A.      I believe he's a sergeant with the

4 police department.

5      Q.      Okay.  Do you know if he's still at the

6 police department?

7      A.      I do not.

8      Q.      Have you ever spoken with

9 Mr. Pendergrass about his statement?

10      A.      I have not.

11      Q.      Do you know whether Attorney Rand spoke

12 with Mr. Pendergrass about his statement?

13      A.      I do not.

14      Q.      How would you characterize your

15 interaction with Mr. Pendergrass?

16      A.      The same as the rest of the employees.

17 I mean, he was a sergeant with the department.  He was

18 not happy about the fact he was not promoted to the

19 rank of lieutenant.

20      Q.      Do you recall where he -- you don't

21 recall where he sat on the list?

22      A.      No, sir.  Other than the information

23 that's contained in Exhibit C-6.

24      Q.      Did you reorganize the police department

25 after you became the chief?

1    A.    We scaled back on some positions that we

2 had, and we reinstituted the rank of lieutenant, and

3 we were going to eliminate the position of major at

4 the agency.

5    Q.    I don't remember if I asked you this

6 about Ms. Howell, and if I did I apologize.  Did you

7 have any disagreements with Ms. Howell?

8    A.    No more than just the regular staff

9 discussions that you would have.  I mean, we didn't

10 have any arguments or anything like that, if that's

11 what you're referring to.

12    Q.    Can you think of any reason why

13 Ms. Howell would make untruthful statements about you

14 or make false allegations?

15    A.    No, sir.

16    Q.    Besides not being promoted to

17 lieutenant, can you think of any reason why

18 Mr. Pendergrass would have had any animosity towards

19 you?

20    A.    No, sir.

21    Q.    Did Mr. Pendergrass ever express to you

22 disagreement about the reorganization of the

23 department?

24    A.    He did not.  As a matter of fact, it was

25 just the opposite.  Several employees were excited by

1 the fact that the lieutenant position was reinstituted

2 and there was going to be opportunity for advancement

3 in the agency.

4     Q.     Mr. Pendergrass was one of them?

5     A.     Yes, sir, he held the rank of sergeant.

6 Prior to any type of reorganization, the rank

7 structure went from sergeant to captain, with one

8 lieutenant, which was Terry Adams, was in the agency.

9     Q.     Do you recall having any conversations

10 with Mr. Pendergrass about his not being promoted to

11 lieutenant?

12     A.     No, sir, I do not.

13     Q.     When the promotions were made for

14 lieutenant, did you speak individually with the people

15 that were not promoted, to explain to them why or give

16 them any reassurance at all?

17     A.     Yes, sir, there was actually a process

18 that they had, an opportunity to view their

19 performance at the assessment center, which was

20 utilized at that time to either identify any

21 deficiencies, or actually their strong points, to help

22 them out for any potential future opportunities that

23 would come up.

24     Q.     Craig Smith, was he a captain at the

25 police department when you were there?

 1      A.      Yes, sir.

 2      Q.      And what particular area did he preside

 3 over as captain?

 4      A.      He was captain in patrol.

 5      Q.      Have you ever spoken -- well, first, do

 6 you know whether Captain Smith still works at the

 7 police department?

 8      A.      I do not.

 9      Q.      Have you ever spoken with him about this

10 report that attributes certain statements to him?

11      A.      I have not.

12      Q.      Can you think of any reason why Captain

13 Smith would have to make false statements about you or

14 criticize you as chief of police?

15      A.      No, sir.

16      Q.      Do you recall having discussions,

17 disagreements, with Captain Smith about countermanding

18 the recommendations that your -- the upper ranks of

19 your support staff were making?

20      A.      I don't think I understand your

21 question, sir.

22      Q.      Sure.  Well, let me ask you this, did

23 you ever -- do you recall ever directly countermanding

24 any orders that your captains had issued to their

25 subordinates?

1    A.    If I didn't agree with the direction

2 that they had given to a subordinate officer, I would

3 meet with the captain individually and try to learn

4 the facts and circumstances why that order was given,

5 what were the surrounding reasons for that.  If I

6 didn't feel like it was in the best interest of the

7 community or the department, I would give another

8 direction and have the captain correct his action.  I

9 would not go out and countermand an order that the

10 captain gave.

11    Q.    Do you recall ever pulling people off of

12 assignments that had been made by captains, without

13 consulting them?

14    A.    I can't say that it never did happen.  I

15 can tell you that it would not be the normal course of

16 operation.

17    Q.    What kind of circumstances would cause

18 that to happen?

19    A.    If you had a -- let me go back for a

20 second.  Say the homicide, if you had a homicide take

21 place, you may would come into the investigation and

22 direct everybody to go out and work on the homicide

23 case, even though they may have other directions from

24 their captain to work on something else.  So you would

25 be giving them directions other than what the captain

1 had given them.  If you had a case that came up or if

2 you had a walk-in complaint that had to be handled,

3 you know, in an immediate fashion, you may pull

4 somebody off of something that they were working on

5 that the captain had given them direction to work on.

6      Q.     Did staff ever express concern to you

7 about your not coming to staff meetings?

8      A.     No.

9      Q.     Did you miss staff meetings regularly?

10     A.     The only time I missed a staff meeting

11 was when I was obligated to meet with the city manager

12 or assistant city manager.

13     Q.     Do you recall Captain Smith ever

14 disagreeing with you -- expressing to you disagreement

15 about the promotions to lieutenant that you had made?

16     A.     I do not.

17     Q.     Did Captain Smith ever express to you

18 disagreement about the way you utilized command staff,

19 not using them to help run the department?

20     A.     I think the only time that Captain Smith

21 questioned me about command staff is when he was

22 placed into investigations under a rotation, and that

23 was simply done because he had never supervised

24 investigations, and I think that we had a discussion

25 about that.

1    Q.    Did Captain Smith ever express to you

2 that there was fear within the department based upon

3 the disciplinary actions that you had recommended for

4 certain individuals?

5    A.    No, sir.

6    Q.    Did Captain Smith ever speak with you

7 about the issue involving the purchase of uniforms?

8    A.    No, sir.

9    Q.    Did Captain Smith ever speak with you

10 about the issue involving the chaplain?

11    A.    No, sir.

12    Q.    Was the chaplain also issued a police

13 radio?

14    A.    Yes, sir.

15    Q.    Was it standard to allow civilian

16 employees or volunteers to have police radios?

17    A.    We had a civilian lady who worked -- or

18 issued parking citations, she was issued a radio.  We

19 had civilian staff that worked the precinct stations,

20 that had radio -- or radio access.  And in the

21 capacity that the chaplain held with the department,

22 he was provided a radio.

23    Q.    Clayton Turnage was previously a captain

24 with the Wilson Police Department?

25    A.    Correct.  And his first name is Carlton,

1 C-A-R-L-T-O-N.

2      Q.      And did he retire while you were the

3 chief of police?

4      A.      He did.

5      Q.      Was that a voluntary retirement?

6      A.      It was.

7      Q.      Was he involved in the Bailey

8 kidnapping/homicide case?

9      A.      I don't recall if he was or not.

10      Q.      Do you recall during the course of the

11 Bailey homicide investigation, having disagreements

12 with particularly the ranking individuals who were

13 working that investigation?

14      A.      No, sir, I do not.

15      Q.      Can you think of any -- have you ever

16 spoken with Mr. Turnage about the statement that he --

17 the report with the statements that are attributed to

18 him?

19      A.      I have not.

20      Q.      When was the last time you had any

21 contact with Mr. Turnage?

22      A.      At his retirement when he left the

23 police department.

24      Q.      Did you have any problems or

25 disagreements, points of contention with Mr. Turnage

1 while he was a captain at the police department?

2      A.      He was suspended one time, and I don't

3 recall what the length or period was.

4      Q.      Do you recall what he was suspended for?

5      A.      No, sir, I do not.

6      Q.      Can you think of any reason why

7 Mr. Turnage would make any false statements about

8 activities that you engaged in while you were chief of

9 police?

10      A.      Other than the items that I mentioned to

11 you.

12      Q.      When Ms. Dampier was working her way

13 through the employment process at the City of Wilson,

14 do you recall an issue coming up about whether she had

15 a speeding ticket that would impair her ability to

16 enter the law enforcement training program?

17      A.      No, sir.  I recall seeing the incident

18 that you talk about, in this document that you

19 presented to me for review.

20      Q.      That's the first time and only time you

21 have any knowledge of it?

22      A.      That's right.

23      Q.      You never made any contact to Durham,

24 North Carolina, about the ticket?

25      A.      No, sir.

1      Q.      Did Ms. Dampier ever tell you about the

2 ticket?

3      A.      No, sir.

4      Q.      When people would apply for this law

5 enforcement training program in North Carolina, would

6 that come across your desk if they were employed with

7 the police department?

8      A.      The --

9      Q.      Would any part of that process come

10 across your desk?

11      A.      The application process would come

12 across.

13      Q.      Would the police department have to

14 sponsor someone for this training program, or could

15 they just go on their own?

16      A.      You have to have a sponsorship to go.

17      Q.      Was Wilson Police Department sponsoring

18 Ms. Dampier?

19      A.      Yes.

20      Q.      Who is Major Johnny Farmer, was he the

21 number-two person?

22      A.      Major Johnny Farmer took Chief Deputy

23 Jimmy Tant's position at the Wilson County Sheriff's

24 Office.

25      Q.      While you were the chief at Wilson, did

1 you purchase for the police department a software

2 program called SmartCOP?

3    A.    I did.

4    Q.    How is it that you knew about that

5 program?

6    A.    I was familiar with it from working at

7 the Escambia County Sheriff's Office, familiar with

8 the platform, SmartCOP.  We were looking for a

9 software product that would allow interaction between

10 the sheriff's office and the police department.

11    Q.    Do you know who owns SmartCOP?

12    A.    I know there are several people who have

13 stock in the company.

14    Q.    Do you know who the president of the

15 company is?

16    A.    I do not.

17    Q.    Who is it that you know has stock in the

18 company?

19    A.    Shane Lincke has stock in the company.

20 Larry Aiken has stock in the company.  There is

21 another individual that I've met a couple of times,

22 who is a coach, but I don't recall his name, and I

23 apologize.

24    Q.    Did any of those individuals contribute

25 to your campaign for sheriff of Escambia County?

1      A.      Shane Lincke contributed to my campaign,

2   as well as the other campaigns of individuals who were

3   running for sheriff.

4      Q.      And did the organization SmartCOP or the

5   corporate entity contribute to your campaign?

6      A.      They did not.

7      Q.      And so was SmartCOP purchased by the

8   police department?

9      A.      It was purchased in conjunction with the

10  Wilson County Sheriff's Office after a bid process.

11     Q.      Do you know whether the Wilson Police

12  Department received any type of discount associated

13  with the purchase of the SmartCOP?

14     A.      Not that I'm aware of, but I did not get

15  involved in the bid process of that.

16     Q.      Who handled the bid process?

17     A.      The purchasing department for the

18  City of Dothan -- or, excuse me, City of Wilson, and

19  the County of Wilson.

20     Q.      Did Mr. Turnage ever express to you any

21  concerns about the SmartCOP?

22     A.      I don't know if it was concerns, but we

23  had a number of vendors come in and put on a

24  presentation, and I think that there were several

25  different varieties of presentation from several

1 different companies, and each one had their favorite

2 that they would have liked to see get instituted.

3    Q.    Do you use SmartCOP at Dothan?

4    A.    I do not.

5    Q.    Were there problems associated with

6 SmartCOP once it was purchased and implemented?

7    A.    Not that I'm aware of while I was there.

8 I do know that they had some problems arise after I

9 left.

10    Q.    Do you know whether they're still using

11 SmartCOP in Wilson?

12    A.    I don't know if they're still using it

13 or not.

14    Q.    Who is Amsy Hoffner?

15    A.    That's the gentleman that I was -- you

16 asked me about earlier, the investigator with the

17 police department.

18    Q.    That you went on vacation with?

19    A.    Correct.

20    Q.    And was Mr. Hoffner hired away from the

21 Wilson County Sheriff's Office?

22    A.    He was.

23    Q.    And was he given -- paid a higher salary

24 than allowed by city guidelines?

25    A.    He was not.

1    Q.    Did the fact of that hiring create a

2 conflict between you and the sheriff of Wilson County?

3    A.    It did not.

4    Q.    Did the city manager ever speak with you

5 about that hiring, express to you any concerns about

6 it?

7    A.    Only to mention that he was happy of the

8 fact that we were able to get somebody who was already

9 certified with the polygraph, as an employee.

10    Q.    Were you ever placed on probation while

11 you were the chief of police?

12    A.    I was not.

13    Q.    Did you encounter problems with the

14 black community in Wilson, North Carolina, when you

15 were the chief of police?

16    A.    No, sir.

17         MR. MURRAY:  Can we go off the record

18     for a minute?

19         MR. TISCHLER:  With regard to what?

20         MR. MURRAY:  Lunch.

21         MR. TISCHLER:  Oh, okay.

22         MR. MURRAY:  If you've got a thought

23     process going, I don't want to interfere with

24     that, I mean, if you want to finish what you're

25     doing.

1          MR. TISCHLER:  Let me see how many more

2      of these I have.

3          It looks like there's about four more.

4      Of course, there's a lot of repetitive stuff in

5      here.  Do you mind if I work through the rest

6      of these?

7          MR. MURRAY:  No, as long as you keep

8      looking at what's on your left wrist.

9          MR. TISCHLER:  Well, if you need to go

10     to lunch now, I'll accommodate you.  I mean, I

11     know some people have certain medical or

12     dietary issues.

13         MR. MURRAY:  I don't want to interrupt

14     you.

15         MR. TISCHLER:  Are you okay, Mr. Powell?

16         THE WITNESS:  I'm good, thank you.

17         MR. PETERSON:  I'm fine right now.

18         MR. TISCHLER:  I'm running on eastern

19     time, so it's past my lunchtime.

20     Q.    (By Mr. Tischler)  Was there ever an

21 issue while you were the chief of police, about

22 command staff agreeing to forego a raise for patrol to

23 receive more money in their raise?

24     A.    No.

25     Q.    Did that occur?

1    A.    No.

2    Q.    Was there any discussion about that
3 occurring while you were the chief of police?

4    A.    Yes.

5    Q.    But it didn't happen?

6    A.    It did not happen.  There was a
7 discussion about if we had to, based on budgetary
8 situations, that the senior staff would forego a pay
9 raise so we could give a raise to the rank and file.

10    Q.    And as a result of that discussion, were
11 raises given to the rank and file?

12    A.    Yes.

13    Q.    Were raises given to command staff also?

14    A.    Yes.

15    Q.    Now, did Harry Tyson replace you as
16 chief of police?

17    A.    He did.

18    Q.    And what was his position while you were
19 the chief of police?

20    A.    He was an assistant to the city manager.
21 He was not an assistant city manager, but he was an
22 assistant to the city manager.

23    Q.    And had he previously been a law
24 enforcement officer?

25    A.    He was.

1    Q.    Had he maintained his law enforcement

2 credentials?

3    A.    He did.

4    Q.    Did he ever serve with the police

5 department in a voluntary capacity, reserve, whatever

6 you-all called it?

7    A.    He was in a reserve status.

8    Q.    Okay.  While Mr. -- have you ever spoke

9 with Mr. Tyson about the report that attributes

10 statements to him?

11    A.    I have not.

12    Q.    Do you know whether Mr. Tyson is still

13 the chief of police at Wilson?

14    A.    As far as I know, yes.

15    Q.    And when is the last time you had

16 contact with Mr. Tyson?

17    A.    I may have called and congratulated him

18 when he was named police chief, but I don't recall

19 specifically, which would have been 2004 sometime.

20    Q.    Okay.  While you were the chief of

21 police and he was an assistant to the city manager,

22 did you and he have any disagreements or points of

23 contention that stick out in your mind?

24    A.    No, sir.

25    Q.    Can you think of any reason why he would

1 make false statements about you?

2       A.      No, sir.

3       Q.      Was he ever critical of your service as

4 chief of police?

5       A.      Chief Tyson and I always got along very

6 well together in working -- you know, working through

7 his capacity where he was at.

8       Q.      As an assistant to the city manager, did

9 he have specific assignments related to the police

10 department?  Was he a special liaison or anything of

11 that nature?

12       A.      I'm not familiar with what assignments

13 he had.  I mean, we had contact on a weekly basis, but

14 I'm not familiar with what the city manager had as

15 assignments.

16       Q.      Okay.  Didn't appear to you as though he

17 was someone specifically assigned to work with the

18 police department?

19       A.      No.

20       Q.      Do you recall ever speaking with

21 Mr. Tyson about the issue involving the purchase of

22 uniforms?

23       A.      No, sir.

24       Q.      Do you recall having any discussions

25 with Mr. Tyson about the purchase of a fire truck?

1    A.    No, sir.

2    Q.    Do you know whether there was ever a

3 fire truck purchased from asset seizure funds?

4    A.    There was not a fire truck purchased

5 from asset seizure funds when I was police chief for

6 the City of Wilson.

7    Q.    Even for the fire department?

8    A.    No, sir.

9    Q.    Did you have any discussions with

10 Mr. Tyson about your relationship with Ms. Dampier?

11    A.    No, sir.

12    Q.    Did you have any discussions with

13 Mr. Tyson about the murder investigation involving the

14 Bailey case?

15    A.    No, sir.

16    Q.    Investigating the Bailey case, was there

17 ever an issue pertaining to your officers performing

18 law enforcement functions in Nash County?

19    A.    No, sir, not that I'm aware of.

20    Q.    No dispute with the Nash County sheriff

21 about that?

22    A.    No, sir.

23    Q.    And was Billy White the deputy chief of

24 police while you were there?

25    A.    Major, yes, sir.

1    Q.    He was a major, okay.  And did he retire

2 while you were there?

3    A.    He did.

4    Q.    Was he replaced?

5    A.    I'm not -- I don't know if he --

6    Q.    While you were there, was he replaced?

7    A.    He was not.

8    Q.    Okay.  How would you characterize your

9 relationship with Mr. White?

10    A.    We had a business relationship, he -- he

11 was a major for the police department.  I mean, we had

12 a business relationship.  I mean, we did have

13 occasion, when we were off duty, to have dinner.  I

14 wouldn't say socialize together, but we would -- he

15 and his wife and my wife and I would eat together.

16    Q.    Have you ever spoken with Mr. White

17 about this report that attributes certain statements

18 to him?

19    A.    I have not.

20    Q.    When was the last time you had contact

21 with Mr. White?

22    A.    Just prior to me leaving the Wilson

23 Police Department.

24    Q.    By then he had already left?

25    A.    No, sir, he was still employed there

1 when I left.

2      Q.      Okay.  Can you think of any reason why
3 he would make false statements about you in your
4 tenure as chief of police?

5      A.      Other than the fact that he and Phil
6 Baggett were good friends, I don't know of any other
7 reason.

8      Q.      Did Mr. White have any role in these
9 events involving Mr. Baggett and the others and their
10 discipline?

11      A.      He was asked for input.  If you mean by
12 role, he didn't conduct any of the investigations or
13 anything like that.  That was left to the internal
14 affairs section.

15      Q.      Did he disagree with your
16 recommendations?

17      A.      He disagreed with the recommendation
18 against Phil Baggett.  I don't recall the other ones.

19      Q.      Are there other aspects of your
20 operation at the police department that you recall him
21 disagreeing with?

22      A.      No, sir.

23      Q.      Do you recall him disagreeing with
24 you -- or discussing with you the issue pertaining to
25 the purchase of the uniforms from Mr. Tant?

1    A.    In his position, we discussed all the

2 operation of the agency.  I don't independently recall

3 him discussing uniforms with me, but it would not be

4 uncommon for him to have a discussion.

5    Q.    Do you recall any disagreement on his

6 part about the uniform purchase from Mr. Tant's

7 company?

8    A.    No, sir.

9    Q.    Do you recall any disagreement with

10 Mr. White about the purchase of the SmartCOP software?

11   A.    No, sir.

12   Q.    Was there an internal investigation

13 conducted regarding the whole Baggett matter?

14   A.    Yes, sir.

15   Q.    And who conducted that investigation?

16   A.    Tim Johnson and some other employees.  I

17 don't recall specifically who was involved.

18   Q.    Were you involved in that investigation

19 at all?

20   A.    Just as police chief.

21         MR. TISCHLER:  This is probably a good

22      stopping point.

23         MR. MURRAY:  Thank you.

24         (A lunch break was taken.)

25   Q.    (By Mr. Tischler)  Mr. Powell, in terms

1 of the documents that we've marked as Exhibits 1 and 2

2 here, the various reports of the interviews, the

3 statements of the persons named in there, how is it

4 that you first came to find out that those documents

5 were in existence?

6     A.     They were delivered to me by an employee

7 of the Escambia County Sheriff's Office.

8     Q.     And who is that employee?

9     A.     Mike Kunert.

10     Q.     And what did Mike do at the sheriff's

11 office at the time?

12     A.     He was assigned to investigations.

13     Q.     Do you know whether he still works for

14 the sheriff's office?

15     A.     He does not.

16     Q.     Do you know what he does for a living?

17     A.     I believe it's consultant work.

18     Q.     And when is the last time you had

19 contact with Mr. Kunert?

20     A.     I talk with him frequently.  I think the

21 last time I actually spoke with him over the telephone

22 was probably a couple of days ago.

23     Q.     Was he involved in your campaign in

24 2004?

25     A.     He was.  He was the president of the PBA

1 at the time.

2      Q.      Did the PBA support you in that

3 election?

4      A.      They did.

5      Q.      Or I guess "endorse" is the right word?

6      A.      Yes, sir.

7      Q.      And do you recall approximately when it

8 was that Mr. -- is it pronounced "Kunert"?

9      A.      Kunert.

10      Q.      Kunert.

11      A.      Yes, sir.

12      Q.      -- gave the copies of Exhibits 1 and 2

13 to you?

14      A.      It was after the primary election.  We

15 were in the general election.  I don't remember the

16 exact date when I received it.

17      Q.      Did Mr. Kunert tell you how he came in

18 possession of them?

19      A.      Yes, sir.  They were found in the

20 mailboxes of the investigations section of the

21 Escambia County Sheriff's Office, which at that time

22 was located at the old DYS building, which was across

23 the street from the main facility of the sheriff's

24 department.

25      Q.      And he just found them in his box one

1 day?

2      A.      They were put in the mailboxes over at

3 the sheriff's office.

4      Q.      Did he indicate to you that he saw them

5 being placed in the mailbox?

6      A.      No.

7      Q.      Did he ever indicate to you that he knew

8 who put them in the mailbox?

9      A.      No, sir.

10      Q.      Did you ever come to any information as

11 to who actually placed those documents in the

12 mailboxes?

13      A.      I received information from another

14 officer that works with the sheriff's department, by

15 the name of Brian Rupert, recently.  He indicated that

16 he had some information, but I have not discussed the

17 information with him.

18      Q.      But the information he has specifically

19 relates to who placed these documents in the

20 mailboxes?

21      A.      I believe it's that and some other

22 information that he had, and I have supplied his name

23 and number to my attorney, Mr. Jim Murray.

24      Q.      Does Mr. Rupert work for the sheriff's

25 office?

1    A.    He does.

2    Q.    Was he involved in your campaign?

3    A.    I believe through the PBA, he may have
4 assisted.

5    Q.    Now, Mr. Kunert, aside from his
6 involvement with the PBA, are you acquainted with him
7 personally or socially?

8    A.    I am.

9    Q.    Do you call him a friend?

10    A.    Yes.

11    Q.    A social acquaintance?

12    A.    Yes.

13    Q.    And how about Mr. Rupert, would you call
14 him a friend or a social acquaintance outside of work?

15    A.    An acquaintance.  I do not know him as
16 well as I know Mike Kunert.

17    Q.    Did you work with Mr. Rupert when you
18 worked with the sheriff's office years ago?

19    A.    I believe he -- he may have been working
20 there, although I don't recall specifically working on
21 a shift with him or working independently with him.

22    Q.    And have you specifically spoken with
23 him about the fact that he has information pertinent
24 to this case, or did that come through some other
25 source, third party or something?

1     A.     I believe I actually have spoken with

2 him.  The conversation was, you know, "I have some

3 information," and then I told him I was going to have

4 Jim Murray get in touch with him.  I did not go into

5 detail with him.

6     Q.     Besides Mr. Rupert, has anyone else told

7 you that they have any information about who placed

8 those documents in the mailboxes at the sheriff's

9 office?

10     A.     Not that I can recall, no, sir.

11     Q.     Okay.  Now, do you know whether those

12 documents were placed in mailboxes other than

13 Mr. Kunert's?

14     A.     From the description that was provided

15 to me, it was in all the mailboxes at the -- in the

16 investigation section of the sheriff's department.

17     Q.     And that was the description provided by

18 Mr. Kunert?

19     A.     Correct.

20     Q.     Did anyone else tell you that they saw

21 those documents in the mailboxes at the investigative

22 division?

23     A.     No, sir.

24     Q.     Did anyone else tell you that they

25 received those documents in their mailboxes in the

1 investigative division?

2      A.      There was another employee of the

3 sheriff's office who was personally handed one of the

4 documents, but it was not in investigations.

5      Q.      And who is this employee that was

6 personally handed the document?

7      A.      Saundra Grant.

8      Q.      And did she tell you who handed her the

9 document?

10      A.      She described her to me, and I do not

11 have a name.  It was a volunteer, female volunteer who

12 works for the sheriff's department, and who was

13 assisting Ron McNesby with his reelection efforts.

14 That was the north-end precinct.

15      Q.      And did Ms. Grant come to you with this

16 information before or after Mr. Kunert came to you?

17      A.      It was along about the same time.

18      Q.      To your knowledge, were similar

19 documents placed in the mailboxes in any other

20 divisions or locations at the sheriff's office?

21      A.      If they were, I was not notified of it.

22      Q.      And besides Mr. Kunert and Ms. Grant,

23 did anyone else come to you and tell you that they

24 received those documents or similar documents?

25      A.      From the Escambia County Sheriff's

1 Office?

2    Q.    From anyone at the sheriff's office.

3    A.    Not that I can recall.

4    Q.    Now, through a source other than your
5 attorneys, have you found out about any other
6 employees at the sheriff's office being delivered
7 those documents, even if those persons didn't tell you
8 themselves?  In other words, so-and-so said that
9 so-and-so got those documents also.

10    A.    Brian Rupert indicated there was another
11 employee, another officer, he's a sergeant -- I can't
12 recall his name.

13    Q.    And did Mr. Rupert tell you how that
14 person claimed to have gotten the documents, or from
15 whom?

16    A.    Didn't say from whom.  It's my
17 understanding that the document was circulated around
18 the patrol division of the sheriff's department, but
19 he did not say from whom the document came from.

20    Q.    Anyone else, besides these three persons
21 within the sheriff's office, that you know of that
22 received this document from someone other than
23 yourself?

24    A.    That's the only ones I can recall at
25 this time.

1  Q.    Did you make any notes or anything

2 contemporaneous with these events, that would list the

3 names of other persons who received these documents,

4 that you could use to refresh your recollection?

5  A.    No, sir, I received the document from

6 Mike Kunert.  The information was sent to Slade Rand,

7 the attorney up in Wilson, North Carolina.  But I

8 didn't take any notes or make any records of it.

9  Q.    Now, besides you giving those documents

10 to Mr. Rand in North Carolina, did you give those

11 documents to anyone else that was involved in your

12 campaign?

13  A.    I don't think I gave a copy of it to

14 anybody, but I feel sure I allowed Travis Peterson,

15 who was a consultant for the campaign, I let him

16 review it.  Russ Swinney, he was assisting with my

17 campaign, I'm sure I allowed him to review it.  But I

18 did not make any copies and provide it to anybody.

19  Q.    What was Mr. Swinney's role in the

20 campaign?

21  A.    He was just helping with the campaign,

22 you know, we had a variety of things.  Putting signs

23 up, making telephone calls.

24  Q.    Did you show it to Jim Way?

25  A.    I may have shown it to Jim Way.

1    Q.    What was Jim Way's role in your

2 campaign?

3    A.    The same, he was placing signs up,

4 helping us make contacts, was a big supporter.  Also,

5 Gordon Sztukowski was a big supporter, as far as

6 helping us get information out.

7    Q.    Did you show the materials to

8 Mr. Sztukowski?

9    A.    I can't say a hundred percent certainty,

10 but I feel sure I would have shown it to him.

11    Q.    But you're confident that you did not

12 give copies of it to anyone?

13    A.    I did not -- well, I gave copies to

14 Slade Rand --

15    Q.    To Mr. -- I'm sorry.

16    A.    -- in North Carolina.  As far as

17 reproducing a copy to provide to anyone, I did not

18 reproduce it to give copies.

19    Q.    And the copy that you had, what did you

20 do with it?

21    A.    I eventually provided it to Jim Murray,

22 my attorney.

23    Q.    Okay.  But during the course of the

24 campaign, what did you do with the document?

25    A.    Held on to it.

1    Q.    Where was it kept?

2    A.    The campaign office, and I had a

3 briefcase that I kept with me.  I don't know in

4 particular if I kept it in the briefcase or not, but

5 it was maintained --

6    Q.    Was it under lock and key?

7    A.    Well, the building was secured.  The

8 independent office that I worked out of was not

9 secured by lock and key.

10    Q.    So there would have been nothing to have

11 prevented Mr. Swinney, Mr. Way, Mr. -- we'll just call

12 him Gordon, or Mr. Peterson, to access that and copy

13 it if they felt they wanted a copy of it for some

14 reason or another?

15    A.    They would have to know where it was

16 being kept at.

17    Q.    Okay.  But it wasn't always in your

18 briefcase, there were times that it was out of your

19 possession in the office?

20    A.    I feel like there was probably times

21 when it was left in the office, yeah.

22    Q.    Now, I presume, based upon what you're

23 telling me, that at the time of the campaign

24 Mr. Rupert didn't come to you and say, "I saw this

25 information, what's it all about?"

1    A.    He did not, no, sir.

2    Q.    Okay.  What individuals within the

3 employ of the sheriff's office came to you and asked

4 you about -- indicated to you that they had received

5 copies of that or seen it -- by "that," I'm referring

6 to Exhibits 1 and 2 -- and inquired of you "what is

7 this all about?"

8    A.    Saundra Grant, once again, who was a

9 civilian employee.  She worked at the precinct office,

10 I think it's Hood Drive up in -- it's not really

11 Cantonment, but it's on the way to Cantonment.  She

12 came to me and asked me questions about it.  Mike

13 Kunert came to me and asked me questions about it.

14 When we would do campaign events where there were

15 gatherings or get-togethers for the campaign in

16 efforts to solicit people to vote for us, questions

17 would arise which were -- obviously they were related

18 to the documents.

19    Q.    Did Ms. Grant -- did you explain to

20 Ms. Grant pretty much what you've explained to us

21 today about the allegations, and respond to the

22 allegations found in those documents?

23    A.    She handed me the document.  I think the

24 only exception to the one that she provided, as to the

25 one that you have here, hers had a driver's license --

1 a copy of a -- photocopy of a driver's license

2 attached to the back of it, with Ms. Dampier's

3 photograph.  I did have some discussion with her about

4 it.  I'm not really sure how detailed I got with it.

5 I had a conversation with Travis Peterson about it.

6 Obviously he was running -- advising us on the

7 campaign, so we had a -- you know, we went down the

8 document and discussed it.

9       Q.      Did you say anything to Mr. Kunert?

10      A.      I didn't have a long, deliberate

11 conversation with him.  As I recall, it was on his

12 lunch period when he came and provided the information

13 to me from the sheriff's department.  So we didn't get

14 into a long, drawn-out conversation about it.

15      Q.      Mr. Kunert continued to support you in

16 the campaign?

17      A.      I received the endorsement of the PBA,

18 and he was the president of the PBA, yes, sir.

19      Q.      And did Ms. Grant continue to support

20 you and work for you during the campaign?

21      A.      Yes.

22      Q.      Now, you said at some meetings or

23 something, people would question you about this

24 information?

25      A.      They would bring up questions related to

1 the information that's contained in the document.

2    Q.    And do you recall the names of any of

3 the persons that brought up questions about the

4 information?

5    A.    It would be citizens in the community,

6 and I do not have their names.  But they would ask

7 questions directly related to the City of Wilson and

8 the Wilson Police Department.

9    Q.    What kind of questions would they ask?

10    A.    From the minority section of the

11 community, I would get questions as far as, you know,

12 discipline.  There was a rumor that was circulated

13 about Captain Baggett, about his termination.  There

14 was an effort put out to assert that he was

15 African-American, when, in fact, he was not.  There

16 were questions asked, obviously, about the

17 relationship with Ms. Dampier.  There were also

18 questions asked about the increase in management,

19 because people were very concerned about the issue --

20 about the sheriff's department.  That was one of the

21 campaign platforms, was the reduction in redundancy of

22 management in the office.  And, in turn, they would

23 say, well, you made all the promotions in Wilson.  You

24 know, just issues like that that would come up.

25    Q.    And did any of these individuals

1 indicate to you the source of the information that

2 these questions were premised upon?

3    A.    No, sir.

4    Q.    And you can't tell me the names of any

5 of those individuals?

6    A.    No, sir, it was at -- I don't think

7 "rally" is the proper term, but it was at gatherings,

8 meetings during the election cycle.

9    Q.    And about how many times did this

10 happen?

11    A.    It was a number of events all the way

12 from the -- from the start of the general election all

13 the way to the actual election day.  I don't know how

14 many events that we attended, but there was a number

15 of them.

16    Q.    Are we talking about more than two or

17 three?

18    A.    Yes, sir.

19    Q.    As many as 50, or less than that?

20    A.    I would say it's less than 50, but it's

21 more than two or three.

22    Q.    A dozen?

23    A.    There was -- to pin me down to a number,

24 I would be willing to say a dozen, but once again,

25 that's with the understanding that that's an estimate

1 only.

2     Q.     Okay.  When -- for instance, when you

3 were asked about Ms. Dampier, did you explain about

4 the fact that there had been an investigation, and

5 these rumors had come forward and they had been

6 investigated and so forth?

7     A.     Only to people who were associated with

8 the campaign that was working with me.  As far as

9 members of the community or people who were out

10 soliciting, the explanation was basically it's not

11 factual, there is no basis in truth in that.  And a

12 lot of times I would have my wife in attendance with

13 me, and I would make it clear that, you know, I'm

14 happily married, have a family.  The reason I went

15 into detail with Travis Peterson and people who were

16 close with the campaign is simply because they needed

17 to know all the facts, you know, surrounding that.

18     Q.     Do you have any information at all, from

19 any source at all other than your attorneys, from any

20 person that has told you that they specifically

21 received this information from Ron McNesby?

22     A.     I have information from somebody who

23 says they put the document together and gave it to

24 Ron McNesby.

25     Q.     Who is that?

1      A.      Mr. Swinehart.

2      Q.      Okay.  But you have no information from

3  any person indicating that Sheriff McNesby gave this

4  document to anyone for distribution or did the

5  distribution himself?

6      A.      I need to talk to my attorney just a

7  second, if I can.

8              (A break was taken.)

9      A.      Okay, sir.

10     Q.      (By Mr. Tischler)  And the answer to my

11  question?

12     A.      Yeah, could you restate it?

13             MR. TISCHLER:  Could you repeat it for

14     me, Kim?

15             (Whereupon, the question was

16             read back by the reporter.)

17     A.      I know that the document was circulated

18  from the McNesby campaign, based on the information

19  that I got from Mr. Swinehart.

20     Q.      My question is Ron McNesby personally.

21  Do you have any information that Ron McNesby

22  personally handed this document to anyone to be

23  circulated or, in fact, circulated it himself by

24  putting it in a box or giving it to anyone?

25     A.      No, sir.

1     Q.     The same question as to Larry Smith.  Do

2 you have any information that, first, Larry Smith ever

3 came into personal possession of the documents that

4 are marked as Exhibits 1 and 2?

5     A.     No, sir.

6     Q.     Do you have any information from any

7 source at all, other than your attorney, that Larry

8 Smith personally distributed that information or gave

9 it to anyone to be distributed?

10     A.     No, sir.

11     Q.     The same question as to Rex Blackburn,

12 do you have any knowledge that Rex Blackburn ever had

13 physical possession of Exhibits 1 and 2?

14     A.     No, sir.

15     Q.     And do you have any personal knowledge

16 or information conveyed to you from any source at all,

17 that Mr. Blackburn was personally involved in

18 distributing that information found in Exhibits 1 and

19 2?

20     A.     I have been told that he was involved in

21 it, but I have no personal knowledge of it.

22     Q.     And who told you that?

23     A.     Through a third party, it's my

24 understanding that he's the one who placed the

25 documents in the boxes in investigations, and that

1 information came from Brian Rupert.  But I was told

2 through a third party of that.

3      Q.     And who's the third party that told you

4 that?

5      A.     Mike Kunert.

6      Q.     In these meetings, forums, gatherings,

7 whatever we call them, where citizens would question

8 you about these matters, when you explained that the

9 information was not factual, or otherwise responded to

10 the inquiries, did those individuals appear satisfied

11 with your responses?

12      A.     Outward appearances, they appeared that

13 they were satisfied.  Of course, that would just be an

14 assumption on my part.

15      Q.     Did anyone ever indicate to you that

16 they would not vote for you based upon this

17 information that they had heard, that's found in

18 Exhibits 1 and 2, regardless of the source of the

19 information?

20      A.     Saundra Grant indicated to me that

21 people that was at the -- and I call it the north

22 precinct, and that's the wrong terminology, but I want

23 to make sure y'all understand it's a precinct office

24 on Hood Drive in the city of Pensacola.  I don't know

25 how it's classified with the sheriff's department.

1          But she indicated to me that when the

2 lady was passing the information out to her, that

3 other people in the office were extremely upset about

4 the allegation with Ms. Dampier, and that they had

5 indicated that they would not support me because of

6 that.

7     Q.     Did you ever personally speak with any

8 of those persons?

9     A.     I did not.  I spoke with Saundra Grant

10 about it, and I left it with her to talk with

11 everybody.

12     Q.     Did you simply tell her it was not

13 factual?

14     A.     I told her that it did not have any

15 basis for fact.  She knows my wife and she knows me.

16 And I asked her to make a decision based on her

17 knowledge of me, and I took it that that satisfied her

18 inquiry about it.

19     Q.     Okay.  Did you ever ask her for the

20 opportunity to speak with these other people at the

21 sheriff's office that indicated they were not going to

22 vote for you as a result of this information?

23     A.     The situation with meeting individuals

24 at the sheriff's office, I was not allowed at the

25 sheriff's department.  Individuals who worked for

1 Ron McNesby at the sheriff's department were extremely

2 hesitant with meeting candidates who were seeking the

3 office of sheriff, so I did not want to put anybody in

4 that kind of position.  That's why I left it upon her

5 to make contact with them.

6     Q.     The information found in Exhibits 1 and

7 2, to your knowledge, was that ever distributed to the

8 public in general?

9     A.     I don't know.

10     Q.     Did that information ever appear in any

11 of the newspapers?

12     A.     Not to my knowledge.

13     Q.     Did any reporters ever inquire of you

14 about the information found in Exhibits 1 and 2 during

15 the course of the campaign?

16     A.     During the course of the campaign?

17     Q.     Yes, sir.

18     A.     No, sir, they did not.

19     Q.     After the campaign?

20     A.     Yes, they have.

21     Q.     Okay.  And what reporters have spoken to

22 you about the information found in Exhibits 1 and 2

23 after the campaign?

24     A.     When I made application for the position

25 of police chief in the City of Dothan, Alabama, the

1  document was supplied to the city manager and all the

2  sitting commissioners at the time.  Additionally, the

3  document was also delivered to the media.  There was a

4  media source in the city of Dothan, it's operated by a

5  gentleman by the name of Rickey Stokes.  That

6  information, he actually posted it on his web site --

7  and at the time he was running a weekly paper akin to

8  the Independent News, I guess is the best way I can

9  describe it -- where he cited that they had received a

10 document containing derogatory information concerning

11 John Powell from Escambia County.  And he has asked me

12 on occasion -- not recently, but upon my arrival in

13 Dothan, you know, about the document, in and of

14 itself.

15    Q.    Is that the only newspaper that's

16 inquired about this information at all?

17    A.    There was a reporter that worked with

18 the Dothan Eagle, it was Mark -- his first name was

19 Mark.  I can recover the last name.  I can't recall it

20 right now, though.  He was writing for the Dothan

21 Eagle, which is the local newspaper for the city of

22 Dothan.  And he did not print anything on the Dothan

23 Eagle, but he did print information on Rickey Stokes's

24 web site, involving the booklet, I think is the term

25 that he used, of derogatory information that had been

1 received by the city commission and by the city

2 manager.

3    Q.    I think I've covered this, but I want to

4 make sure.  Besides what Ms. Grant told you about the

5 reaction of some of her coworkers, did anyone else

6 express to you that as a result of the information

7 that's found in Exhibits 1 and 2, they were not going

8 to vote for you?

9    A.    Nobody verbally came up and told me

10 that.

11    Q.    As a part of the campaign, did you run

12 any polls, or did Mr. Peterson run any polls on your

13 behalf?

14    A.    I don't believe that we ran any polls.

15 I think that UWF ran a poll that we relied on.  Once

16 again, that's from memory.  I say UWF, it may be

17 another organization around town, but we didn't

18 independently run a poll ourselves.

19    Q.    Okay.  And do you still have any

20 information at all pertaining to your campaign, any

21 documents, such as poll -- information regarding any

22 polls?  I know the response to my request to produce

23 indicated you didn't have your campaign finance

24 documents anymore.

25    A.    No, sir, we don't have any of that.  I

1 moved since then, relocated completely, and I don't

2 know what happened to the information.

3      Q.      Did you destroy it?

4      A.      We destroyed a lot of it, but I don't

5 know exactly what all documents that we did do away

6 with.  And there may be some maintained by Travis

7 Peterson, but I don't have any.

8      Q.      Who was the director of your campaign,

9 was that you?

10      A.      Travis Peterson.

11      Q.      So he would have been the repository for

12 all the documents pertaining to your campaign?

13      A.      I would say that he maintained all the

14 documents.

15      Q.      And that includes the contribution

16 reports and expenditure reports and all of those

17 things that elections require you to do?

18      A.      That, and also the Supervisor of

19 Elections office has that maintained at their office.

20      Q.      And as these polls were done, were they

21 received in some form of printed form?

22      A.      If I recall correctly, it seems like we

23 could go online and pull up the information for the

24 poll.  I don't think we actually had a hard copy.  I

25 think there was a web site you could go online and

1 pull up.

2    Q.    I presume you would print it off of the
3 web site?

4    A.    I would think that Travis probably
5 printed it, yes, sir.

6    Q.    And when the campaign was over, did
7 Travis give you everything that he had pertaining to
8 the campaign?

9    A.    No, sir, when we shut the campaign down,
10 I spent my time finishing up the financial reports
11 required by the Supervisor of Elections, collecting
12 the signs around the community, and closing down the
13 campaign office.  I don't recall collecting any
14 documents or anything like that.

15    Q.    You don't recall him giving you a box of
16 stuff and saying, "Here, this is what's left over from
17 the campaign"?

18    A.    No, sir, I do not.

19    Q.    Have you spoken with him since, about
20 what documents he might still have that pertain to the
21 campaign?

22    A.    No, sir, I haven't talked with Travis --
23 it's probably been a year, I guess, and that's when
24 I -- I called just to see how he was doing and learned
25 that he and his wife were expecting their first child,

1 and I haven't talked with him since then.

2      Q.      From your recollection, was there

3 anything in those polls that indicated to you that the

4 information found in Exhibits 1 and 2 was influencing

5 the voter response to your candidacy?

6      A.      Indications from Travis Peterson, and

7 I -- I remember that we had a discussion after the

8 primary, because of the influx of people that was

9 coming to the office, we were overwhelmed, I guess is

10 the best way to say, with people coming to the office,

11 and that it looked like the campaign was on an

12 upswing.  I don't think that there was ever any

13 discussion about the negative influence of this, the

14 negative influence of the document on the campaign.  I

15 don't recall sitting down and having any type of

16 meetings or discussions about that.  I don't recall

17 that.

18      Q.      Was there ever a time, from the polls

19 that you saw, that you were ahead of McNesby?

20      A.      I don't think there was ever a poll when

21 it showed that we were ahead.  The one that I -- and

22 once again, not knowing the validity of the poll and

23 where it came from, the one I did see showed that

24 surprisingly, you know, it was close, but I don't

25 think we were ahead.

1    Q.    How do you define "close," how many

2 percentage points?

3    A.    You know, I can only remember seeing the

4 bar graph, I don't remember the percentages and stuff.

5 And once again, I don't know the validity of the poll

6 or where it came from.  And when I say "close," that's

7 what I mean, by looking at the graph.  I mean, it --

8 but I don't have the numbers.

9    Q.    Okay.  Now, the first primary was held

10 in September?

11    A.    I don't recall when the primary was

12 held, but I think you're correct, it was somewhere

13 around that time frame.

14    Q.    And then the general is November?

15    A.    Correct.

16    Q.    And where does Hurricane Ivan fit into

17 this time?

18    A.    Actually I think the primary was in

19 August, Ivan came in September, and then your general

20 election was in November.  And Ivan -- everything I'm

21 telling you is prior to Hurricane Ivan.  And I don't

22 remember the date, I think it was the 16th of

23 September Ivan hit, if I recall correctly.

24            MR. PETERSON:  That's right.

25    A.    And then everything was shut down, you

1 know, right after the storm hit, for a while.

2      Q.      (By Mr. Tischler)  The polls that you

3 were receiving -- you know, we all watch CNN, and so

4 forth, and the polls that they do, particularly for

5 presidential elections, identify all these various

6 factors that influence voters.  Economy, crime,

7 whatever.  Was there any of that kind of sophisticated

8 polling being done here --

9      A.      No, sir.

10      Q.      -- or was it just he's ahead and he's

11 not, and here are the percentages?

12      A.      I think it was very short and precise,

13 it didn't have all the factors, as you just mentioned,

14 figured into it.

15      Q.      Did you notice a change in the polling

16 data after Hurricane Ivan?

17      A.      I don't think the polling data was

18 available after Hurricane Ivan.

19      Q.      I can imagine.  During the course of the

20 days following Hurricane Ivan, or I should say even

21 the month or so following Hurricane Ivan, was then

22 Sheriff McNesby on TV pretty regularly?

23      A.      Yes, sir.

24      Q.      Just about every night?

25      A.      Yes, sir.

1     Q.     And this would be in addition to his

2 campaign ads?

3     A.     Correct.

4     Q.     And besides your campaign ads, were you

5 on television for any other reason?

6     A.     No, sir, not that I can recall.

7     Q.     Okay.  Do you recall, for instance,

8 during the campaign, you know, your being interviewed

9 by any of the visual press about, you know, your

10 reaction to the hurricane, your reaction to how the

11 sheriff's office or McNesby were handling the

12 hurricane, anything like that, where you would have

13 gotten some air time as well?

14     A.     It seems that the paper -- and once

15 again, this is from memory.  It seems the paper did do

16 a query of not just me but other candidates, as far as

17 the effects of the hurricane on the election, and if

18 we had been in the position of holding office, how

19 would we react to, you know, the devastation and

20 stuff.

21               (Defendants' Exhibit Number 4

22               was marked for identification

23               and hereto attached.)

24     Q.     Let me show you what I'm going to mark

25 as Exhibit 4 to this deposition, which was marked as

1 Exhibit A to your complaint.

2     A.     Okay.  (Witness reviews document.)

3     Q.     I wanted to give you a minute to look at

4 it.

5     A.     Yes, sir, thank you.

6     Q.     The information found in this document,

7 is there any other -- any portion of it that you would

8 contend is inaccurate or false?

9     A.     Yes, sir.

10     Q.     Can you identify for me what portions

11 you would contend are inaccurate or false?

12     A.     The fact that the one lieutenant was

13 attritioned out is an inaccurate statement.  The

14 comment that -- when I was given this document, which

15 I recall receiving this when it was -- when I went to

16 place an ad with the Pensacola Voice, which is

17 strictly a minority paper in Pensacola, this was

18 provided to me, and it was a comment made -- I once

19 again go back to Captain Baggett, about the fact that

20 he was a minority captain that I had dismissed, and,

21 you know, of course, I spent time correcting that

22 information.

23     The comment that James Anderson was

24 forced to retire is an inaccurate statement.  The

25 comment about Johnnie Boswell and Craig Smith being

1 fearful for their job, I would consider both of those

2 to be a false statement.

3          As far as the suspension and the

4 transfers, probably accurate.  Without having the

5 documents from the Wilson Police Department, it would

6 be hard for me to dispute those.

7          As far as a disciplinary transfer,

8 transfers are not made for disciplinary purposes.

9 Discipline is handled wherever the individual is

10 working.  Once the discipline is rendered, then the

11 individual may be moved or transferred out.

12          As far as the comment about the weapons,

13 buying the .357 semi-automatic pistols, that is a

14 correct statement.  However, the pistols that were

15 replaced were older than two years old, the guns that

16 were replaced were just about worn out.

17          As far as adding a level of managers, in

18 parentheses it says "lieutenant," to the rank

19 structure, that is a correct statement.  However, they

20 do not expound on the statement stating that the

21 reason that the level was added was to increase the

22 upward mobility of officers in the ranking positions,

23 and also to enhance the ability of minorities to

24 progress through the rank structure.

25     Q.    And how many of the lieutenants that

1 were promoted were minorities?

2     A.     If you count the fact that Kendra Howell

3 is a female in law enforcement and she is considered

4 to be a minority, that's one of the four that was

5 promoted.  There was a number of sergeants who were

6 African-American who were promoted to rank of

7 sergeant.

8     Q.     And none of the lieutenants who were

9 promoted were African-American?

10     A.     They were not African-American.

11     Q.     Were there any candidates for lieutenant

12 that were African-American?

13     A.     No, sir.

14     Q.     In terms of these two little sections

15 that we have showing the command structure, aside from

16 the attrition out of lieutenant, is that otherwise

17 essentially correct?

18     A.     I would have to have the documents from

19 the city to check the numbers on the number of

20 sergeants.  However, I do feel that the captains'

21 positions is correct, the elimination of the major's

22 position should have been notated on here, which

23 that's not showing on this document.  And as far as

24 the lieutenants' positions, I believe that number is

25 correct.

1      Q.      And did the sergeants' positions

2 increase by three also?

3      A.      I would have to have the documents from

4 the city to look at that.

5      Q.      And so it's your testimony that you

6 received this document from the, what, newspaper?

7      A.      The Pensacola Voice.

8      Q.      And is there a person there at the

9 Pensacola Voice that you received it from?

10      A.      I don't have the name, but I feel like

11 it was the editor that we were talking to when I met

12 with him.

13      Q.      You don't remember the name?

14      A.      I do not.

15      Q.      What caused you to go to the Pensacola

16 Voice?

17      A.      We were placing an ad in the paper for

18 the election.

19      Q.      And did the individual from the

20 Pensacola Voice tell you where they got this document

21 from?

22      A.      They had received it from the sheriff's

23 office, but she didn't specifically say from whom.

24      Q.      Did you engage in a discussion about the

25 information found in this Exhibit 4 at that time?

1      A.     Yes, sir, just like you and I just

2 talked.  As a matter of fact, I welcomed the telephone

3 call to Ed Wyatt in the City of Wilson to verify what

4 I had told them.

5      Q.     Did the Pensacola Voice indicate to you

6 they had also received documents Exhibits 1 and 2?

7      A.     No, sir, this was the only document that

8 they produced to me.

9      Q.     And did you receive this from the

10 Pensacola Voice before or after you became aware of

11 Exhibits 1 and 2?

12      A.     I received this single-page document

13 prior to receiving the other documents.

14      Q.     And do you have any knowledge, either

15 direct or from what anyone has told you, about who

16 generated Exhibit 4, who created it?

17      A.     Other than what was said to me, that

18 they had received it from the sheriff's department, I

19 do not have any knowledge of it.

20      Q.     Okay.  During the course of the primary,

21 who did you run against?

22      A.     Gary Willis.

23      Q.     Okay.  During the course of that primary

24 campaign, did Gary Willis raise issues about your

25 administration as chief of police in the City of

1 Wilson?

2      A.      I think in public debates there was a

3 question about the crime rate.  I think it was just

4 about the crime rate.  I don't recall seeing anything

5 in writing that came out from Gary Willis.

6      Q.      None of these other questions were

7 raised about your relationship with Ms. Dampier or

8 anything of that nature during the Willis campaign?

9      A.      I don't recall any of those issues

10 coming up, no, sir.

11     Q.      Do you know whether the Pensacola Voice

12 ever publicized the information found in Exhibit 4?

13     A.      I don't recall seeing the information

14 being printed.  And as I do recall, the conversation

15 that I had with the individual at the Pensacola Voice,

16 she appeared to be satisfied with the explanation that

17 was provided, because she took our request for an ad

18 to be run in the Pensacola Voice.

19     Q.      Okay.  And besides the Pensacola Voice

20 editor, did anyone else tell you that they received

21 this document from any source at all?

22     A.      No, sir.

23     Q.      By "this document," I mean Exhibit 4.

24              (Defendants' Exhibit Number 5

25              was marked for identification

1           and hereto attached.)

2      Q.     Let me show you what I've marked as

3 Exhibit 5 --

4      A.     Are you through with this one, sir?

5      Q.     Yes, sir.  Thank you.

6             -- and ask you if you've seen that

7 before.

8      A.     Yes, sir.

9      Q.     And do you recall how it is that you

10 came to see Exhibit 5?

11     A.     I do not recall how it came about.  I do

12 recall seeing it during the campaign.

13     Q.     Are we talking about during the primary

14 campaign or during the general campaign?

15     A.     Indications would be it would be during

16 the primary.

17     Q.     Well, it certainly says it's a paid

18 political announcement of Gary Willis for sheriff,

19 correct?

20     A.     Yes, sir.

21     Q.     Do you recall who gave it to you, how

22 you came into possession of this?

23     A.     No, sir, I do not.

24     Q.     After the primary election, who did

25 Gary Willis support in the general, if anybody?

1     A.     It's my understanding that he supported

2 Ron McNesby.

3     Q.     Was there anything that you are aware

4 that he -- any overt acts he took part in to support

5 McNesby as opposed to you?  Announcements, appearance

6 at campaign functions, anything at all?

7     A.     Not that I'm aware of, no, sir.

8     Q.     Now, as a part of the campaign, did you

9 maintain a web site?

10     A.     I did.

11     Q.     And I presume that web site is no longer

12 active?

13     A.     That's correct.

14     Q.     Did you maintain any documents

15 pertaining to that web site, information that was put

16 on it, copies of information that was on it, anything

17 of that nature?

18     A.     There were some training documents that

19 was placed on there that I would -- obviously I would

20 have the actual document.  As far as the opening on

21 the web site, the opening page and stuff like that, I

22 didn't have -- I don't have any copies of that.

23     Q.     Did you monitor any blog-type web sites

24 during the campaign of 2004, either pro or con?

25     A.     There was a blog site that was

1 monitored, but I don't think it was related to the

2 campaign, I think it was just a blog site in regards

3 to the sheriff's office.  I can't remember the actual

4 site, but it had commentary for and against Ron

5 McNesby, for and against myself.  Prior to the race

6 being between McNesby and myself, for and against

7 Willis or for and against myself.  I don't know who

8 monitored or who ran the web site.  It was up and

9 running, and it seems like it was up and running until

10 just a few years ago, if I recall correctly.

11     Q.     It's not up and running presently, as

12 far as you know?

13     A.     I haven't checked.  I haven't heard

14 anybody talk about it.

15     Q.     During the course of the election, did

16 any of the information that we've looked at here on

17 Exhibits 1, 2, 4, and 5 appear on those blogs?

18     A.     Not that I'm aware of.  I didn't really

19 track it that -- we had people with the campaign that

20 would monitor it and all that.  I didn't -- I'm not

21 really up on blog sites.

22     Q.     Who on the campaign was monitoring the

23 blog sites for you?

24     A.     There was a lady by the name of Kathy --

25 we called her Kathy Theo.  Her actual last name was

1 like or something to that nature, but I don't know how

2 to spell it.  And she provided secretarial services

3 for the campaign, and I think she pretty well stayed

4 attuned to the blog sites.

5      Q.     Do you know if that's Kathy with a "C"

6 or a "K"?

7      A.     It's with a "K."

8      Q.     And with a "Y" or an "I"?

9      A.     With a "Y."

10      Q.     Was she a sheriff's office employee?

11      A.     She was not.  She was retired.

12      Q.     As a part of the campaign, I know you

13 say the PBA endorsed you.  Did the PBA run information

14 on their web site favorable to you and critical of

15 McNesby?

16      A.     I don't know if the web site was active

17 because of the storm, to be quite honest with you.  I

18 know I got the endorsement from the PBA, but I don't

19 know what assistance they rendered after the

20 endorsement, because of the tragedy that Ivan brought.

21      Q.     How did Ivan limit your campaign

22 activities?  I would imagine that it would create some

23 difficulties.

24      A.     It did initially.  I would say probably

25 the first day or so after the storm, the campaign

1 office was practically shut down.  However, we

2 continued on with events that we had planned.  We were

3 heavily involved with meeting people in the north end

4 of county, and conducting the fish fries and the

5 get-togethers, the same as what we would do at the

6 south end of the county, events that we had already --

7 had planned out to attend.  We did not do the

8 door-to-door campaigning that you would normally do

9 during an election, obviously, because everybody was

10 in a position trying to recover from the storm.  But

11 we continued on the best we could.

12      Q.     I don't mean to make light of it, but I

13 would imagine that at some of the campaign functions

14 where there was food involved, they might have been

15 well attended because of the difficulties in that

16 regard?

17      A.     I think it was welcomed, and it was done

18 more as an effort to make sure that everybody was

19 being fed, particularly up in the north end of the

20 county.  We spent a lot of time up there holding fish

21 fries and stuff.

22      Q.     Now, when was it that you first made the

23 decision to run for sheriff in Escambia County?

24      A.     Sometime in the spring -- started, you

25 know, kicking the idea around sometime in the spring

1 of 2003.

2     Q.     And what do you mean "by kicking the

3 idea around"?  What did you do?

4     A.     I had been approached by some friends

5 who live here in Escambia County.  They're well aware

6 of the fact that I have relatives who still live here

7 in the county, and the fact that I was born and raised

8 here in the county, and my employment with the

9 sheriff's office.  And obviously they were

10 dissatisfied with the job that Ron McNesby was doing

11 with the sheriff's department.

12     Q.     And who was it that contacted you about

13 the prospects of you running?

14     A.     Well, there was a number of people.

15 Ken Repine, Russ Swinney, you know, Gordon Sztukowski.

16 Retired members of the sheriff's department.  I mean,

17 there were just a number of them that asked.  You

18 know, basically I think they were looking for a

19 candidate to run.

20     Q.     Did they indicate to you that they had

21 approached other persons who said they weren't

22 interested?

23     A.     Did not indicate that.  They indicated

24 that there was dissatisfaction with Ron McNesby, and

25 they were not satisfied with the fact that Gary Willis

1  was running.  They didn't want Gary Willis to be the

2  sheriff either.

3      Q.    Did Gary Willis have past background

4  with the sheriff's office?

5      A.    Gary Willis was a retired lieutenant

6  from the sheriff's department.

7      Q.    During the course of the campaign, did

8  it ever become an issue, the fact that you hadn't

9  lived in Escambia County for, what, ten years or so,

10 and now you're coming back wanting to be sheriff?

11     A.    The only time it was an issue is when --

12 I believe Rex Blackburn at one of the get-togethers

13 made a comment that I was not a taxpayer because I

14 didn't own property in Escambia County, and

15 questioned -- questioned, you know, why I had a right

16 to make any comments about the way money was being

17 spent with the sheriff's department.

18     Q.    And was that accurate, did you not own

19 property in Escambia County at the time that you were

20 running for sheriff?

21     A.    That's correct.

22     Q.    Did you reside in Escambia County?

23     A.    I did.

24     Q.    In an apartment?

25     A.    With my father.

1    Q.    Was your wife here with you or was she

2 still --

3    A.    She was.

4    Q.    And it's your testimony that no one

5 other than Mr. Blackburn raised the issue of you

6 wanting to be sheriff if you hadn't been here for

7 ten years; none of the citizens, none of the forums

8 that ever became an issue, none of the press?

9    A.    I don't remember ever having to answer

10 any questions as far as it being asked.  I mean, it

11 doesn't stick out in my mind.

12    Q.    So after you were approached in the

13 spring of '03 about possibly running for sheriff, what

14 actions did you take to move forward on that interest?

15    A.    I had conversations with the family, on

16 both sides of family, you know, trying to make a

17 decision if it would be the right thing to do.  It

18 certainly is something that I think that most members

19 of the sheriff's department would like to do, if you

20 come up -- you know, if you work at the sheriff's

21 office.

22          Other than just making telephone calls

23 and personal contacts to see what, in fact, type of

24 support was out there, you know, as far as actions, I

25 don't think there was any actions at that particular

1 point in time.

2     Q.     Who else were you -- besides the people

3 who contacted you, who else were you reaching out to

4 to contact here in Escambia County in the spring of

5 '03 about the possibility of running for sheriff?

6     A.     People that I had worked with -- I mean,

7 I would be at a loss to recall names now, but just

8 people that I worked with at the sheriff's department.

9 People that I had attended school with.  Some people

10 over in Santa Rosa County who worked at the Santa Rosa

11 County Sheriff's Office, that I knew through working

12 over here.

13     Q.     Who did you contact at Santa Rosa?

14     A.     Keith Morris is a friend of mine, you

15 know, I talked with him.  I have an uncle that lives

16 over in Santa Rosa County, I spoke with him.  I know

17 the sheriff in Santa Rosa County.  And as a matter of

18 fact, my wife -- when we returned to Pensacola, my

19 wife went to work with the Santa Rosa County Sheriff's

20 Office.

21     Q.     For how long did she work there?

22     A.     The whole time we were campaigning, the

23 whole year of 2004.

24     Q.     What did she do there?

25     A.     She was in dispatch.

1    Q.    Did she resign after the campaign was

2 over?

3    A.    Yes, because we relocated to the City of

4 Dothan.

5    Q.    Sure.  So would it be safe in assuming

6 that based upon the fact that you were talking to

7 people in Escambia County, including people at the

8 sheriff's office, it was no secret after the spring of

9 '03 that you were at least contemplating making a run

10 for sheriff?

11    A.    When you say a secret, I mean, was I

12 sneaking around trying to do it?  The answer to your

13 question would be no, I was not sneaking around.  I

14 don't think I publicized it, but I wasn't sneaking

15 around.

16    Q.    But from your experience working in a

17 sheriff's office or any law enforcement agency, people

18 within the agency talk, and something like this would

19 be the topic of conversation within a sheriff's

20 office, wouldn't it?

21    A.    Well, I think that working in law

22 enforcement, because they know the situation, if

23 somebody is contemplating running for sheriff, I don't

24 think it's widely discussed in an open forum, because

25 they know that there is a -- there would be a

1 potential for would-be supporters to find themselves

2 in an unusual predicament or a strenuous situation.

3 So I think the discussion is very limited, and that's

4 based on the experience of working at the sheriff's

5 office, having gone through a couple of elections.

6    Q.    So when did you first take some

7 affirmative steps to actually, for lack of a better

8 term, activate your campaign for sheriff?

9    A.    Well, according to the rules and

10 regulations of the State of Florida, you're not

11 allowed to accept any contributions or actually

12 solicit the position or let people -- you know,

13 solicit their vote for the office of sheriff.  And I

14 prefiled to run for the office of sheriff around

15 Thanksgiving of 2003.

16    Q.    And at that time you were still employed

17 with the City of Wilson?

18    A.    I was.

19    Q.    And your prefiling for the office of

20 sheriff is a matter of public record?

21    A.    It is.

22    Q.    Do you recall whether when you prefiled,

23 did you make any kind of a press release or anything?

24    A.    I did not.

25    Q.    Do you recall whether when you prefiled,

1 it was publicized at all in any of the local

2 newspapers?

3      A.      I don't recall if they run an ad on it

4 or not.  People running for office, I don't know.

5      Q.      And once you prefile, then that allows

6 you to solicit contributions and accept contributions?

7      A.      It does.

8      Q.      And otherwise -- does it allow you to

9 start advertising?

10      A.      You can start advertising.  You can

11 start collecting contributions.  But once again,

12 that's a -- prefiled is not a -- you do not actually

13 qualify until later on in the year, and I don't recall

14 what the date was for qualification.

15      Q.      So after Thanksgiving of '03, did you

16 begin receiving and accepting contributions?

17      A.      I would have to check the campaign forms

18 to see that, because they would be recorded on that

19 document.

20      Q.      But just as a matter of recollection,

21 did money start coming in once you prefiled?

22      A.      Seems like I did start getting some

23 contributions, but once again, I would have to refer

24 to the document.

25      Q.      Which you no longer have?

1     A.     No, sir, but it's maintained on file

2 with the Supervisor of Elections.

3     Q.     And so as of the time you prefiled

4 Thanksgiving of '03, had you spoken with anybody at

5 the City of Wilson about your political aspirations in

6 the Escambia County?

7     A.     The assistant city manager and the city

8 manager were both aware of it, that it was prefiled,

9 and that they -- that there had not been a firm

10 decision up to that point.

11     Q.     What was their reaction to that?

12     A.     Actually it was a reaction that they

13 understood that I needed to make a decision if I was

14 going to seek office, and if I did choose to run for

15 office, that we need to come up with a separation

16 date.

17     Q.     Was there a policy in place, either in

18 the police department or the City of Wilson in

19 general, about employees running for political office?

20     A.     There's a policy, and once again, all

21 the policies kind of run together.  I know that

22 there's a policy which kind of tracks the information,

23 as far as the Hatch Act, and I think that's the City

24 of Wilson's policy.  Once it is -- you know, once a

25 determination is made, as far as the individual

1 seeking office, I think that he has to tender a letter

2 of resignation from his position.

3     Q.     And when you notified the assistant city

4 manager and the city manager at the City of Wilson,

5 did they indicate to you that they had received any

6 information previously about your running for sheriff

7 in Escambia County?

8     A.     Mr. Ed Wyatt had earlier, before I

9 actually prefiled, had received a telephone call from

10 an individual who reported that they worked with the

11 sheriff's office, held the rank of captain, it was a

12 female.  The caller identified themselves as Brenda

13 Chromiak.

14     Q.     This is what Mr. Wyatt told you?

15     A.     No, this is what Charles Pittman told

16 me, the assistant city manager.

17     Q.     And do you recall how long before

18 Thanksgiving of '03 this phone call occurred?

19     A.     No, sir, I do not.

20     Q.     Are we talking months or weeks or --

21     A.     I know it was before Thanksgiving, but I

22 don't know how long.

23     Q.     And what was Mr. Pittman's reaction to

24 that?

25     A.     He said that he had -- and I'm

1 paraphrasing.  He said that he had received a

2 telephone call from an individual wanting to make

3 application for the chief of police position in the

4 City of Wilson.  Mr. Pittman told them that the

5 position was not open, they were not taking

6 applications.  The caller made a statement that the

7 position would be open, because that I -- that John

8 Powell is running for sheriff in Escambia County,

9 Florida.  Mr. Pittman asked me about that.  At that

10 time there had not been a preapplication or prefiling.

11 And once again, I was in the decision-making process,

12 and I explained that to him, that I was, you know, in

13 the decision-making process.

14     Q.     But this was after you had already

15 spoken with the people who had solicited you to run

16 for sheriff in the spring of '03, and then others,

17 about the possibility?

18     A.     During the same time.  I mean, it was

19 ongoing conversations.  It wasn't just like one

20 telephone call, it was ongoing conversations.

21     Q.     Have you ever spoken with Ms. Chromiak

22 about this?

23     A.     I have not.

24     Q.     And so after you prefiled in

25 Thanksgiving of '03 and had this conversation with the

1  assistant manager and the city manager at Wilson, how

2  long after that was it before you left the city,

3  resigned your position?

4      A.      I think the resignation date was

5  effective January 31.

6      Q.      '04?

7      A.      Of 2004.

8      Q.      Was that a date that you selected or

9  they selected?

10      A.      It was a date that was mutually decided

11  upon by all of us.

12      Q.      And did the fact that you had now

13  prefiled to run for sheriff -- what was the response

14  within the city to that, the city officials and those

15  that you worked with?

16      A.      I didn't really have a negative response

17  from any of the city officials.  I mean, it was -- you

18  know, we sat down, inquiry as far as, you know, if I

19  was sure that I wanted to seek office, and if, in

20  fact, I was going to do that, that we needed to come

21  to a mutually decided date for separation, which we

22  did.  And with the holidays and everything, I mean,

23  that was pretty much it.  I mean, everything was, I

24  guess -- I hate to use the term "fine," but everything

25  was fine from that point forward.

1    Q.    Did you ask to stay on longer?

2    A.    No, sir.

3    Q.    And so at that point in time, you

4 relocated to Pensacola?

5    A.    I did.

6    Q.    And during the course of the time that

7 you were running for sheriff in Escambia County, did

8 you work at all?

9    A.    No, sir, I campaigned.  I did do some

10 teaching online with Florence-Darlington Technical

11 College, but I did not hold a full-time job.

12    Q.    And so besides the prefiling, was there

13 a point in time when you formally announced your

14 candidacy in Escambia County?  And how did you do

15 that?

16    A.    I think there was a letter presented to

17 the media, as far as making the official announcement.

18 I don't think there was any spots -- news spots or

19 anything like that, and there wasn't any ads taken out

20 in the paper.  If I recall correctly, it was a

21 hand-delivered letter down to the media outlets,

22 making the announcement.

23    Q.    No press conference or anything?

24    A.    No, sir.

25    Q.    And was that immediately the subject of

1 a newspaper report the following day?

2    A.    It showed up in the paper, but I don't

3 know if it was the following day.  I don't remember.

4    Q.    And how long after you returned to

5 Pensacola did you do that?

6    A.    I was back in Pensacola on February 1.

7 It's going to be right around the first of the year,

8 but I don't recall the dates on when that was

9 delivered.

10    Q.    Okay.  Had Gary Willis already announced

11 his intention to run, do you know?

12    A.    It's my understanding that Gary Willis

13 had announced probably a year prior to the election.

14    Q.    So besides Mr. Peterson, Mr. Swinney,

15 Mr. Way, and -- I'm just going to call him Gordon,

16 because I can't get his last name right, I hope he

17 won't be offended by that -- were there any others

18 that you would consider part of your, for lack of a

19 better term, inner circle of your campaign?

20    A.    The lady that I identified a while ago,

21 Kathy.

22    Q.    The secretary?

23    A.    Right.  And did you mention Travis

24 Peterson on your list?

25    Q.    I did.

1    A.    Okay.  That would pretty much do it.

2    Q.    Now, during the course of the

3 campaign -- let me ask you this.  After you prefiled

4 to run for sheriff around Thanksgiving 2003, did you

5 have any contact before that with Ron McNesby about

6 the fact that you were going to run for sheriff?

7    A.    He called the office one day, left a

8 message for me to return the call.  I don't recall the

9 time period when that took place.

10    Q.    Do you recall whether it was before you

11 prefiled or not?

12    A.    It was before I prefiled, yes, sir.  But

13 I don't recall the exact time and date when he called.

14    Q.    He called you at the Wilson Police

15 Department?

16    A.    Correct.

17    Q.    And this was after you had already made

18 your initial spring of '03 inquiries or contacts?

19    A.    Yes.

20    Q.    And did you call him back?

21    A.    I think I tried to call back, but I did

22 not get in touch with him.  I think I left a message

23 with the receptionist or his secretary.

24    Q.    And the result -- as a result of

25 McNesby's message and then your message, did a phone

1 call ever take place?

2     A.    No, sir, it did not.

3     Q.    Was there any other contact that you

4 recall having with Ron McNesby before you prefiled in

5 '03?

6     A.    Yes, sir, I've had contact with Ron

7 McNesby prior to the election.

8     Q.    Okay.  Any campaign -- any contact that

9 pertained to the election or your running for sheriff?

10     A.    Yes, sir.

11     Q.    What contact did you have with

12 Mr. McNesby, prior to prefiling, about the campaign?

13     A.    I had come in town, which was not

14 uncommon, to visit my father and my brother.  I was

15 accompanied by a friend of mine, his name is Dan

16 House.  And like on every other occasion when I was in

17 town, I would go by the sheriff's department to visit

18 former coworkers and friends.  This particular event

19 was no exception.  I went to the investigations

20 section of the sheriff's office, which was located at

21 DYS.  I was talking to my former secretary, Marlene

22 Lutz.  There was a couple of other secretaries that

23 was in the office with her, and there was some

24 investigators that was around.  And Dan House was

25 standing with me.

1     Q.     Does Mr. House work for the sheriff's

2 office?

3     A.     Mr. House works for -- it's either

4 University of North Carolina or North Carolina State,

5 as a lieutenant with the police department.  At the

6 time he was working for the City of Wilson.

7          During my conversation with Marlene and

8 the other two ladies that was in the office, I was

9 approached by Sheriff McNesby.  He was accompanied by

10 Larry Smith.  Sheriff McNesby was agitated and was

11 visibly upset, and said that he wanted -- he asked if

12 he could speak with me.  I replied that he could.  We

13 walked down the hallway, to an office where Mike

14 Steele was sitting behind the desk.  Mike Steele was a

15 lieutenant in investigations.  The sheriff at that

16 time asked Mike if we could borrow the office.  Mike

17 Steele got up, walked out of the office, and McNesby

18 closed the door, with him and Larry Smith standing

19 between me and the doorway.

20          At that time McNesby started raising his

21 voice, making statements that I was trying to get his

22 job, I didn't know what I was getting into, that I had

23 been listening to Russ Swinney.  You know, basically

24 Russ Swinney, you know, who still worked at the

25 sheriff's office at the time, was going to get his.

1          At that point, I tried to cut the

2 conversation off and told the sheriff that I didn't

3 work for him and I was not going to stand there and

4 allow him to yell at me like he was yelling.  And I

5 took a step towards the doorway.  Once again, him and

6 Larry Smith was standing in the doorway.  The sheriff

7 made a motion, he said, "Well, let's all calm down,"

8 and he pulled up some chairs and asked that we could

9 sit and talk.

10          They placed their chairs against the

11 wall where the door was located.  I sat down at a

12 chair that was in the office.  We started making

13 conversation.  The sheriff made a comment that I

14 didn't have any idea what I was getting into, that I

15 had been appointed police chief by a panel or by a

16 commission, I didn't have any idea what it was like to

17 run for office.

18          Larry Smith piped in at that time, he

19 said how would I like it if a telephone call was made

20 to the City of Wilson and let the city manager know I

21 was down there politicking, and they would try to get

22 me fired.

23          My comments at that time -- you know,

24 please keep in mind all this is from memory.  My

25 comments at that time towards McNesby was the fact

1 that I had not definitely made a decision about

2 running for office.  He kept interjecting while I was

3 trying to talk.  He said he didn't -- excuse my

4 language, he said he didn't give a damn about the

5 people in North Carolina, made a comment that he had

6 supplied equipment for South Carolina, in the city of

7 Hartsville.  I interjected and I said if I recall

8 correctly, it was not him, it was Sheriff Jim Lowman

9 that had supplied the equipment to the citizens in the

10 city of Hartsville, South Carolina.  He immediately

11 took his link off his belt and he called for Louie

12 Kemp in the garage, he had the speaker on the link.

13 He asked Louie who gave the equipment to South

14 Carolina, and Louie Kemp said, you know, it was --

15 "Sheriff, it was you."

16             He went on to say that me and him were

17 friends.  I made the comment -- I said, "If we're such

18 good friends, why do you have Larry Smith sitting here

19 when you want to carry on a personal conversation?"

20 Larry Smith appeared like he got aggravated, and said

21 that he would get up and leave, and I simply made a

22 comment I don't care if he's in there or not.

23             McNesby then switched and started to say

24 something -- he made a comment about my father, and

25 that -- he made a comment that I was down in Pensacola

1 trying to cause some problems, and I told him I was

2 down in Pensacola visiting my father.  He made a

3 comment, he said, "I didn't realize your dad was still

4 alive."  I said, "Well, my father really has nothing

5 to do with this.  I'm down here visiting my family."

6 And I said, "I've come by the sheriff's office now

7 just like I've always come by since I've left."

8               Then he went to say something about my

9 wife.  He said, "You know your wife Beth --" and I cut

10 him off, I said, "I'm not talking about your family, I

11 don't expect you to talk about mine."

12               The conversation started getting

13 aggressive once again, and he made a comment that I

14 didn't need to be at the sheriff's department, I was

15 not welcome at the sheriff's department, he didn't

16 want me there, the employees didn't want me there, and

17 if I was to come back, that I would be arrested.

18 Larry Smith made the comment, he said, "Do you

19 understand what's being told to you?"  And I looked at

20 the sheriff and asked him to clarify, I said, "You're

21 giving me a trespass warning?"  And he said,

22 "Absolutely."  I said, "There's no sense in saying

23 anything else, I understand."  And that was the end of

24 the meeting.

25               Him and Larry Smith was still in front

1 of the door when I stood up, and I had to walk towards

2 them, and then they got up out of their chairs and

3 they moved out of the way for me to exit the office.

4     Q.     Now, has Mike Steele indicated to you

5 that he overheard any of this conversation?

6     A.     I have not talked with Mike Steele about

7 that.

8     Q.     Was Mike Steele involved in your

9 campaign?

10     A.     Not that I'm aware of.

11     Q.     Now, this office that has the

12 investigations, is that a secure area?

13     A.     I don't know.  I don't know what the

14 classification would be back there.

15     Q.     Did someone have to buzz you in?

16     A.     If they did, they did it without me

17 knowing about it.  I don't know if it was a secure

18 area or not.

19     Q.     Why did you go to that part of the

20 sheriff's office?

21     A.     The last duty station I held was in

22 investigations.  I have good friends who work in

23 investigations.  Marlene Lutz, like I stated earlier,

24 you know, used to be my secretary.  Basically, to go

25 by and visit, just like I had done previously every

1 time I've been -- I can't say every time, but most of

2 the time when I came back to Pensacola, if time

3 allowed, I would go by there and visit.

4      Q.      And do you recall the approximate date

5 of this?

6      A.      I want to say it was in the springtime

7 of 2003, but I can't be specific without looking at

8 the documents and stuff, and a calendar.

9      Q.      Do you have some documents that you

10 could review that would tell you what date this

11 occurred, other than the complaint?

12      A.      Just the complaint.

13      Q.      Okay.  And so this would have been after

14 you had already made inquiries and been solicited

15 about running for sheriff?

16      A.      Probably around the same time frame,

17 yes.

18      Q.      Okay.  And would you agree with me that

19 from this event, it's apparent that somebody -- some

20 people that you had contacted in Escambia County about

21 running for sheriff had talked about this to others,

22 for Ron McNesby to know about it?

23      A.      I would agree that the sheriff was

24 aggravated.

25      Q.      Well, he made specific reference to the

1 fact that you were going to run for sheriff, and I

2 think you said take his job?

3    A.    Correct.

4    Q.    So obviously he knew that that was going

5 to happen, or at least that you had made those

6 inquiries about that possibility happening?

7    A.    Yes.

8    Q.    And you had never spoken with McNesby or

9 Smith about this --

10    A.    No.

11    Q.    -- before that time?

12          After this happened, did you report it

13 to anyone, other than maybe telling your wife about

14 it, or your father?

15    A.    I talked with Russ Swinney about it,

16 because I was in town visiting with him.

17    Q.    At that time, did Mr. Swinney still work

18 for the sheriff's office?

19    A.    He did.

20    Q.    He no longer works for the sheriff's

21 office?

22    A.    He retired.

23    Q.    Do you know when he retired?

24    A.    I think it was in 2004.

25    Q.    Did you ever communicate further with

1 the sheriff or Larry Smith about -- with Ron McNesby

2 or Larry Smith about this confrontation?

3     A.     No, sir.

4     Q.     Didn't write a letter or anything?

5     A.     No, sir.

6     Q.     Didn't contact the State Attorney's

7 Office?

8     A.     No, sir.

9     Q.     Didn't contact the elections commission

10 or ethics commission?

11    A.     No, sir.

12    Q.     And to your knowledge, did anyone else

13 overhear this conversation that took place?

14    A.     Dan House overheard the raised voices

15 from the office, and it's my understanding that

16 Marlene Lutz heard the raised voices from the office,

17 as well as the other two secretaries that was with

18 her.

19    Q.     Did you tell Mr. House about that event

20 after it happened?

21    A.     I did.

22    Q.     Aside from raised voices, did he

23 indicate to you that he was able to discern what was

24 actually said?

25    A.     I think his comment was that he could

1 tell that the -- pardon me, that the sheriff was very

2 pissed, I think is the term that he used.

3     Q.    Thereafter, aside from running into

4 Ron McNesby at campaign functions, did you have any

5 other one-on-one conversations with him during the

6 course of the precampaign or the campaign?

7     A.    Not that I recall.

8     Q.    During any of the campaign activities,

9 were there any confrontations between yourself and

10 Ron McNesby that stick out in your mind as being

11 particularly noteworthy or significant for purposes of

12 this lawsuit?

13     A.    There were no confrontations.  There

14 were comments from Ron McNesby about Gordon

15 Sztukowski, who was an employee at the sheriff's

16 office, and about Russ Swinney, who was a former

17 employee at the sheriff's department.

18     Q.    What were those comments?

19     A.    Something to the effect that Gordon had

20 better be careful about campaigning on duty, and that

21 Russ Swinney basically would get his in the end.

22     Q.    By that time, Russ Swinney had retired?

23     A.    He had.

24     Q.    Do you know what Mr. Swinney's doing

25 now?

1     A.     I think he's just retired.

2     Q.     Not law enforcement in any other

3 capacity?

4     A.     No, sir.

5     Q.     And Gordon was promoted by Sheriff

6 McNesby after the election, wasn't he?

7     A.     Yes, sir.

8     Q.     During the course of the campaign,

9 during any of the campaign functions that you were at,

10 did McNesby raise any of the issues that we see in

11 Exhibits 1, 2, 4, or 5, any debates or presentations

12 or speeches?

13    A.     Not that I'm aware of, no, sir.

14    Q.     Did you ever have any conversation with

15 Ron McNesby about any of these exhibits that we've

16 talked about?

17    A.     No, sir, I have not.

18    Q.     During the course of the campaign, how

19 prevalent was Larry Smith?  Did you see him around

20 much?

21    A.     Larry Smith contacted -- there was a

22 couple of occasions where he made -- reached out and

23 contacted me.  One occasion was during an event where

24 one of the sheriff's department employees, Rex

25 Blackburn, had come to the campaign office and made

1 threats, and I filed a complaint with the sheriff's

2 department.  On another occasion, when we had

3 instituted a records request for documents from the

4 sheriff's department, Larry actually walked over to

5 the campaign office and sat down and talked to me

6 about the request and about compliance on the request.

7        Q.     Let's talk about the second conversation

8 first.  What were the nature of the documents that you

9 were asking for?

10       A.     Operation of the helicopters, reports,

11 some overtime reports, use of overtime funding.  It

12 was various documents that we requested.

13       Q.     And what was the nature of the

14 conversation about compliance with the request of

15 Mr. Smith?

16       A.     One of the requests Larry -- Larry was

17 trying to explain why the office -- the sheriff's

18 department tried to shield the request -- or tried to

19 shield the documents from the request, should I say,

20 and it was in regards to the use of the helicopter.

21 They were trying to declare that it was a Homeland

22 Security issue, about the funding for the helicopter.

23 And pursuant to that attempt to shield that request, I

24 had filed a complaint with the State Attorney's

25 Office, and it's my understanding the State Attorney's

1 Office contacted the sheriff's department.

2      Q.      And do you know how that complaint was

3 resolved?

4      A.      They had to release the records.

5      Q.      Was the conversation that you had with

6 Larry Smith about those records cordial?

7      A.      It was.

8      Q.      Was there any discussion at all about

9 the campaign?

10      A.      No, sir.

11      Q.      And he came over to your campaign office

12 to have that conversation with you?

13      A.      Yes, sir, that's correct.

14      Q.      And you say you also had a conversation

15 with Larry Smith about the complaint that you had made

16 against Mr. Blackburn?

17      A.      Correct.

18      Q.      And that happened at a campaign

19 function, campaign event?

20      A.      No, sir.

21      Q.      I'm sorry, I misunderstood you.

22      A.      Rex Blackburn -- this was early in the

23 morning, and if I recall correctly, it was in the

24 springtime.  I had just arrived to the campaign

25 office --

1    Q.    I hate to interrupt you, but -- I'm

2 probably going to ask about that later on.  I just

3 want to know about where this communication with

4 Larry Smith took place, right now.

5    A.    Telephonically, is where it took place.

6    Q.    And just tell me about the conversation

7 that you had with Larry Smith at that time.

8    A.    He contacted me and had indicated that

9 he had received the documents in regards to the

10 complaint on Rex, and stated that he had reviewed

11 them, and that he was going to issue a -- I think he

12 used the term stern letter -- a stern verbal warning

13 or a stern letter of caution or something to that

14 effect, to Rex for the way he acted.  And that was

15 pretty much it.  He -- basically "I'm calling just to

16 let you know the follow-up on your complaint."

17    Q.    Was that the same day that you made the

18 complaint?

19    A.    No, sir, it was not the same day.

20    Q.    Do you recall how long after it was?

21    A.    No, sir, I do not.  It seems like it was

22 followed up with a letter later on, but I don't recall

23 the dates on it.

24    Q.    Was that conversation with Larry Smith

25 cordial?

1     A.     It was.

2     Q.     Any discussion of the campaign or

3 otherwise?

4     A.     No, sir.

5     Q.     And those are the only two contacts that

6 you had with Larry Smith during the campaign, that you

7 recall?

8     A.     The only two that I recall, yes, sir.

9     Q.     Was Mr. Smith a regular at the campaign

10 events?

11     A.     He was there, I can't say he was at

12 every one of them, but I remember seeing him at some

13 campaign events.

14     Q.     Okay.  Did you ever have any discussions

15 with Larry Smith about any of the events that are

16 found in the documents that we've identified as

17 exhibits?

18     A.     Not that I recall.

19     Q.     He never asked you about them, you never

20 asked him about them?

21     A.     No, sir.

22     Q.     Now, aside from this incident about

23 Mr. Blackburn that occurred at your campaign

24 headquarters that resulted in, as you say, Larry Smith

25 giving him a stern warning, what other contact did you

1 have with Mr. Blackburn in the course of the campaign?

2     A.     Would see Rex out and about at the

3 different campaign functions.  And it seemed like

4 there was one time when we were passing out fliers at

5 the jail or around the jail, when he was out in the

6 parking lot.  But once again, that's from memory, I

7 don't remember a date on that.

8     Q.     And what was he doing?

9     A.     In the parking lot?

10     Q.     Yes, sir.

11     A.     Just kind of standing around watching.

12     Q.     Okay.  Didn't engage in any form of

13 harassment or anything like that?

14     A.     No, sir, didn't make any comments to me.

15     Q.     And when he was at these functions, what

16 would he be doing?

17     A.     In attendance.  Would not participate in

18 the function, but he was there in attendance.

19            I remember one particular function out

20 at UWF.  We had finished up and I went to -- trying to

21 be cordial, had shook Larry Smith's hand, and it

22 seemed like there was a couple of other employees with

23 the sheriff's office, went to shake his hand, and, you

24 know, he refused to do so and he made a derogatory

25 comment.

1    Q.    What did he say?

2    A.    Something to the effect he wouldn't

3 shake my damn hand or something like that.

4    Q.    At these functions, did you ever observe

5 him doing anything to undermine your campaign?  Pull

6 fliers off of cars, disrupting passing out of campaign

7 information, anything of that nature?

8    A.    I was involved with the -- with whatever

9 event we were in, I did not pay attention to him.

10    Q.    Has it come to your attention that

11 Rex Blackburn did anything of that nature?

12    A.    No, sir.

13    Q.    So aside from the parking lot, watching

14 you pass out fliers; when he wouldn't shake your hand;

15 and the confrontation in front of your campaign

16 office, any other face-to-face personal contact with

17 Mr. Blackburn during the campaign, that you can

18 recall?

19    A.    Not that I can recall, no, sir.

20    Q.    Did any of your inner circle,

21 Mr. Peterson, Mr. Swinney, Mr. Way, Gordon, ever

22 indicate to you that they had had personal contact

23 with Ron McNesby during the course of the campaign,

24 with some event that was noteworthy as it related to

25 the campaign?

1    A.      Not that I recall, no.

2    Q.      The same question as to Larry Smith, did

3 any of them ever indicate that they had had any

4 interaction with Larry Smith about the campaign that

5 was noteworthy?

6    A.      No, sir.

7    Q.      And how about Rex Blackburn, the same

8 question?

9    A.      I think that Gordon had an event where

10 he came across -- it seemed like he came across Rex,

11 where he was taking a report on damage to campaign

12 signs, and it seemed like there was some comments that

13 transpired between the two.  But once again, I would

14 have to defer to Gordon on that, but it seems like I

15 remember him talking about that.

16    Q.      Whose campaign signs had been damaged,

17 yours or McNesby's?

18    A.      I think it was Gary Willis.

19    Q.      Oh, okay.  Now, Willis was involved in

20 the primary against you, correct?

21    A.      Yes.

22    Q.      Willis never ran against McNesby?

23    A.      No.

24            (Defendants' Exhibit Number 6

25            was marked for identification

1          and hereto attached.)

2     Q.     I'm showing you what I'm marking as

3 Exhibit -- I think we're on 6.  Do you recognize that?

4     A.     Are you through with this?

5     Q.     Yes.

6            MR. PETERSON:  I'm sorry, what was

7       Exhibit 5?

8            MR. TISCHLER:  Number 5 is -- I'll just

9       let you interpret it yourself.

10            MR. PETERSON:  Okay, thank you.

11     A.     (Witness reviews document.)

12     Q.     (By Mr. Tischler)  Do you recognize that

13 document?

14     A.     Yes, I do.

15     Q.     What is that?

16     A.     It's a campaign flier that we had during

17 the general election.

18     Q.     Okay.  And under the fourth block there,

19 to the far right there's a list of what's called Grand

20 Jury Investigations --

21     A.     Yes.

22     Q.     -- on McNesby.  What's the first thing

23 that you listed there involving McNesby?

24     A.     The first bullet says "Improper purchase

25 and use of helicopters."

1    Q.    Okay.  And are you aware that there's a

2 grand jury investigation regarding that?

3    A.    At the time, yes, sir.

4    Q.    Was it ongoing during the campaign?

5    A.    It was.

6    Q.    And what was the result of that

7 investigation, do you know?

8    A.    I think he was cleared on the

9 allegation, if I recall correctly.

10    Q.    You didn't put that information in your

11 campaign flier?

12    A.    No, sir.

13    Q.    Didn't you think that it was important

14 to allow the electorate to have the full picture, that

15 allegations had been made and that he had been cleared

16 of them?

17    A.    I think it was important to the

18 electorate to let them know about the grand jury

19 investigations.

20    Q.    But not the result?

21    A.    We let them know about the grand jury

22 investigation.

23    Q.    But not the result?

24    A.    That's correct.

25    Q.    And what's the next entry there?

1    A.    The second bullet says "Intimidating and

2 threatening a local business owner."

3    Q.    And what was that all about?

4    A.    Once again, that was a grand jury

5 investigation that he went under, I believe involving

6 Arety's Club, I think is the name of it.

7    Q.    It's a strip club, isn't it?

8    A.    Yes, sir.

9    Q.    And what was the result of that grand

10 jury investigation?

11    A.    There was no finding on it.

12    Q.    So McNesby was clear?

13    A.    Well, there was a finding.  I think that

14 the finding that came out said that he used improper

15 judgment on becoming involved in the investigation, if

16 I recall correctly.

17    Q.    What was the investigation involving

18 this strip club, what were they allegedly doing?

19    A.    If I recall correctly, it involved the

20 use -- the county administrator's son -- and once

21 again, all of this is from memory -- had utilized a

22 credit card and ran up a bill inside the club.  And I

23 think the allegation was that the sheriff got involved

24 in trying to get the bill reduced or dismissed by the

25 club owner.  And once again, that's from memory.

1  Q.  Okay.  But the sheriff was cleared of

2 that; in other words, he hadn't engaged in that

3 conduct?

4  A.  I don't know if you could say he was

5 cleared.  I mean, the grand jury came back and said he

6 used poor judgment on getting involved in it.

7  Q.  But he wasn't charged with a crime?

8  A.  Was not charged, no, sir.

9  Q.  And you didn't put that in your campaign

10 ad, did you?

11  A.  No, sir.

12  Q.  And that was all over with by the time

13 this campaign ad was generated, wasn't it?

14  A.  I don't recall the time frame when it

15 took place.  It was all going on about the same time.

16  Q.  What's the next bullet?

17  A.  The third bullet down says "Questionable

18 sale of county property to a political supporter."

19  Q.  What do you know about that?

20  A.  It involved the transfer of title to

21 some mobile homes, but I don't recall who they went

22 to, but it was somebody who was identified as being a

23 supporter of the sheriff in the first election that he

24 ran.

25  Q.  So these were mobile homes that the

1 sheriff's office owned and sold to this individual?

2    A.    Yeah, actually I think the county owned

3 them -- once again, you're asking me to recall stuff.

4 Somehow the title got transferred, I don't know who

5 the actual owner was.  I don't know if it was the

6 county or the sheriff's office.

7    Q.    Was there an allegation that these

8 persons did not pay fair market value for them?

9    A.    There was an allegation, yes, sir.

10    Q.    And what was the result of that grand

11 jury investigation?

12    A.    I don't think there was a finding on it.

13    Q.    So McNesby was cleared?

14         MR. MURRAY:  I'm going to object to the

15         term "cleared," unless you want to define it.

16         I mean, if he knows what the finding was -- I'm

17         going to object to the form of the question.

18         MR. TISCHLER:  That's fine.

19    Q.    (By Mr. Tischler)  Was McNesby found to

20 have violated any law?

21    A.    No, sir, there was no finding.

22    Q.    And in that instance, was he found to

23 have engaged in any poor judgment, as you referenced

24 from the earlier one?

25    A.    I don't recall if there was any issue on

1 that.  That one doesn't stick out in my mind.

2      Q.      And that was all over and done with by

3 the time this campaign flier was generated?

4      A.      I believe so.

5      Q.      But you didn't put in the campaign flier

6 the fact that there had been no finding of wrongdoing

7 on the part of McNesby, did you?

8      A.      That's correct.

9      Q.      And what's the last bullet?

10      A.      The fourth bullet down says "Indicted

11 for falsifying official sheriff's office report

12 involving DUI incident."

13      Q.      Do you know when that occurred?

14      A.      Back in the sixties.

15      Q.      Back in the sixties?

16      A.      Yes, sir.

17      Q.      And what is the result of that

18 indictment?

19      A.      Actually, the indictment, the case

20 itself was nolle prossed at the time, pending -- I'm

21 trying to remember how it was phrased.  The case

22 didn't take any action on it -- didn't have witness

23 cooperation or something to that effect.  Once again,

24 I'm trying to recall from memory.

25      Q.      So there was no finding of guilt or

1 wrongdoing on his part?

2     A.     And no finding of innocence either in

3 that particular case.

4     Q.     But you didn't note that in your

5 campaign flier?

6     A.     No, sir, I did not.

7     Q.     And Sheriff McNesby had not -- had --

8 with regard to the bullet point four, that indictment

9 or arrest, he had not had those records sealed or

10 expunged, had he?

11     A.     I'm not sure if he did or not.  I mean,

12 when the research was done, it was found through the

13 Clerk of the Court's office.  But it was not under

14 Ron McNesby, it was Harold McNesby.

15     Q.     Which is his first name?

16     A.     Correct.

17     Q.     Now, in your campaign flier there, when

18 you list these grand jury investigations involving

19 McNesby, all of which he was cleared of, you didn't

20 also indicate that you had been arrested for battery

21 and cleared of that, did you?

22              MR. MURRAY:  Object to the form of the

23         question, same objection as before.

24              You can answer, if you know.

25     A.     I did not list it.

1     Q.     (By Mr. Tischler)  Okay.  During the

2 course of the campaign, did the issue involving your

3 arrest on this battery charge arise?

4     A.     It did.

5     Q.     And in what context did it arise?

6     A.     The first time that it was brought to my

7 attention, Steve Mraz, from the Pensacola News

8 Journal, actually came to my office, and I think that

9 he was doing a story on the candidates for sheriff,

10 and I don't recall the time frame when he came over.

11 And he asked me a question about it, and I gave him

12 all the details on the particular incident.  And I

13 think in closing, with the contact with Steve, I made

14 the comment that the record had been expunged, and

15 asked where the information came from, and he said he

16 had gotten the information from Ron McNesby.

17     Q.     Who was that, Steve Mraz?

18     A.     Steve Mraz, Pensacola News Journal.

19     Q.     Do you know if he still works there?

20     A.     I do not.

21     Q.     And he told you he got it directly from

22 Ron McNesby?

23     A.     He did.

24     Q.     Are you aware of whether there's any

25 information pertaining to that event in your personnel

1 file?

2  A.  No, sir, I'm not aware.

3  Q.  So was there any publication of the

4 arrest for battery involving yourself, as a result of

5 this disclosure and this conversation with the

6 reporter?

7  A.  It was.

8  Q.  It appeared in the Pensacola News

9 Journal?

10  A.  It did.

11  Q.  Did Mraz indicate that he had actually

12 received paperwork about the arrest, or just been told

13 about it?

14  A.  He didn't indicate if he had received

15 documents or just a verbal.

16  Q.  Now, Ron McNesby was working at the

17 sheriff's office at the time of the arrest?

18  A.  Correct.

19  Q.  So he would have been aware of it?

20  A.  Correct.

21  Q.  And I presume at the time of the arrest,

22 when a sheriff's deputy goes on trial for something

23 like that, it's a matter of public record and there's

24 press coverage?

25  A.  Yes, sir.

1    Q.    So when you were being charged and then
2 tried for that offense, it was in the newspaper every
3 day, I bet, wasn't it?

4    A.    I don't know about every day, but it was
5 in the newspaper, yes, sir.

6    Q.    So it was a matter of public knowledge
7 already?

8    A.    I think at the time it was a 13- or
9 14-year-old event, but yes, sir, it was.

10    Q.    Just as the event involving
11 Mr. McNesby's indictment was more than 13 or 14 years
12 old, wasn't it?

13    A.    Correct.

14    Q.    In fact, it was about, what, 30 years
15 old, wasn't it?

16    A.    Somewhere around there, yes, sir.

17    Q.    So Mr. McNesby telling this reporter
18 about the fact that you had been arrested for battery
19 13 or 14 years ago, that would not be an untruthful
20 statement, would it?

21    A.    Not untruthful, no, sir.

22    Q.    And this information that you included
23 in your flier, Exhibit 6, pertaining to Mr. McNesby,
24 that was all information that was a matter of public
25 record?

1    A.    Yes, sir.

2    Q.    And so you had unfettered access to the

3 public record involving Mr. McNesby, since he was a

4 public official?

5    A.    Correct.

6    Q.    So after the election, how soon after

7 that did you begin your job search for other

8 employment?

9    A.    Probably started -- and once again, this

10 would be from memory, but I probably started looking

11 around immediately after the election, after I took

12 care of all the issues pertaining to finishing up the

13 run for office, which is picking up the signs, closing

14 down the office.  Really began to search right after

15 the Thanksgiving holiday, you know, looking -- you

16 know, looking for any potential employment.

17    Q.    I meant to ask you this and I neglected

18 to.  Let me go back for just a second.  I think I've

19 asked you about all of the contact that you had with

20 McNesby, Smith, and Blackburn during the course of the

21 election campaign, I think we talked about all of

22 that.

23    A.    Yes, sir.

24    Q.    After the election, did you have contact

25 with McNesby about the outcome?

1    A.    No, sir.

2    Q.    Okay.  Larry Smith, contact with him

3 about the outcome, or any of the other campaign

4 activities?

5    A.    No, sir.

6    Q.    Rex Blackburn?

7    A.    No, sir.

8    Q.    And it's my understanding that you never

9 conversed with any of those three individuals about

10 any of the documents or the information found in the

11 in the documents that we've attached as Exhibits 1, 2,

12 4, and 5?

13    A.    Not that I recall, no, sir.

14    Q.    And based upon what you've told me, you

15 have no personal knowledge, other than what you've

16 heard through Mr. Kunert via Mr. Rupert, that McNesby,

17 Smith, or Blackburn had any role in distributing any

18 of these documents that are marked Exhibits 1, 2, 4,

19 and 5?

20    A.    And Mr. Swinehart.

21    Q.    And Mr. Swinehart.  But all you know

22 about what Mr. Swinehart says is that he provided them

23 to Mr. McNesby?

24    A.    Correct.

25    Q.    He has no knowledge about what happened

1 to those documents once he claims they went to

2 McNesby?

3    A.    Correct.

4    Q.    Okay.  And have you spoken with

5 Mr. Swinehart directly about that fact?

6    A.    I have.

7    Q.    When did you speak with him about that?

8    A.    One day at lunch, at the Pensacola Yacht

9 Club, I believe it's called.

10    Q.    Before or after you sued him?

11    A.    Before.

12    Q.    Did you tell him you were going to sue

13 him when you had the conversation with him?

14    A.    I did not.

15    Q.    Had you already made the decision to sue

16 him at that point in time?

17    A.    I think there had been discussion, but I

18 don't think a formalized decision had been made.

19    Q.    What was the purpose of the

20 conversation?

21    A.    It was preempted -- or actually it was

22 started based on a conversation that he had with me

23 when I first was introduced to Mr. Swinehart at the

24 Dothan barbecue festival, in Dothan.  Another

25 candidate, Harri Anne Smith, who is a senator in the

1 State of Alabama, introduced me to Mr. Swinehart. The

2 first thing that Mr. Swinehart did was outstretch his

3 hand, and he made a comment, he said something to the

4 effect, "You don't want to beat me up" or, excuse my

5 language, "You don't want to kick my ass," or

6 something like that. And we shook hands. He made a

7 comment to me as we were shaking hands, that he did

8 not send the information up to Dothan, Alabama, but he

9 knew who did. And then he stated that we needed to

10 get together and have lunch, and he supplied me his

11 telephone number. And upon making that contact, I

12 immediately contacted my attorney, Mr. Jim Murray, and

13 let him know about the contact.

14      Q.     Okay.  When did this actual luncheon

15 with Mr. Swinehart take place?

16      A.     It was before the -- before the primary

17 election in 2008.

18      Q.     And when did this meeting in Alabama

19 take place?

20      A.     Sometime in March, I guess, or April.  I

21 could -- it was during the barbecue festival in the

22 city of Dothan, 2008.

23      Q.     And so when you had this meeting with

24 Mr. Swinehart about sending information to Dothan, did

25 he tell you who sent the information to Dothan?

1      A.      When we had lunch at the Pensacola Yacht

2 Club, he stated that he had compiled the information

3 at the -- he was working for the sheriff as a

4 campaign -- I think he said advisor, was the term that

5 he used.  But he had compiled the information, he had

6 put the document together, that he didn't send the

7 document out.  Of course, I inquired, you know, how

8 did it end up in Dothan.  He indicated that he felt

9 like Nan Weaver had sent it up to the City of Dothan.

10 That he had given the document to Ron McNesby, and

11 that was pretty much it.

12      Q.      Okay.  So he felt as though Nan Weaver

13 had done it?

14      A.      Correct.

15      Q.      That was his words?

16      A.      Correct.

17      Q.      Didn't indicate to you that he saw

18 Ms. Weaver do it, that she told him that she did it,

19 or anything like that?

20      A.      No, sir.

21      Q.      If all of this happened in 2003 and

22 2004 -- and we'll talk about the Dothan actions,

23 assuming those happened in 2005, after you got work up

24 there -- can you explain to me why you waited until

25 2008 to file the lawsuit?

1      A.      The continuation of the harassment that

2 has been caused by this document.  And in

3 conversations with my attorney, Mr. Murray, you know,

4 that's what formulated the decision and based the

5 decision, based on conversations with the attorney and

6 the contact with the documents and the collecting of

7 the information that we do have.

8      Q.      Well, you had all of this information

9 back in 2004, during the campaign, didn't you?

10     A.      We had the information, yes, sir.

11     Q.      And if I'm recalling correctly, you

12 waited until after McNesby had lost the primary to

13 Sheriff Morgan before you filed the lawsuit; isn't

14 that correct?

15     A.      I think that's incorrect.

16     Q.      You think it was filed before the

17 primary election?

18     A.      I believe it was filed before the

19 primary, if I recall correctly.

20     Q.      The record will speak for itself.

21             So I was asking you about your job

22 search.  You said about after Thanksgiving you started

23 looking for a job.  Where did you put in applications?

24     A.      Initially, the job search was conducted

25 using IACP, because I'm a member of the International

1 Association of Chiefs of Police.  Made application to

2 the City of Bay Minette.

3     Q.     Where is that located?

4     A.     Alabama.  There was an application made

5 to a department down in Central Florida, and I can't

6 recall the name of it.

7     Q.     A city?

8     A.     Yes, sir, it was a city.

9          Made application to the City of Dothan,

10 and it seemed like there was an application made to a

11 municipal agency in Georgia.

12     Q.     Did you keep copies of those

13 applications?

14     A.     No, sir.

15     Q.     So after you -- when you sent these

16 applications in, you don't make copies of the

17 applications that you sent in?

18     A.     I do make copies.  Once I secured a

19 position, a lot of the documents that I had in regards

20 to the application process, I have no reason to

21 maintain them, so I destroy them.  And I relocated to

22 Dothan, Alabama, upon being offered that position.

23     Q.     So you destroyed them even though you

24 had already contemplated and sent notice that you were

25 going to file a lawsuit against McNesby, the

1 sheriff?

2    A.    I think at that stage of the game we

3 were just kicking the idea around about filing the

4 lawsuit, because this is early, early 2005.  There had

5 been not a determination made as far as a lawsuit

6 going to be pursued or not.  I think it was at the

7 stage that we were -- you know, we were thinking about

8 doing it.

9    Q.    Amongst these four entities that you

10 sent applications for -- I'm sorry, applications to

11 for -- they were all for chief of police positions, I

12 presume?

13    A.    I think -- the one in Georgia might have

14 been a deputy chief position.

15    Q.    Did any of -- besides Dothan, did any of

16 them result in any interviews?

17    A.    The City of Bay Minette called, I went

18 for an interview on it.  The community -- the city in

19 Florida called, I was prepared to travel for an

20 interview on it.  Georgia did not take any of the

21 applications that were submitted because they closed

22 the search down, and I don't know the reason for that.

23 And then Dothan, I received an interview for it.

24    Q.    The city in Central Florida, I'm not

25 sure I understood, did you receive a response for

1 them?

2      A.      I did, and I was scheduled to go for an
3 interview for them.

4      Q.      Is there a reason why you didn't go?

5      A.      I was offered a position in Dothan.

6      Q.      Okay.  I'll talk about the City of
7 Dothan in a moment.  Besides the City of Dothan, did
8 any of these other municipalities indicate to you that
9 they had received derogatory information about you
10 from the sheriff's office, or anyone else for that
11 matter?

12      A.      No, sir.

13      Q.      And so you say you started looking about
14 November.  Do you recall when it was -- I'm sorry,
15 after Thanksgiving in '04.  Do you recall when it was
16 that you actually put the application in to Dothan?
17 Was it after the first of the year or was it before
18 then?

19      A.      I think it was right at the first of the
20 year.

21      Q.      And how long after that were you
22 interviewed?

23      A.      Probably February.  I think the
24 interviews went in February, and maybe the first week
25 in March.

1   Q.    And when were you offered the job?

2   A.    March the 15th.  That's when I actually

3 started.  I was offered the position before that, but

4 I actually started March the 15th.

5   Q.    Do you recall when you were actually

6 offered the position?

7   A.    Probably a couple of weeks before that.

8   Q.    March 1st or so?

9   A.    Yeah.  And once again, that would be a

10 guess.

11   Q.    Do you know how many applicants other

12 than yourself were part of the process?

13   A.    No, sir, I do not.

14   Q.    Do you know how many people they

15 interviewed?

16   A.    No, sir, I do not.

17   Q.    Did they tell you they were interviewing

18 other people?

19   A.    I saw other people being interviewed --

20 or coming out of the interview process, but I don't

21 have an idea how many people, total, were interviewed.

22   Q.    How many do you recall seeing at the

23 interview process?

24   A.    The day I was there, it seemed like

25 there was three or four people that was involved in

1 going in and out of the interview process.

2      Q.      Didn't recognize any of them?

3      A.      No, sir.

4      Q.      Now, do you know what Dothan, Alabama,

5 did in the way of background investigation as they

6 processed your application for chief of police?

7      A.      I don't have any idea as far as the

8 background work.  I do know that there was a number of

9 meetings with the city manager that was generated

10 pursuant to the background.

11     Q.      That you had with the city manager?

12     A.      Yes, sir.

13     Q.      Do you know if Dothan, Alabama, obtained

14 from the City of Wilson your employment file there?

15     A.      I do not.

16     Q.      Do you know if they obtained from the

17 City of Wilson this internal affairs investigation

18 that was conducted by Captain Johnson about the

19 allegations involving Ms. Dampier?

20     A.      I do not.

21     Q.      Did you, as a part of the application

22 process, sign releases enabling them to get this

23 information from your prior employers if they chose

24 to?

25     A.      I did.

1    Q.    Did you ever receive any contact from

2 anyone at the City of Wilson indicating to you that

3 they had been contacted by the City of Dothan about

4 your employment there?

5    A.    I don't recall being contacted by

6 anybody.

7    Q.    And do you have any knowledge about what

8 the City of Dothan did in the way of contacting the

9 Escambia County Sheriff's Office about background

10 information?

11    A.    No, sir, I do not.

12    Q.    So you indicated that at some point in

13 time you became aware that the City of Dothan had come

14 into possession of certain information about you?

15    A.    Yes, sir.

16    Q.    Did they show you the information that

17 they had received?

18    A.    Yes, sir.

19    Q.    And what did they show you that they had

20 received?

21    A.    The information that they had received

22 reflects the document that you have marked, I guess it

23 would be Exhibit B-1.

24    Q.    My marking is the ink in the lower

25 right-hand corner.

1      A.      Oh, I apologize.  Exhibits 1 and 2, I

2 actually had a conversation with the city manager

3 about that document.

4      Q.      And who is that city manager that you

5 conversed with?

6      A.      Mike West.

7      Q.      Is he still the city manager?

8      A.      He is.

9      Q.      And did Mr. West tell you how he had

10 come into possession of those documents?

11      A.      There was a fax page on the top of it,

12 it indicated that it came from a Roberts bonding

13 agency out of Pensacola.

14      Q.      Was there any other information on the

15 fax sheet other than the fact that it was from

16 Roberts?

17      A.      There was some writing on it, but I

18 don't remember what the writing was.  He maintained it

19 in his file.

20      Q.      Okay.  And are you familiar with Roberts

21 bonding agency?

22      A.      I am.

23      Q.      What do you know about Roberts bonding

24 agency?

25      A.      Steve and Therell Roberts, who are the

1 owners of Roberts bonding agency, was a strong

2 supporter of Ron McNesby when he was running for

3 sheriff.

4     Q.     Have you ever spoke with Mr. Roberts

5 about -- either Steve or Therell Roberts, about this

6 fax?

7     A.     No, I have not.

8     Q.     Aside from your attorney, has anyone

9 else told you that they've spoken with either of these

10 gentlemen about the fax?

11     A.     I don't recall if the city manager said

12 he talked to them or not, but I do recall seeing the

13 fax cover sheet.

14     Q.     So you have no idea how Steve or Therell

15 Roberts, or anyone else at Roberts bonding agency,

16 came into possession of Exhibits 1 and 2?

17     A.     No, sir.

18     Q.     Do you have any information, from any

19 source at all other than your attorney, that those

20 documents were delivered to Mr. Roberts by someone

21 associated with the sheriff's office?

22     A.     No, sir, I do not.

23     Q.     Did Mr. West indicate to you that he had

24 had any conversations with anyone at the Escambia

25 County Sheriff's Office about this information?

1    A.    Not that I recall, no, sir.

2    Q.    Did he indicate to you that he had had

3 any conversations with anyone at the Escambia County

4 Sheriff's Office about your past employment there or

5 about your character, about anything at all in terms

6 of a job referral?

7    A.    No, sir, he did not.

8    Q.    And I'm not only talking about at this

9 initial meeting, I'm talking about at anytime during

10 the course of this application process or thereafter.

11    A.    No, sir.

12    Q.    And so I presume that during the

13 interview process, Mr. West asked you about this

14 information?

15    A.    He did.

16    Q.    Okay.  Was that during the first

17 interview or were there multiple -- well, let me ask

18 you, were there multiple interviews before you got the

19 job?

20    A.    Yes.

21    Q.    And who did you interview with?

22    A.    The initial interview was with a group

23 of citizens from the community.

24    Q.    Were any of the issues found in

25 Exhibits 1 or 2 raised during that interview?

1    A.    No.

2    Q.    And then when or who was the next

3 interview?

4    A.    The next interviews were a series of

5 one-on-one interviews with the city manager.

6    Q.    How many?

7    A.    There was probably three or four

8 interviews with the city manager.

9    Q.    And during those interviews, was the

10 information found in Exhibits 1 and 2 the subject of

11 discussion?

12    A.    Yes.

13    Q.    At all of them, or the first one, the

14 last one?  Can you expand on that a little bit for me?

15    A.    They were discussed -- I don't remember

16 at what stage, but they were discussed, in addition to

17 some other information that had been sent by Larry

18 Smith in regards to the arrest, the battery charge

19 that I had earlier.  But I don't recall what stage

20 that the discussions took place, but I know it was

21 during those meetings that we did talk about it.

22    Q.    And I presume you explained to him what

23 you've explained to me today in response --

24    A.    I did.

25    Q.    -- to the allegations?

1          So, for instance, with regards to

2 Ms. Dampier, you told him that there were rumors, they

3 were investigated, there was no finding of wrongdoing

4 on your part?

5     A.    Correct.

6     Q.    And did he ever indicate to you that as

7 a result of what you had told him, he was going to

8 follow up on that with the City of Wilson, get copies

9 of the documents or anything like that?

10    A.    He didn't indicate to me.

11    Q.    And you don't know whether he did that

12 or not?

13    A.    I do not.

14    Q.    Did Mr. West seem to accept your

15 explanation in response to these allegations?

16    A.    Yes.

17    Q.    And ultimately you were hired?

18    A.    That's correct.

19    Q.    In terms of your hiring, was there a

20 salary range that you were eligible to be hired at, do

21 you know?

22    A.    It was not advertised, but I assume --

23 and that's an assumption on my part -- that there is a

24 salary range assigned to the position.

25    Q.    You don't know for a fact that there's a

1 salary range?

2      A.      I do not.

3      Q.      So you don't know whether you were hired

4 at the low end of the salary range or the high end of

5 the salary range?

6      A.      I do not.

7      Q.      Do you know what the previous chief had

8 been making?

9      A.      No, sir, I do not.

10      Q.      The previous chief, had he retired or

11 resigned?

12      A.      He retired.

13      Q.      Besides the interviews with the citizen

14 board and then Mike West, were there additional

15 interviews that you engaged in before you were hired

16 for the chief position?

17      A.      For lack of a better term, I had to

18 undergo a confirmation hearing with the city

19 commission, and I learned that they had each received

20 a copy of the material also.

21      Q.      Do you know who they received a copy of

22 the material from?

23      A.      No, sir, I do not.

24      Q.      Do you know whether Mr. West gave it to

25 them?

1    A.    Mr. West did not give it to them.

2    Q.    Did you ever inquire of any of the

3 commissioners in terms of how they obtained the

4 information?

5    A.    I did.

6    Q.    And what did they tell you?

7    A.    Through the mail.

8    Q.    And did any of them provide to you or

9 save the envelopes that they received them in?  Did

10 you ever see those?

11    A.    I did not see them, but they were very

12 specific to tell me that it did not have a return

13 address on the envelopes.

14    Q.    And I presume no cover letter or note or

15 anything of that nature?

16    A.    No, sir.

17    Q.    So do you have any information -- again,

18 other than what your attorney has told you -- that you

19 know personally or that anyone else has told you, that

20 this information was provided to Mike West or the city

21 commissioners by McNesby, Smith, or Blackburn?

22    A.    Other than what Swinehart indicated,

23 that he put the packet together and provided it to

24 Ron McNesby.

25    Q.    But there was nothing about -- other

1 than he thinks -- I forget your word, it wasn't

2 "think," but that he has some belief that Nan Weaver

3 did that, no other information that McNesby,

4 Blackburn, or Smith were personally involved?

5     A.     Other than Mr. Swinehart saying he

6 provided the documents to Mr. McNesby.

7     Q.     But the next step of them going from

8 McNesby to the City of Dothan, you have no information

9 that McNesby did that, that Smith did that, or

10 Blackburn did that?

11     A.     No, sir.

12     Q.     When you went before the board of city

13 commissioners as a part of the application process,

14 did they inquire of you pertaining to the information

15 found in Exhibits 1 and 2?

16     A.     They inquired individually prior to

17 going before the board as a whole.  Additionally, when

18 we had new commissioners that were seated, I think it

19 was in 2007, the new commissioners also received those

20 documents.

21     Q.     Do you know who they received them from?

22     A.     No, sir, it was the same format as the

23 previous commissioners.

24     Q.     So they received them separately, as

25 opposed to them just having them in the office

1 available?

2     A.     That's correct.

3     Q.     It's your belief that someone sent

4 them -- sent it to them yet again, in an envelope

5 without a return address?

6     A.     That is correct.

7     Q.     And as to those city commissioners,

8 again, you have no information as to who they

9 received -- who sent those documents to them?

10     A.     No, sir.

11     Q.     When you say you met with the board of

12 city commissioners individually about that

13 information, was that in private?  Was that

14 one-on-one?

15     A.     Either one-on-one or two-on-one.  It was

16 done in our offices prior to, you know, actually going

17 out before the public in the actual official call

18 meeting.

19     Q.     I'm not familiar with Alabama law.  Do

20 they have a Sunshine Law there like we have in

21 Florida?

22     A.     They do.

23     Q.     And those kind of meetings are exempt

24 from the Sunshine Law?

25     A.     That's correct.

1    Q.    And then you say that the questions

2 about the information found in Exhibits 1 and 2 were

3 raised again during the public hearing for your

4 appointment?

5    A.    It was not raised during the public

6 hearing, no, sir.

7    Q.    It didn't come out at the public hearing

8 at all?

9    A.    It did not.

10    Q.    And the vote for your appointment, what

11 was it?

12    A.    Unanimous vote.

13    Q.    How many city commissioners voted?

14    A.    We have seven that's on the -- well, six

15 commissioners and the mayor.

16    Q.    Now, you made reference to information

17 that was sent by Larry Smith regarding your battery

18 charge?

19    A.    Correct.

20    Q.    Who was that sent to?

21    A.    The city manager.

22    Q.    Mike West?

23    A.    Yes.

24    Q.    And how is it that you know that Larry

25 Smith sent that information?

1    A.    I saw the e-mail -- e-mail document.

2    Q.    You don't have a copy of it?

3    A.    I do not.  The city manager has the

4 document.

5    Q.    And it's an e-mail from Larry Smith to

6 the city manager?

7    A.    I don't know if it was addressed

8 directly to him or not, but he had the document in his

9 file.

10    Q.    But it clearly is from Larry Smith at

11 the sheriff's office?

12    A.    Yes.

13    Q.    What does the document say?

14    A.    It's just language pertaining to the

15 arrest, me being arrested for battery.  It generated

16 the city manager to inquire about the incident, which

17 we discussed the incident thoroughly.  And I guess the

18 decision was made that he was satisfied with the

19 explanation.

20    Q.    And again, what Mr. Smith told the city

21 manager was truthful, you had been arrested for

22 battery?

23    A.    Correct.

24    Q.    Okay.  Was that information about the

25 battery charge shared with the other commissioners, to

1 your knowledge?

2    A.    I don't know that.

3    Q.    You weren't asked about it?

4    A.    No, sir.

5    Q.    Now, you say this information was sent

6 again in 2007.  What, were there new city

7 commissioners elected?

8    A.    Yes, sir.

9    Q.    How many new commissioners?

10    A.    I think there was three.

11    Q.    Okay.

12    A.    May not be newly elected, but

13 reelected -- but I think there was two new ones that

14 was elected, if I recall correctly.

15    Q.    And then when they were elected, did

16 they have to reappoint you?

17    A.    No, sir.

18    Q.    So there were no proceedings going on

19 pertaining to you that involved these documents?

20    A.    No, sir.

21    Q.    And after they received the documents,

22 what happened then?

23    A.    The documents were provided to the city

24 manager, and I was made aware that the documents had

25 been resent.

1    Q.    Did those new commissioners speak to you

2 about the allegations?

3    A.    No, sir.

4    Q.    While you've been chief of police at

5 Dothan, have you been the subject of any

6 investigations at all?

7    A.    No, sir.

8    Q.    Been the subject of any discipline?

9    A.    No, sir.

10    Q.    Have you had any conversations with

11 present Sheriff Morgan about this lawsuit?

12    A.    Since he's been elected as sheriff?

13    Q.    Yes, sir.

14    A.    No, sir.

15    Q.    Did you have conversations with him

16 before he was elected sheriff?

17    A.    I think two years ago, I think we may

18 have had a telephonic conversation where I indicated

19 that I was thinking about filing a lawsuit against the

20 sheriff.

21    Q.    Did you call him or did he call you?

22    A.    I don't recall.  It wasn't uncommon for

23 us to talk on the telephone.

24    Q.    Are you acquainted with Mr. Morgan,

25 Sheriff Morgan?

1     A.     Yes.

2     Q.     How are you acquainted with him?

3     A.     We met each other during the campaign in
4 2004, and during his bid for election against Sheriff
5 McNesby, there was times where we had conversation
6 where he would ask for an opinion on something that
7 involved the campaign, you know, what I thought about
8 it.

9     Q.     And in the 2004 election, did Sheriff
10 Morgan support anyone?

11     A.     After the primary election, he was
12 defeated by Ron McNesby, Sheriff Morgan came out and
13 supported me.

14     Q.     But you haven't spoken with Sheriff
15 Morgan about this lawsuit since he's been elected?

16     A.     I have not.

17     Q.     Besides a couple of years ago telling
18 him you were thinking about suing McNesby, that's the
19 only conversation that you had with him about the
20 lawsuit?

21     A.     Yes.

22     Q.     After you filed it, while the campaign
23 was still ongoing in 2008, you didn't speak with him
24 about it at all?

25     A.     No, sir.

1      Q.      Since Sheriff Morgan has been elected,

2  have you been to the Escambia County Sheriff's Office?

3      A.      Yes.

4      Q.      And have you met with Sheriff Morgan?

5      A.      I have.

6      Q.      For what purpose?

7      A.      I went to the swearing in of the

8  sheriff, I think it was the 6th of January,

9  congratulated him on him winning the election.  He

10 called me after the swearing in and asked me if I

11 would come by.  There was some discussion of

12 employment with the sheriff's department, and he

13 wanted to meet with me.  That was the following day,

14 which would have been the 7th of January, which was on

15 a Wednesday.  And I went by and met with the sheriff.

16     Q.      You say discussion regarding employment?

17     A.      Yes, sir.

18     Q.      Was that him initiating contact with you

19 about employment or you contacting him about

20 employment?

21     A.      He initiated the contact in regards to

22 employment.

23     Q.      And what sort of employment did he speak

24 to you about?

25     A.      It was a question about coming on board

1 in a management position with the sheriff's

2 department.

3      Q.      Any particular position or rank

4 discussed?

5      A.      There was -- I don't think that there

6 was ever discussion about rank, but there was a

7 discussion about working in patrol, and working in

8 Homeland Security, and working in, also, internal

9 affairs.

10      Q.      And how many times have you discussed

11 that with Sheriff Morgan?

12      A.      The initial discussion started in

13 November.  There were numerous contacts.  The last

14 discussion, I don't recall the date, but it was on a

15 Friday in January, and basically the decision was made

16 that the funding is not available for the position,

17 and that was the last discussion that we've had.

18      Q.      Did you indicate to him that if the

19 funding was available, you were interested in such a

20 position?

21      A.      Indicated to him if the funding

22 circumstances change at the sheriff's office,

23 certainly, you know, I would be willing to discuss any

24 options that may be available.

25      Q.      Was that -- was the -- assuming there

1 were funding sources, was the pay rate you were

2 discussing a raise from your Dothan pay?

3    A.    About the same as what I'm making in

4 Dothan.

5          MR. PETERSON:  Do you mind if we take a

6    break?

7          MR. TISCHLER:  No, not at all.

8          MR. PETERSON:  We've been going a couple

9    of hours.

10          (A break was taken.)

11    Q.    (By Mr. Tischler)  Besides the

12 individuals that you've identified already, if I'm

13 recalling correctly from some of your earlier

14 testimony, you seemed to indicate that it's your

15 belief that other people in the Dothan area have

16 received this information that's found in Exhibits 1

17 and 2, besides the city commissioners and Mr. West?

18    A.    Yes.

19    Q.    Okay.  And who else do you understand

20 this information to have been provided to?

21    A.    The media.  Rickey Stokes would be one

22 of them.

23    Q.    Okay.  Has Mr. Stokes told you how he

24 came to that information?

25    A.    No.

1      Q.     And you just know that Mr. Stokes has

2 it?

3      A.     Yes.

4      Q.     Because he posted it on his web site, is

5 that what you said?

6      A.     Posted that he had documents --

7      Q.     Okay.

8      A.     -- from Pensacola.

9      Q.     He didn't post the documents themselves?

10     A.     No.

11     Q.     Okay.  And -- but you have no idea where

12 he got them from?

13     A.     No.

14     Q.     And does the City of Dothan have a

15 public records law?  I'm sorry, does the State of

16 Alabama have a public records law?

17     A.     Yes.

18     Q.     And based upon your understanding of the

19 public records law, would this information be

20 available pursuant to a public records request made

21 for your personnel file or documents pertaining to

22 your investigation, your background investigation?

23     A.     I don't know if personnel files are

24 covered by the open records law in the State of

25 Alabama.  I'm not -- I don't think so.

1    Q.    So who else besides Mr. Stokes do you

2 believe this information has been provided to?

3    A.    I received two independent copies of

4 this document from officers who work with the City of

5 Dothan Police Department.

6    Q.    And who were those persons?

7    A.    Tommy Martin provided a copy to me, that

8 he found -- he was overseeing investigations at the

9 time.  He found it in one of the officers' desk when

10 that officer had moved.  And then it was also

11 presented to me by a female officer --

12    Q.    Sylvia Sommers?

13    A.    Sylvia Sommers, thank you.

14    Q.    Now, whose desk did Tommy Martin find

15 this information?

16    A.    I believe it was Mike Sorelli.

17    Q.    Does Mr. Sorelli still work at the

18 Dothan Police Department?

19    A.    Yes.

20    Q.    Have you spoken to Mr. Sorelli about the

21 documents?

22    A.    I have not.

23    Q.    Do you know whether anyone has spoken to

24 Mr. Sorelli about the documents on your behalf?

25    A.    Not that I'm aware of.

1    Q.    So you have no idea where Mr. Sorelli

2  got the documents from?

3    A.    No, sir.

4    Q.    And all Tommy Martin knows about the

5  documents is that he found them in Mr. Sorelli's desk?

6    A.    Correct.

7    Q.    Was this a desk that Mr. Sorelli had

8  vacated?

9    A.    Correct.

10    Q.    And Ms. Sommers, did she tell you how

11  she came to possession of the documents?

12    A.    If I recall correctly, she made a

13  comment that she got it from some of the union members

14  that's associated with the International Brotherhood

15  of Police Officers, I think is the name of the union,

16  and she felt it necessary that I be made aware of it

17  and she brought me a copy of it.

18    Q.    What's Ms. Sommers' position at the

19  Dothan P.D.?

20    A.    She no longer works with the Dothan

21  Police Department, but she is employed in law

22  enforcement.

23    Q.    Do you know where?

24    A.    No, sir, I do not.

25    Q.    Is it in the Alabama area?

1      A.      It's in Alabama, it's in the area.

2      Q.      South Alabama?

3      A.      Yes, sir.

4      Q.      Do you know whether she still lives in

5 Dothan, the greater Dothan area?

6      A.      I do not.

7      Q.      And so she got it from this union

8 organization?

9      A.      Correct.

10      Q.      And did you ever find out how the union

11 organization came into possession of it?

12      A.      No, sir.

13      Q.      Anyone else in the Dothan area that you

14 know of to have had this document delivered to them

15 from any source?

16      A.      Not that I'm aware of or not that I can

17 recall at this time.

18      Q.      In your answers to interrogatories, you

19 listed a Willie Williamson, about materials sent to

20 officials in the City of Dothan.  Do you know anything

21 about Mr. Williamson having this?

22      A.      It would be a female.  She is a

23 lieutenant with the police department.  And I believe

24 that is the chain of command that Sylvia Sommers went

25 through.

1      Q.      So it's not as if Ms. Williamson got

2  this document directly?

3      A.      That is correct.

4      Q.      And you also list Keith Gray.  Is that

5  also a chain of command involving Ms. Sommers?

6      A.      No, sir, I think Keith Gray -- well,

7  Keith Gray is a lieutenant with the police department,

8  and I believe that he has independent information

9  concerning the document.

10      Q.      Have you spoken with him about it?

11      A.      Other than the fact that he made mention

12  that he was aware of the document and what it

13  contained, and he just wanted to make me aware of it.

14      Q.      He didn't indicate to you that he had

15  received the document from anyone?

16      A.      No, sir.

17      Q.      Mr. Gray and Ms. Williamson still work

18  with the Dothan P.D.?

19      A.      Correct.

20      Q.      Is there a process at the Dothan P.D.

21  where you accept summonses for officers that are being

22  subpoenaed for depositions and so forth?

23      A.      Yes -- I do not, but we have a process

24  where someone --

25      Q.      Yeah, I know you don't personally.

1      A.      Yes, sir.

2      Q.      Am I safe in presuming that in Alabama,

3 law enforcement officers' addresses are exempt from

4 public records or kept confidential, as in Florida?

5      A.      Yes, sir.

6      Q.      You also list Ken Curtis, television

7 station manager, WDHN?

8      A.      That's correct.

9      Q.      What is his role in this, as far as you

10 know?

11      A.      It's my understanding that he also

12 received a packet of information.

13      Q.      Have you spoken with Mr. Curtis about

14 that?

15      A.      I have not.

16      Q.      How is it that you know that Mr. Curtis

17 received this information, then?

18      A.      If I recall correctly, when Rickey

19 Stokes broadcast it on his web site that he had

20 received the information, he also listed the TV

21 stations as receiving the information.  And I think

22 that particularly he mentioned Ken Curtis.

23      Q.      Did he indicate whether the TV stations

24 had received the information from him or from some

25 other source?

1    A.    Did not indicate.

2    Q.    Okay.  Is Rickey Stokes a supporter of

3 you as chief of police in Dothan?

4    A.    I mean, he is an acquaintance.

5 Sometimes he publishes good things about law

6 enforcement, sometimes he publishes bad.  I don't know

7 how you would judge whether he's a supporter or not.

8    Q.    Has he been critical of you as chief of

9 police?

10   A.    He has, but he's also been positive too.

11   Q.    And has he been arrested by the Dothan

12 Police Department?

13   A.    He has.

14   Q.    And what was he arrested for?

15   A.    On which occasion?

16   Q.    So he's been arrested multiple times,

17 then?

18   A.    Yes, sir.

19   Q.    What has he been arrested for on those

20 multiple occasions?

21   A.    It's my understanding he was arrested

22 concerning -- and once again, I was not involved in

23 it, and it occurred prior to me getting there, but I

24 think it was an aggravated assault charge.  He was

25 arrested for a perjury charge during my

1 administration.

2      Q.      Was he convicted of that charge?

3      A.      I don't think he was convicted on either

4 charge.

5      Q.      Any other arrests besides those two,

6 that you're aware of?

7      A.      Not that I'm aware of, no, sir.

8      Q.      Now, also on your answers to

9 interrogatories, you list Mike West.  He's still the

10 city manager.  Chester Sowell is the former mayor?

11      A.      Yes.

12      Q.      Does he still live in Dothan?

13      A.      He does.

14      Q.      Do you have an address for him or access

15 to an address for him?

16      A.      I don't have an address -- I mean we can

17 get an address, but I don't have it with me.

18      Q.      Is Jason Rudd still a councilman?

19      A.      No, sir, he's a former councilman.

20      Q.      Does he still live in Dothan?

21      A.      He does.

22      Q.      Paul Lee, still a councilman?

23      A.      Current council member.

24      Q.      Phillip Tidwell still a councilman?

25      A.      Former council member.

1    Q.    Still live in Dothan?

2    A.    As far as I know, yes, sir.

3    Q.    Amos Newsome?

4    A.    Current council member.

5    Q.    Clark Matthews is an EMA director.  What

6 does he know about this?

7    A.    He has had conversations with Rickey

8 Stokes concerning this information, and also about his

9 contact with Ron McNesby.

10    Q.    So it's your understanding Mr. Matthews

11 had direct contact with Mr. McNesby?

12    A.    No, it's my understanding that

13 Mr. Matthews talked with Ricky Stokes, who has had

14 direct contact with Ron McNesby.

15    Q.    This is something Matthews told you?

16    A.    Yes.

17    Q.    And Pat Thomas is still the mayor?

18    A.    Correct.

19    Q.    I presume you've never spoken with

20 Jimmy Calhoun regarding these matters?

21    A.    I have not.

22    Q.    Do you know Jimmy Calhoun at all?

23    A.    No, sir, I do not.

24    Q.    When you were in North Carolina, you had

25 not heard of him or known him?

1    A.    No, sir.

2    Q.    When you were with the FBI, had you ever

3 heard his name?

4    A.    No, sir.

5    Q.    Besides these individuals that we've

6 talked about now in Dothan, anyone else that you're

7 aware of that's received this information, Exhibits 1

8 and 2?  I'm talking about the sheriff's office, I'm

9 talking about Dothan, I'm talking about anywhere else

10 in the world that you're aware of that this

11 information has been distributed to.

12    A.    At this time, not that I'm aware of.

13    Q.    And besides the information that's found

14 in Exhibits 1, 2, and 4, and the disclosures

15 pertaining to your arrest for battery, any other

16 derogatory information that you believe has been

17 disclosed about you by McNesby, Smith, or Blackburn?

18    A.    Not that I'm aware of.

19    Q.    During the course of the 2004 campaign,

20 did you speak with now Sheriff Morgan about these

21 disclosures found in Exhibits 1 and 2?

22    A.    I don't know if we particularly talked

23 about the documents themselves.  I think that we made

24 comments between each other about what we called dirty

25 campaigning or mudslinging, I think there was

1 conversations about that.

2    Q.    Now, in paragraph 20 of your complaint

3 you made allegations about threats to ruin you. And

4 you listed as witnesses McNesby, Smith, Steele, Lutz,

5 and House. So I'm presuming those all relate to this

6 conversation you already told me about that occurred

7 at the investigations division?

8    A.    What page are you on, sir?

9    Q.    Paragraph 20, sir.

10    A.    That's correct, sir.

11    Q.    There were no other allegations that you

12 heard made by McNesby or Smith to ruin you?

13    A.    Just the conversation that we had in

14 that office that day.

15    Q.    Okay.

16    MR. MURRAY:  Tell him about the airport.

17    A.    Prior to my -- my going to the sheriff's

18 department, I had flown in and arrived at the

19 Pensacola Regional Airport, Dan House and myself both.

20 I don't remember what time of day it was, but when we

21 come off of the plane and coming onto the -- coming

22 into the terminal, there was a member of the Escambia

23 County Sheriff's Office that was present, somebody who

24 I've known for years, Jeff VanCamp was present. Jeff

25 approached me, seemed to be extremely -- was nervous,

1 and made a statement that if I was going to run for

2 sheriff -- and once again, I'm paraphrasing, this is

3 as I recall -- that Larry Smith had made comments that

4 he had information on me that he would ruin me if I

5 tried to run for sheriff in Escambia County.  And Jeff

6 felt like he was obligated to let me know that because

7 we were friends.

8      Q.     (By Mr. Tischler)  Was this a chance

9 meeting or did Mr. VanCamp know you were coming in

10 that day?

11      A.     Jeff indicated to me that he was there

12 to pick up somebody for the Crime Stoppers meeting

13 that was taking place in town, indicated to me he just

14 happened to be at the airport at the same time I was

15 coming in, because he was there to meet somebody else.

16      Q.     And did he tell you when Mr. Smith had

17 made this allegation, had made this statement?

18      A.     No, sir, he did not.

19      Q.     And this was before you had

20 prequalified?

21      A.     Yes.

22      Q.     Any other knowledge you have about

23 threats to ruin you made by McNesby, Smith, or

24 Blackburn, as you've alleged in your complaint?

25      A.     No, sir, not that I can recall at this

1 time.

2     Q.     Besides the fact that you say that

3 Mr. Swinehart has told you that he had this

4 information and gave it to then Sheriff McNesby, do

5 you have any other proof that McNesby, Smith, and

6 Blackburn somehow conspired or agreed to create and

7 disseminate false information pertaining to you?

8     A.     Just the document itself, from the

9 information that Mr. Swinehart provided that he had

10 prepared a document and provided it to Ron McNesby.

11 Swinehart was working for Ron McNesby as his campaign

12 consultant.  The e-mail that I've seen from the

13 sheriff's department, the one that I mentioned from

14 Larry Smith.

15     Q.     About the battery arrest?

16     A.     Correct.

17     Q.     Which is truthful?

18     A.     Correct.  The fact that the document has

19 followed me when I left Escambia County, Florida, and

20 I try to continue on basically with my life and my

21 career in Dothan, Alabama.  And this is a campaign

22 document that nobody else basically -- for lack of a

23 better term, you know, really wouldn't care about

24 anything.  I mean, this campaign, it's over with.

25 It's a dead issue.  And yet this document continues to

1 resurface time and time again.  And it appears to be

2 driven by the people who have control over it, which

3 would be Ron McNesby, because he's the one who

4 actually had the document put together.

5     Q.    But there were others that had access to

6 this document, including those within your own

7 campaign?

8     A.    You could speculate that, yes.

9     Q.    That's not speculation, that's proof,

10 that's true, they had access to this document?

11    A.    Yes.

12    Q.    Okay.  Let me show you -- before I

13 staple it, I want to make sure this all goes together.

14 Let me show you what I'm going to mark as Exhibit 7,

15 and ask you if that's a copy of the complaint that you

16 submitted pertaining to the confrontation with Rex

17 Blackburn.

18    A.    It's a copy of a document that has my

19 signature on it, and also my initials on the two

20 pages, which looks like it reflects the complaint that

21 was filed with the sheriff's department.

22    Q.    And there's also another page attached

23 to it that's a citizen complaint, the last page.  I

24 just want to make sure this goes together.  Did you

25 fill that out?

1    A.    No, sir, it was typed.  I didn't fill

2 this out.

3    Q.    Okay.  Have you ever seen that before

4 today, other than when I produced it to your attorney?

5    A.    Not this.

6    Q.    So based upon your familiarity at the

7 sheriff's office, do you think that would have been an

8 internally created document for purposes of processing

9 the complaint?

10    A.    It looks like it would be a document

11 from the sheriff's department.

12    Q.    Let's remove that, then, since that's

13 not the document you have any personal knowledge of,

14 and we'll just staple this together.

15              (Defendants' Exhibit Number 7

16              was marked for identification

17              and hereto attached.)

18    Q.    Without going through it line by line,

19 me asking you questions about it, let me just ask you

20 this, Mr. Powell.  I presume that since you submitted

21 this to the sheriff's office as a complaint,

22 everything contained in here would be true and

23 accurate?

24    A.    Correct.

25    Q.    You would not submit a false statement

1 to the sheriff's office for purposes of investigating

2 a matter, would you?

3     A.     I would not.

4     Q.     Is there anything that you think that

5 you left out of this complaint that would be important

6 for me to know about this confrontation that occurred

7 with Mr. Blackburn back in May of 2004?

8     A.     No, sir, this was completed near as

9 close to the event as possible.  I don't --

10     Q.     Okay.  Now, was anyone present during

11 this confrontation that would have overheard it?

12     A.     No, sir.

13     Q.     Okay.  You list in your answers to

14 interrogatories, when I asked you about persons having

15 knowledge about this confrontation, Travis Peterson.

16 What would Mr. Peterson know about this confrontation?

17     A.     I contacted him right after the incident

18 occurred, by cellular telephone.

19     Q.     So anything he would know would be based

20 on what you told him?

21     A.     That is correct.

22     Q.     Do you know whether he had any contact

23 with the sheriff's office about the matter, Larry

24 Smith or anyone else?

25     A.     I do not.

1     Q.    And let me -- oh, do you know for a fact

2 whether Rex Blackburn was on duty at the time that

3 this occurred?

4     A.    I do not know for a fact, no, sir.

5     Q.    Do you know what his shift was at the

6 time?

7     A.    No, sir, I do not.

8           (Defendants' Exhibit Number 8

9           was marked for identification

10         and hereto attached.)

11    Q.    And Exhibit 8 is the document that you

12 received, I think you spoke of it earlier, from Larry

13 Smith, about the complaint.  Is that correct?

14    A.    (Witness reviews document.)  Yes, sir,

15 it's a copy of a document bearing Larry Smith's

16 signature on it.  Up top it says -- it has my name on

17 it, and it says in response to citizen complaint.

18    Q.    Do you recall receiving this letter?

19    A.    I recall receiving a letter, yes, sir.

20 I think this represents a copy of the letter I

21 probably would have received.

22    Q.    I presume you kept the letter after you

23 received it?

24    A.    I probably did, but I do not have it

25 now.

1     Q.    So you destroyed it with the other

2 campaign documents that you destroyed?

3     A.    Yes, sir, I mean, I --

4     Q.    Okay.  I notice that this letter

5 contains a "cc" to Greg Marcille at the State

6 Attorney's Office.  Had you contacted the State

7 Attorney's Office about this event?

8     A.    I did.

9     Q.    Did you ask them to file charges against

10 Mr. Blackburn?

11    A.    No, sir.  Just scanning over the

12 document that you provided me, the first document, if

13 you'll notice on the -- I thought I read in here where

14 I made contact with the State Attorney's Office.

15    Q.    Uh-huh (indicating affirmatively).

16    A.    Yeah, on the second page, the second

17 paragraph from the bottom, it's indicated on there

18 that the -- I contacted Greg Marcille and Barry Brooks

19 from the State Attorney's Office.

20    Q.    What was your purpose of contacting the

21 State Attorney's Office if you didn't request charges

22 be filed against Mr. Blackburn?

23    A.    Based on the circumstances -- well,

24 number one, I didn't file charges, I filed a complaint

25 with the sheriff's office.  Based on the circumstances

1 and the campaign going on at the time, I wanted to

2 make them aware of the event that had taken place

3 because I felt like the incident needed to be

4 investigated.  I was not sure what kind of response I

5 would get from the sheriff's department, based on

6 previous contacts I had with the sheriff's office.

7    Q.    Did you actually speak to these two

8 individuals at the State Attorney's Office?

9    A.    Yes.

10    Q.    And did you ask them to conduct an

11 investigation?

12    A.    I don't know if I asked them to conduct

13 the investigation or just made them aware of what had

14 occurred.

15    Q.    And you didn't ask them to file charges?

16    A.    No, sir.

17    Q.    Or have any information issued or

18 anything?

19    A.    Not that I recall, no.

20    Q.    Did you ever see Mr. Blackburn's

21 response to your allegations, his written response?

22    A.    I don't recall if I've seen it or not,

23 sir.

24    Q.    Besides Larry Smith, did you have

25 conversations with anyone else at the sheriff's office

1 about your complaint and the investigation and so

2 forth?

3      A.      Jim Powell.  He is no relation to me.

4      Q.      Okay.  And when did you converse with

5 Mr. Powell, and tell me about that conversation,

6 please?

7      A.      Jim Powell was actually assigned to

8 follow up the investigation by the sheriff's office.

9 He's actually the investigator who took the complaint.

10 He came over to the campaign office to take the

11 complaint.

12      Q.      Any other contact with Mr. Powell?

13      A.      During this period in time?

14      Q.      Right.

15      A.      After he took the complaint, no, sir.

16      Q.      Any contact with Mr. Powell thereafter?

17      A.      Yes.

18      Q.      What was the nature of your contact with

19 Mr. Powell thereafter?

20      A.      January the 6th, at the swearing in, I

21 saw Jim Powell after the swearing in.  We were all

22 standing around -- and when I say "all," there was a

23 bunch of us standing around talking.  There was a

24 comment that was made concerning the trespass warning

25 that had been issued against me by the sheriff, and

1 also the investigation that Jim Powell had run

2 concerning Rex Blackburn.  Jim Powell kind of shrugged

3 it off and said he never really got a chance to

4 investigate it, because he took the complaint and

5 Larry Smith immediately relieved him of the complaint

6 and basically took over the investigation.

7      Q.     Okay.  And did he say something about

8 the trespass warning also?  Did you just reference

9 that?

10     A.     I don't know if he actually said

11 something about it or if it was the group as a whole

12 that made a comment about it, about the trespass

13 warning.

14     Q.     What comment was made?

15     A.     The sheriff had actually came to me

16 right after the event, made an indication to me --

17 actually made a comment to me, that he thought that I

18 had been joking him all these years about being warned

19 against trespassing at the sheriff's office, that he

20 had spoke with Darlene Dickey and realized that it was

21 not a joke.  Apparently there was some kind of

22 documents or something that indicated that.  And that

23 since he had just been sworn in, that I could consider

24 the trespass warning had been lifted and I was welcome

25 to come visit him at the sheriff's office anytime I

1 liked.  And that was witnessed by Tracy Yuhasz.

2     Q.     You make an allegation about

3 surveillance, and when I asked you about that in an

4 interrogatory, you said Richard White has information

5 about this.  Who is Richard White?

6     A.     Richard White is a private investigator

7 who works for a number of attorneys in Pensacola.  He

8 has contacted me and said that they had uncovered some

9 information concerning the surveillance that Rex

10 Blackburn had conducted on me during the 2004

11 campaign, and also had information concerning the

12 surveillance conducted on Sheriff David Morgan during

13 the 2008 campaign.

14     Q.     When did he contact you about this?

15     A.     It seems like it was right after we

16 filed notice -- or actually filed the suit, is when

17 the contact came in.

18     Q.     Well, if you didn't have this

19 information from Mr. White before you filed the

20 lawsuit, what information did you base the allegation

21 in your lawsuit on, then?

22     A.     I'm talking about the -- when I say the

23 information on the lawsuit --

24     Q.     On page -- in paragraph 32 of your

25 lawsuit, you indicate that in August 2004 Blackburn

1 and other officers at the sheriff's office conducted

2 surveillance of the plaintiff.  At the time you made

3 that allegation, what information did you have?

4       A.      Richard White, once again, had also been

5 involved in the campaign, my campaign.

6       Q.      Okay.

7       A.      Even back in 2004, Richard White was

8 involved.

9       Q.      And he told you about it back then?

10      A.      They were -- no, not back then.  Not in

11 2004, he did not.  He revealed that there was -- they

12 had received information on documents from requests of

13 information that they had filed.  And I'm trying to

14 remember what the allegation was, but they had been

15 ongoing filing information requests from the sheriff's

16 department concerning activities that they had been

17 involved in.  Richard White -- and there was another

18 gentleman who ran for sheriff who was also a private

19 investigator.  He ran on the Democratic ticket this

20 past election, and I can't think of his name.  But he

21 ran on the Democratic ticket in this past election.

22 They had received numerous documents from the

23 sheriff's department, and Richard White said that he

24 had information indicating that Rex had been

25 conducting surveillance -- had conducted it on me, and

1 had been conducting it on David Morgan in the past

2 election and also in the current election.

3     Q.     You spoke to Mr. White directly about

4 this?

5     A.     Yes, I have.

6     Q.     And did he provide you with these

7 documents?

8     A.     He did not.

9     Q.     Do you know whether he's provided them

10 to anybody?

11     A.     Not that I'm aware of.  I mean, I don't

12 know if he's provided them to anybody or not.  But

13 like I say, he's an investigator here in Pensacola.

14     Q.     Did you put him in contact with

15 Mr. Murray?

16     A.     I believe Mr. Murray has a contact

17 number for him.

18     Q.     Do you know whether he provided to

19 Mr. Murray any documents --

20     A.     I do not.

21     Q.     -- to support this allegation that he

22 claims he has?

23     A.     I do not.

24     Q.     And so besides Mr. White, there's this

25 other Democratic candidate who also told you that he's

1 aware of documents pertaining to surveillance?

2    A.    He was assisting the other Democratic

3 candidate in retrieving the information from the

4 sheriff's department.

5    Q.    Richard White was?

6    A.    Yes.

7    Q.    Did he indicate to you where in the

8 sheriff's department he got the information from?

9    A.    No, sir, he did not.

10    Q.    In paragraph 34 and 35, I had asked

11 you -- you make allegations about a contract or

12 agreement pertaining to Swinehart and Calhoun.  And in

13 the interrogatories you listed Tim Kemp as someone who

14 has information about that, chief of police of

15 Hartsville Police Department.  Who is Tim Kemp and how

16 does he have this information and what information

17 does he have?

18    A.    Tim Kemp is currently the chief of

19 police for the City of Hartsville, South Carolina.

20    Q.    Did he replace you?

21    A.    Yes.

22    Q.    Okay.

23    A.    Tim Kemp was contacted by Mr. -- I don't

24 know if it's Calhoun or "Cahoon," in September of

25 2004, representing -- Mr. Calhoun was representing

1 himself to be working for Escambia County, and doing a

2 background check on myself.

3           During questioning, Tim Kemp asked for

4 some identification.  Calhoun told Kemp, Tim Kemp,

5 that he, in fact, was not working for Escambia County,

6 he had been hired by Ron McNesby to dig up dirt on me

7 during the campaign -- during the sheriff's campaign.

8      Q.     Mr. Kemp has told you this directly?

9      A.     He did.

10      Q.     In paragraphs 35 through 41, there's a

11 series of allegations about Calhoun obtained

12 derogatory information that he knew to be false, and I

13 had asked you in interrogatories about that.  You

14 listed a number of witnesses, most of whom we've

15 talked about.  Do you know whether, for instance,

16 Mr. Calhoun ever had contact with Slade Rand about the

17 information contained in these reports that are marked

18 as Exhibits 1 and 2?

19      A.     I do not.

20      Q.     So you don't know that Mr. Rand

21 contacted Mr. Calhoun and told him that the

22 information contained in these reports was in, fact,

23 false?

24      A.     I do not.

25      Q.     And we have already gone through

1 basically all of these people, and aside from

2 Lieutenant Adams, you don't know that any of these

3 people will actually say that the information found in

4 those reports is false, or that they notified Calhoun

5 or anyone else that the information found in those

6 reports was false?

7      A.     I have no idea what they will say.

8      Q.     In terms of the allegations in paragraph

9 42, 43, and 48 about the preparation and dissemination

10 of information, the packages containing this

11 information that's been marked as Exhibits 1 and 2, in

12 your answers to interrogatories you listed a number of

13 people.  We've already talked about Mr. Kunert and

14 Ms. Grant.  Have you ever spoke with Nan Weaver about

15 this information?  You also list her as a witness.

16     A.     I have not.

17     Q.     So all you know about what role Nan

18 Weaver might have in dissemination of this information

19 is based on what Mr. Swinehart -- what you claim

20 Mr. Swinehart told you?

21     A.     Correct.

22     Q.     Okay.  And you also list Jeff VanCamp.

23 Has Jeff VanCamp talked to you about dissemination of

24 this information found in Exhibits 1 and 2?

25     A.     Yes.

1      Q.      What has he told you about?

2      A.      I don't have all the particular details.

3 I have referred him to my attorney, Mr. Jim Murray.

4 But Jeff VanCamp has advised me he was present when

5 the information was faxed out.

6      Q.      Faxed to who?

7      A.      The City of Dothan, Alabama.

8      Q.      And you're aware that Mr. VanCamp has

9 sued the sheriff's office?

10      A.      I am.

11      Q.      And you're aware that Mr. Murray

12 represented him?

13      A.      I am.

14      Q.      What do you know about Dennis Williams'

15 role in the preparation and dissemination of this

16 information?  You listed him as someone.

17      A.      The position that Dennis Williams had

18 with the sheriff's office, he was present at many of

19 the campaign functions that were sponsored.  There was

20 a comment that Dennis Williams made that was overheard

21 by the secretary at the jail, and I would have to get

22 her name, that he could not believe that the City of

23 Dothan, Alabama, would hire me after they received all

24 that information that was sent.

25      Q.      Have you spoken with the secretary

1 directly?

2      A.      I have not.

3      Q.      How is it that you heard about this

4 comment?

5      A.      From her sister.

6      Q.      Who's her sister?

7      A.      Sandy Manaccia.

8      Q.      Does she work at the jail?

9      A.      She does not.

10     Q.      Did we mention Sandy Manaccia's name

11 earlier?

12     A.      No, sir.

13     Q.      What does Sandy Manaccia do?  How do you

14 know her?

15     A.      She is retired, and she assisted me with

16 the campaign.  Her sister is the administrative

17 secretary for the jail, I believe is her official

18 title.

19     Q.      During the course of the campaign, did

20 you have any direct contact with Dennis Williams about

21 the campaign?

22     A.      No, sir.

23     Q.      Were there any actions that Dennis

24 Williams took, that you're aware of, that were

25 derogatory in nature or served to impede your

1 campaign?

2      A.      Not that I'm aware of, no, sir.

3      Q.      Did you ever provide notification to the

4 sheriff asking him to, for lack of a better term,

5 cease and desist distributing this information,

6 McNesby or Smith or Blackburn?

7      A.      No, sir, I did not.

8      Q.      Did you ever -- other than the lawsuit,

9 did you ever provide to McNesby, Smith, or Blackburn

10 any notice that you believed that they had circulated

11 false information that was defamatory?

12     A.      Just the notice of intent to file a

13 lawsuit.

14     Q.      And that document speaks for itself in

15 terms of what it says, correct?

16     A.      Yes, sir.

17     Q.      Did you review that document before it

18 went out?

19     A.      I did.

20     Q.      You did?

21     A.      Yes, sir.

22     Q.      At that time, Chris Cadenhead was

23 representing you?

24     A.      Yes, sir.

25     Q.      In your response to my questions about

1 paragraphs 45 to 47, that I asked you about in your

2 interrogatories -- let me show you those.

3         MR. TISCHLER:  Let me mark these as

4     Exhibit 9.

5         (Defendants' Exhibit Number 9

6         was marked for identification

7         and hereto attached.)

8     Q.    These are your answers to Defendant

9 Blackburn's interrogatories, page 4, section "e."  I

10 had asked you to identify persons that have knowledge

11 regarding notification to an action by the city

12 attorney for the City of Wilson, North Carolina.  You

13 list all those persons.  Now, again, based upon the

14 testimony you've given me, you haven't talked to any

15 of these persons, so you don't know if they actually

16 spoke to Mr. Rand or not, do you?

17     A.    Independently, no, sir, I do not.

18     Q.    And did Mr. Rand tell you that he

19 specifically spoke with each of these people?

20     A.    That he had conducted an investigation

21 on the document that I had sent to him, independent on

22 his own.  That he had made contact, and had run down

23 the allegations that was contained in the document,

24 and that there was no basis for the complaint.

25     Q.    But he didn't tell you that he had

1 spoken to each one of these individuals personally?

2    A.    I don't know if he used that exact term

3 or not.

4    Q.    So you don't know whether these

5 individuals indicated that yes, that is what I told

6 Mr. Calhoun, or whoever generated those reports, or

7 no, I didn't tell him that?  You don't know that, do

8 you?

9    A.    I would have to contact Mr. Slade and

10 ask him about each one separately.

11    Q.    Okay.  In terms of the allegations found

12 in your complaint about the delivery of flowers --

13 it's found at paragraph 50 through 54.  The name of

14 the florist is Flowerama?

15    A.    Yes, sir.

16    Q.    Are they still in business?

17    A.    The company is still there, yes, sir.

18    Q.    Do you know if it's changed hands since

19 September 2004 when this occurred?

20    A.    I do not.

21    Q.    Have you contacted Flowerama to see if

22 they have any documentation at all about this purchase

23 of flowers?

24    A.    Recently or back then?

25    Q.    At any time.

1    A.    Back then, I did.

2    Q.    You did?

3    A.    Yes, sir.

4    Q.    And did they provide you any paperwork,

5 a purchase order, a sales slip, an invoice?

6    A.    No, sir, they had a videotape that they

7 retrieved from their security cameras.  The lady that

8 we contacted who was working at the store allowed us

9 to view the security tape, behind the counter, I guess

10 it would be in the office area of the store.  My wife,

11 Dell Cranford, and myself reviewed the videotape.

12    Q.    And did you recognize the person on the

13 videotape?

14    A.    Yes.

15    Q.    Who was it?

16    A.    Shawn Cook.  And I believe she has a

17 married name, but I know her as Shawn Cook.

18    Q.    Was she an employee of the sheriff at

19 the time?

20    A.    Yes.

21    Q.    Have you ever spoken with Ms. Cook about

22 this event?

23    A.    I have not.

24    Q.    Did you obtain a copy of that videotape?

25    A.    They would not provide a copy of the

1 videotape.

2     Q.     Why not?

3     A.     Because it was security for the store.

4     Q.     Have you since made any effort to obtain

5 a copy of the videotape, now that it's four years

6 later, five years later?

7     A.     I have not recontacted the store since

8 that period in time.

9     Q.     Did you ask them to preserve the tape?

10     A.     No, sir.

11     Q.     Did you ever speak with anyone else --

12 did you ever speak with anyone at the sheriff's office

13 about these events, to determine any additional

14 information about Ms. Cook's role?

15     A.     No, sir, I have not.

16     Q.     Do you have any knowledge as to whether

17 Ms. Cook did this on her own or -- assuming she did

18 it, or was instructed to do it by someone?

19     A.     I don't have any knowledge about who

20 instructed her or anything like that because I have

21 not made contact with her.

22     Q.     Okay.  And did you even, say, take a

23 still photograph of this image on the video camera, so

24 that it could be preserved?

25     A.     No, sir, I did not.

1    Q.    Did you ask to do that?

2    A.    No, sir.

3    Q.    And who is Cyrus Cranford?

4    A.    Dell Cranford was a campaign supporter,

5 a former employee of the sheriff's department, and a

6 friend.  I mean, he just -- he helped us out with the

7 campaign.

8    Q.    Does he still live in Pensacola?

9    A.    Actually, I believe he lives in Pace.

10    Q.    Have you had any contact with him since

11 September of 2004?

12    A.    Yes, sir.  I routinely contact him.

13    Q.    When was the last time you spoke to him?

14    A.    A couple of days ago, I guess.

15    Q.    Do you have an address for him?

16    A.    I do not have an address.

17    Q.    I presume you can get an address from

18 him?

19    A.    Yes, sir.

20    Q.    Do you know whether -- assuming it was

21 Ms. Cook that ordered these flowers, do you know

22 whether she did so on work time or on her own time?

23    A.    I don't have any idea, sir.

24    Q.    Was she in uniform?

25    A.    No, sir, she was not.

1    Q.    How was she dressed?

2    A.    In civilian attire, but she is a

3 civilian employee with the sheriff's office.

4    Q.    Can you describe for me her attire at

5 all, other than civilian?

6    A.    It was a black-and-white film.  It

7 appeared that she was in jeans, a light-colored shirt.

8 Hard to distinguish color because, once again, it was

9 black and white from the security monitor.

10    Q.    And at what distance was this shot from?

11    A.    Right from behind the counter where the

12 cash register is located.  I don't know how better to

13 describe it other than the --

14    Q.    Is the camera located in the ceiling?

15    A.    The camera is overhead, looking down at

16 the counter and the cash register.

17    Q.    What was the distance from the camera to

18 the counter?

19    A.    It's not far.  I mean, it would be the

20 distance -- the counter width and the work space

21 behind the counter, from the ceiling down to the

22 floor.  I mean, I -- 12 feet, 15 feet, maybe.

23    Q.    Was the film grainy or clear?

24    A.    It was about like most security cameras,

25 you know, it doesn't have a Class A picture to it, but

1 certainly the image that was on there was discernible.

2     Q.     Was it recorded on videotape or

3 digitally?

4     A.     I believe it was videotape.

5     Q.     And did the owner of the flower shop or

6 the people you were talking to at the flower shop

7 about this videotape indicate to you how long they

8 kept those tapes for?

9     A.     I don't recall them saying that, and I

10 think it was actually the manager of that particular

11 store.  I don't think it was the owner, but I think it

12 was the manager of that particular location that we

13 dealt with.

14     Q.     Do you know the name of that person?

15     A.     No, sir, I do not.

16     Q.     I presume you didn't make any notes

17 about any of these events as they were going on, in

18 terms of who you spoke with and so forth?

19     A.     No, sir, just other than the fact there

20 was three of us there that witnessed the tape.

21     Q.     Did the manager of the store that

22 pertained to this tape indicate how often they recycle

23 the tapes?

24     A.     No, sir.  I don't recall asking and I

25 don't recall her saying how often they recycle it.

1    Q.    And do you have any documents at all

2 pertaining to the delivery of this bouquet of flowers?

3 For instance, this reference to a card, do you have a

4 copy of that card?

5    A.    No, sir, I do not.

6    Q.    What happened to it?

7    A.    I'm not sure what happened to it.

8    Q.    Did you destroy it with the rest of the

9 campaign documents?

10    A.    I'm not sure what happened to it.

11    Q.    Well, if it's important enough to file a

12 lawsuit about, didn't you think it was important

13 enough to preserve?

14    A.    You're talking about 2004, and we were

15 trying to move on from the campaign.  And as far as a

16 card in and of itself, in the transition from one

17 location to the other, I'm not really sure what

18 happened to the card, as far as if it got misplaced or

19 if it was destroyed with the documents from the

20 campaign.

21    Q.    Since you've been employed with the

22 City of Dothan, have you applied for any other

23 employment, other than your conversations with

24 Sheriff Morgan about coming to Escambia?

25    A.    I have not.

1      Q.     Let me show you -- now, while you were

2 working in Wilson, North Carolina, as the chief of

3 police, did you maintain a residence there?

4      A.     I did.

5      Q.     You owned a residence?

6      A.     I did.

7      Q.     Does North Carolina have a homestead

8 exemption type thing like Florida does?

9      A.     I don't know.  I don't recall if they do

10 or not.

11      Q.     As a part of your employment with Wilson

12 Police Department, were you required to maintain a

13 legal residence within the city limits of Wilson?

14      A.     Correct.

15      Q.     And at that time, did you have any other

16 residences?

17      A.     No, sir, I had my primary residence,

18 which was inside the city limits.

19             (Defendants' Exhibit Number 10

20             was marked for identification

21             and hereto attached.)

22      Q.     Let me show you what I've marked as

23 Exhibit 10 to this deposition, which was provided to

24 me as part of discovery.

25      A.     (Witness reviews document.)

1      Q.      Do you recognize that as being your tax

2 return for 2003?

3      A.      Yes.

4      Q.      Okay.  What address does that show as

5 your residence?

6      A.      It shows [redacted] in Pensacola.

7      Q.      And you weren't residing there at the

8 time?

9      A.      No, that was a mistake.

10      Q.      And how long had it been since you had

11 resided at [redacted] in Pensacola?

12      A.      In 2003, when this was filed?

13      Q.      No, how long before this 2004 tax return

14 was completed and filed, which actually would have

15 occurred in 2005 --

16      A.      No, this would have been filed in '04,

17 would it not?

18      Q.      Well, if it's your 2004 tax return, you

19 usually don't file that until --

20      A.      This is 2003, sir.

21      Q.      I'm sorry, I'm looking at the wrong one.

22 My mistake, I apologize.  I put the wrong one in front

23 of me.  No, that's okay, I just had the wrong one in

24 my stack.

25                In 2004, when you would have filed that

1 tax return, how long had it been since you lived on

2 [redacted] in Pensacola?

3     A.    Well, when I filed this, I was living on

4 [redacted] in 2004.  It was an error on my part, when

5 I put down [redacted].  I should have put down my

6 previous address in North Carolina, because in 2004 I

7 was living on [redacted].

8     Q.    Okay.  Now, I noticed that there's

9 included in that a tax return from South Carolina.

10 What income did you have from South Carolina?

11     A.    That's from the teaching that I did for

12 Florence-Darlington Technical College, which is

13 located in South Carolina.

14     Q.    And you were doing that in 2003 while

15 you were working for the Wilson Police Department?

16     A.    Correct.

17         (Defendants' Exhibit Number 12

18         was marked for identification

19         and hereto attached.)

20     Q.    Okay.  And let me show you what we'll

21 mark as Exhibit 12.

22         MR. MURRAY:  Are you going to attach

23     this to the deposition?

24         MR. TISCHLER:  Yes, sir.  And I

25     recognize that we need to redact home addresses

1    and Social Security numbers.

2         MR. MURRAY:  And who is going to do

3    that?

4         MR. TISCHLER:  I'll be happy to do it

5    before we leave here.

6         MR. MURRAY:  Okay.

7         THE WITNESS:  Can I give you back some

8    of these documents so we don't get them mixed

9    up?

10        MR. TISCHLER:  Sure.  Yeah, that's a

11   good idea.  Thank you.

12        (Off-the-record discussion was

13        held.)

14        (Defendants' Exhibit Number 11

15        was marked for identification

16        and hereto attached.)

17   Q.    (By Mr. Tischler)  And Exhibit 11 is

18 your tax return for 2004, correct?

19   A.    Yes, sir.

20   Q.    Okay.  And I guess during that year your

21 primary job was running for sheriff, for most of it?

22   A.    Correct.

23   Q.    And that would be the reason for the

24 decline in income from 2003?

25   A.    Yes, sir.

1      Q.     And then let me show you your tax return

2  for 2005, it's marked as Exhibit 12.  Is that a true

3  and correct copy of that?

4      A.     Yes, sir.

5      Q.     Okay.  And that's an accurate reflection

6  of your income?

7      A.     Yes, sir.

8             (Defendants' Exhibit Number 13

9             was marked for identification

10            and hereto attached.)

11     Q.     Okay.  And Exhibit 13 is your tax return

12  for 2006?

13     A.     Yes, sir.

14     Q.     Okay.  An accurate reflection of your

15  income?

16     A.     Yes.

17            (Defendants' Exhibit Number 14

18            was marked for identification

19            and hereto attached.)

20     Q.     And Exhibit 14 is your tax return for

21  2007?

22     A.     Yes, sir.

23     Q.     It accurately reflects your income?

24     A.     Yes, sir.

25     Q.     Have you ever worked for the Santa Rosa

1 County Sheriff's Office?

2     A.     I have not.

3     Q.     Just your wife?

4     A.     That's correct.

5     Q.     As a result of the events that you

6 allege in your complaint, have you suffered from any

7 form of -- I guess you would call it physical

8 consequences, physical symptoms, physical

9 ramifications?

10     A.     Can I get you to clarify what you're

11 asking?

12     Q.     Sure.  Are there any physical conditions

13 that you identify that you're suffering from as a

14 result of the events that you're alleging in your

15 complaint, any physical problems that you've had or

16 that you've required medical treatment for or anything

17 at all?

18     A.     No, sir.

19     Q.     Who is your primary care physician?

20     A.     Dr. -- I can't think of his name now.

21 He's in Dothan somewhere, sir, and I apologize, I

22 can't think of his name.  It starts with an "S," if

23 that helps any, but I can't think of his full name.

24     Q.     There's probably more than one doctor

25 that starts with an "S" in Dothan, I would imagine.

1     A.     Yes.  I apologize for that.

2     Q.     So I presume you have not received

3 treatment from any doctor for any physical ailments

4 that you relate to these events?

5     A.     No, sir.

6     Q.     Okay.  Have you received treatment for

7 any mental or emotional side effects that relate to

8 this event?

9     A.     No, sir.

10     Q.     As a part of your employment process at

11 the City of Dothan, did you have to go through any

12 kind of mental health fitness exam?

13     A.     No, sir.

14     Q.     Have you ever been treated by a

15 psychologist, psychiatrist, mental health

16 professional?

17     A.     No, sir.

18     Q.     Are there any mental or emotional

19 consequences that you --

20     A.     Let me correct that.  When I was on the

21 SWAT team with the sheriff's office, routinely we

22 would see a psychiatrist.  But I don't know if you

23 would say it was treatment or just a visit, but that

24 was a routine for members of the SWAT team.

25     Q.     Are there any mental or emotional

1 problems, injuries, that you associate with the events

2 alleged in the complaint?

3     A.     No, sir.

4     Q.     You make an allegation in your complaint

5 that you chose not to run for sheriff in 2008 as a

6 result of the events that had occurred in 2004 and so

7 forth.  Did you ever take any action to explore the

8 possibility of running for sheriff in Escambia County

9 in 2008?

10     A.     I did not.

11     Q.     So you have no idea how viable your

12 campaign would be, had you chose to do that?

13     A.     I never checked.  I don't have any idea.

14     Q.     And I guess you would have run as a

15 Democrat again?

16     A.     I'm not sure, sir.  I didn't even

17 consider the idea.

18     Q.     Are you registered as a Democrat or

19 Republican?

20     A.     In the State of Alabama, you don't

21 register as one or the other, it's open voting.  But I

22 have been voting Republican since I've been up in

23 Alabama.

24     Q.     When you were in North Carolina, do they

25 register by party?

1     A.     I don't recall if they did or not, sir.

2     Q.     But when you ran in Florida, you ran as

3 a Democrat?

4     A.     Correct.

5     Q.     In terms of the witnesses, I just have a

6 few more follow-up questions in addition to what I've

7 already asked you.  Sergeant Dan House is listed as a

8 witness.  Besides the information pertaining to your

9 coming to the sheriff's office and visiting, is there

10 anything else that he would know about this

11 information disseminated, Exhibits 1 and 2?

12     A.     I think he was aware of it because he

13 actually came in and helped us campaign.  I have not

14 talked with him about it, but I think that he was

15 aware of the fact that negative information had been

16 circulated.

17     Q.     Do you know whether he actually saw the

18 information?

19     A.     No, sir, I do not.

20     Q.     When is the last time you had contact

21 with Mr. House?

22     A.     A couple of weeks ago.

23     Q.     Pardon?

24     A.     A couple of weeks ago.

25     Q.     What was the nature of that contact?

1    A.    Just calling to see -- he actually

2 called me to see how I was doing.  He was very excited

3 because he and his wife had just learned they're

4 expecting their first child.

5    Q.    And he works for NC State University?

6    A.    I believe it's North Carolina State.

7    Q.    VanCamp, besides the two things that

8 we've talked about, do you have knowledge of

9 Jeff VanCamp having any other information pertaining

10 to the allegations in your complaint?

11    A.    No, sir, I do not.

12    Q.    And Mr. Rand, in terms of what he knows

13 about, as it's stated in your witness disclosure,

14 "information concerning statements circulated in

15 Escambia County by defendants," all he knows is what

16 you told him, as far as you know?

17    A.    No, sir, I know that he conducted an

18 investigation on his own of the individuals who's

19 listed in that document.

20    Q.    Okay.  Do you know whether he has any

21 knowledge about this information actually being

22 circulated in Escambia County, other than what you've

23 told him?

24    A.    Other than what I've told him, I do not.

25    Q.    To your knowledge, he didn't come to

1 Escambia County and conduct an investigation or talk

2 to anyone?

3      A.     No, sir, not to my knowledge.

4      Q.     And Mike Steele, besides him being in

5 this office where this conversation occurred with

6 McNesby and Smith, do you know whether he has any

7 information about these statements listed in Exhibits

8 1 and 2 being circulated in Escambia County?

9      A.     That's all I'm aware of.

10     Q.     Did he ever indicate to you that he had

11 seen Exhibits 1 and 2 or any of this information?

12     A.     I haven't talked with Mike Steele other

13 than the day over at the sheriff's office.  It's been

14 quite a while since I've actually talked with Mike.

15     Q.     He no longer works for the sheriff's

16 office, does he?

17     A.     It's my understanding he is retired.

18     Q.     Do you know where he lives?

19     A.     I do not.

20     Q.     Charles Pittman, again, it's stated he

21 has information concerning statements circulated in

22 Escambia County by defendants.  Did you ever speak

23 with Mr. Pittman about this information being

24 circulated in Escambia County?

25     A.     He's aware the information was provided

1  to Slade Rand, who is the city attorney.  Being the

2  assistant city manager, he would have knowledge of

3  what the city attorney is working on.

4      Q.      The question was, did you ever talk to

5  him about this information?

6      A.      I have not.

7      Q.      And to your knowledge, he never came to

8  Escambia County to do any investigation or anything?

9      A.      Not to my knowledge.

10      Q.      So all he would know about any

11  statements circulated in Escambia County by defendants

12  would be what Mr. Rand told him, based upon what you

13  told Mr. Rand?

14      A.      Correct.

15      Q.      Ed Wyatt, the city manager, the same

16  situation as Mr. Pittman?  You haven't spoken with him

17  directly about this information?

18      A.      Correct.

19      Q.      Tim Kemp is identified also as having

20  information concerning statements circulated in

21  Escambia County by defendants.  Again, do you know

22  whether he knows anything about this information

23  that's actually in documents one and two that you

24  allege were circulated in Escambia County?

25      A.      No, sir, I do not know.

1    Q.    Okay.  In fact, all he's told you that

2 he knows is the fact that Mr. Calhoun came to him and

3 asked for information?

4    A.    Correct.

5    Q.    Okay.  You list Dennis Price.  I don't

6 remember us talking about Mr. Price.  Who is

7 Mr. Price?

8    A.    Former employee of the City of Wilson

9 Police Department.

10    Q.    Was he an employee when you were the

11 chief?

12    A.    No, sir, he was retired when I was chief

13 of police in the City of Wilson, was familiar with the

14 activity of the individuals mentioned in those

15 documents.

16    Q.    I'm not sure I understand.  Explain what

17 you mean.

18    A.    He was familiar with the events

19 surrounding Phil Baggett that you questioned me about,

20 he has all the information on that.

21    Q.    Okay.  So he -- the address for the

22 Wilson Police Department is 112 Goldsboro Street,

23 correct?

24    A.    I think that's the address, yes, sir.

25    Q.    And so he hasn't been at that address

1 for years, since you --

2     A.     Yes, sir, he's been retired.  The only

3 way I know to recover his address is through them.

4     Q.     Okay.  Have you made any efforts to

5 locate his home address?

6     A.     I have not.

7     Q.     Okay.  Have you contacted the police

8 department to see if you can obtain his home address?

9     A.     No, sir, I have not.

10     Q.     You, again, in your disclosure

11 pertaining to him, say he has information concerning

12 statements circulated in Escambia County by

13 defendants.  Do you know whether he ever saw any of

14 this information identified in Exhibits 1 and 2?

15     A.     I do not.

16     Q.     And do you know whether he ever spoke

17 with anyone in Escambia County about what was being

18 circulated down there?

19     A.     No, sir, I do not.

20     Q.     You list Dathan Shows, City of Wilson

21 safety manager.  I don't think we talked about him.

22 Who is he, and what's his role in these?

23     A.     Dathan Shows was with the -- the City of

24 Wilson was involved in a decision-making process

25 involving the individuals who's cited in the document.

1 As far as a disciplinary action that was taken, he was

2 on the review committee for the discipline that was

3 taken against the individuals.

4      Q.     Have you ever spoken with him about the

5 information identified in Exhibits 1 and 2 that was

6 allegedly distributed in Escambia County, Florida?

7      A.     I have not.

8      Q.     Do you know whether he has any knowledge

9 at all about the circulation of these statements?

10     A.     No, sir, I do not.

11     Q.     Okay.  You have no reason to believe

12 he's ever been to Escambia County, knows anything

13 about the circulation of this information in Escambia

14 County?

15     A.     No, sir, I do not.

16     Q.     Shane Lincke, SmartCOP.  I think we

17 already talked about the fact that he was one of the

18 stockholders?

19     A.     Yes, sir.

20     Q.     Contributed to your campaign?

21     A.     Yes, sir.

22     Q.     You dealt with him in terms of

23 purchasing this software?

24     A.     Correct.

25     Q.     Okay.  Has he ever spoken to you about

1 his knowledge about this information in Exhibits 1 and

2 2?

3    A.    No, sir, he has not.

4    Q.    Okay.  Has he ever indicated to you that

5 he heard about or received any of that information?

6    A.    That he heard about the information, and

7 that was during the campaign.  But I do not know how

8 he heard about the information.

9    Q.    Did he indicate -- he didn't indicate to

10 you how he heard about the information then?

11    A.    No, sir, he did not.

12    Q.    Jimmy Grimes, former sheriff of Nash

13 County, North Carolina.  Was he already the former

14 sheriff when you were the chief of police?

15    A.    No, sir, he was the sheriff.

16    Q.    He was still the sheriff.  Okay.  And

17 what information would he have about this lawsuit,

18 about these events?

19    A.    About the information contained in the

20 document, as far as interference over in Nash County

21 on the murder investigation.

22    Q.    But he wouldn't have any information

23 about what statements were circulated in Escambia

24 County?

25    A.    He would not.

1    Q.    Carlton Turnage, I believe we already

2 talked about him.  And let me cut this short with a

3 few of these names that we've already talked about.

4 Turnage, Garris, do you know whether they have any

5 information about the circulation of this information,

6 Exhibits 1 and 2, in Escambia County?

7    A.    Other than they provided the statement

8 to the individual who was taking the information.

9    Q.    Okay.  But you don't know that they know

10 anything about what happened to that information in

11 Escambia County after they gave the statement?

12    A.    No, sir, I do not.

13    Q.    To your knowledge, have they ever been

14 to Escambia County?

15    A.    Not that I'm aware of.

16    Q.    Besides Mr. House, did any of the other

17 individuals from the City of Wilson come to Escambia

18 during your campaign?  Help out or say hi, passing

19 through, anything of that nature?

20    A.    No, sir.

21    Q.    I don't remember us talking about

22 Captain Johnny Farmer.

23    A.    You referred to him as a major early on

24 in the deposition.

25    Q.    Okay.  And what's his role in this case?

1    A.    His information showed up in the

2 document.  I'm not sure what other part he would play.

3    Q.    Okay.  Do you know whether he would have

4 any information about what statements were circulated

5 in Escambia County?

6    A.    Not that I'm aware of.

7    Q.    Jimmy Tant, we already talked about your

8 relationship with him.  Do you know whether he would

9 have any information about what statements were

10 circulated in Escambia County?

11    A.    Not that I'm aware of, no, sir.

12    Q.    Ms. Dampier.  During the campaign, did

13 you have any contact with her?

14    A.    No, sir, I did not.

15    Q.    Do you know whether -- do you know

16 whether anyone ever spoke with Ms. Dampier directly

17 about the events that we talked about that were

18 associated with McNesby's campaign, Swinehart or

19 Calhoun or anyone else?

20    A.    No, sir, I do not.

21    Q.    And so do you know whether Ms. Dampier

22 has any information about what statements were

23 circulated in Escambia County by the defendants?

24    A.    No, sir, I do not.

25    Q.    Captain Tim Johnson would have been the

1 person conducting the investigations?

2    A.    Correct.

3    Q.    And he's listed as presently being with

4 the North Carolina state police department?

5    A.    Correct.

6    Q.    Do you know him to still be employed

7 there?

8    A.    I believe he still is, yes, sir.

9    Q.    What knowledge would he have about the

10 information that was actually circulated in Escambia

11 County?

12    A.    None that I'm aware of.

13    Q.    Okay.  Boykin, Bissette, Pendergrass,

14 Howell, Adams, Smith, Tyson, we already talked about

15 them in terms of their statements?

16    A.    If you could make a caveat by Bissette,

17 Bissette is deceased, if you will.

18    Q.    I understand.  Do you know whether they

19 have any knowledge at all about what was actually

20 disseminated or circulated in Escambia County

21 regarding their statements?

22    A.    Other than providing the information to

23 Mr. Calhoun.

24    Q.    But they wouldn't have any knowledge

25 about what happened to that information after they

1 gave it to Mr. Calhoun, as far as you're aware of?

2     A.     Not that I'm aware of.

3     Q.     The same thing with Mr. Chesson, did you

4 ever speak with Mr. Chesson about this information

5 that was being circulated -- that you thought was

6 being circulated in Escambia County?

7     A.     No, sir.

8     Q.     So when it's listed that he has

9 information concerning statements circulated in

10 Escambia County by defendants, you don't know that he

11 would have any information in that regard?

12     A.     Other than the documents themselves

13 being generated.

14     Q.     Well, other than refuting the allegation

15 that -- well, actually you admitted that he did fly,

16 he did provide flight services?

17     A.     Correct.

18     Q.     Okay.  Don Oliver, the fire chief, is

19 listed, from Wilson, North Carolina.  I don't think we

20 talked about him.  What would he know about this case?

21     A.     Once again, his information would be

22 directed towards the document itself and the

23 statements as far as the fire truck.

24     Q.     Okay.  He wouldn't have any information

25 about what statements were circulated in Escambia

1 County by defendants, though, would he?

2        A.      Not that I'm aware of, no, sir.

3        Q.      Dr. Groskins, at Barton College, is he

4 the one that contacted you about Ms. Dampier being an

5 intern?

6        A.      Correct.

7        Q.      Did you ever talk to him about these

8 statements that you're alleging were circulated in

9 Escambia County?

10       A.      No, sir.

11       Q.      And so you don't know what knowledge he

12 would have about their being circulated in Escambia

13 County?

14       A.      I would not.

15       Q.      What's the purpose of having him listed

16 as a witness, other than to talk about Ms. Dampier

17 being an intern?

18       A.      The reply to the document that was

19 contained.

20       Q.      Okay.  Well, he wouldn't have any

21 knowledge -- do you know whether he has any knowledge

22 about the allegations or the rumors about the affair

23 and the investigation and so forth?

24       A.      Not that I'm aware of, no, sir.

25       Q.      Okay.  He never contacted you and said,

1 "Hey, what's going on over there?  I send you an

2 intern, and these kind of rumors are floating around"?

3     A.     No, sir, he did not.

4     Q.     You list Karen Jordan of FDLE.  I guess

5 she was a witness to your lunch with Mr. Swinehart?

6     A.     Correct.

7     Q.     Did you actually just see her there or

8 did you actually speak with her?

9     A.     I actually spoke with her.

10     Q.     And was she standing there while you

11 were having lunch with Mr. Swinehart?

12     A.     No, sir, she was at a table away from us

13 having lunch at the same time we were having lunch.

14     Q.     Okay.  And do you know whether she knows

15 Mr. Swinehart at all?

16     A.     I do not.

17     Q.     And she would not have been a party to

18 or overheard any conversation between you and

19 Mr. Swinehart, as far as you know?

20     A.     No, sir.

21     Q.     Did you ever talk to her about this

22 meeting with Mr. Swinehart?

23     A.     I have not.

24     Q.     You list Reggis Branch as a witness.  He

25 was one of the --

1    A.    That would be "Reggie" Branch.

2    Q.    Reggie Branch, okay.

3    A.    Yes, sir.

4    Q.    He was one of the detectives supervising

5 Ms. Dampier, correct?

6    A.    Correct.

7    Q.    That's where his name came up?  Okay.

8 And aside from refuting whatever allegations are found

9 in those statements, do you know whether he would have

10 any information about these statements actually being

11 circulated in Escambia County?

12    A.    I do not.

13    Q.    The same question for Mr. Hasty, he

14 wouldn't have any knowledge about these statements

15 being circulated in Escambia County?

16    A.    I don't know.

17    Q.    Have you spoken with Mr. McGruder?

18    A.    I have not.

19    Q.    He's listed as having knowledge of

20 campaign actions by defendants against plaintiff, and

21 has copies of e-mails back and forth to Dothan,

22 Alabama, regarding plaintiff's employment application.

23 Have you seen any of those documents?

24    A.    I have not.

25    Q.    Other than conversations that you've had

1 with your attorney, do you know anything at all about

2 Mr. McGruder's role in the events surrounding this

3 case?

4     A.     Information was derived by Brian Rupert

5 in regards to his activity.

6     Q.     Your relationship with Mr. Kunert

7 includes him providing training for City of Dothan

8 police officers, correct?

9     A.     He did, yes, sir.

10     Q.     And Mr. Murray has also provided

11 training at your request for police officers in

12 Dothan?

13     A.     He has.

14     Q.     Do you know George Stephenson?

15     A.     I've heard of the name.  I don't think

16 I've actually met him.

17     Q.     How do you know his name?

18     A.     I think the name is associated with

19 SmartCOP, I believe.

20     Q.     Do you know whether he contributed to

21 your campaign for the office of sheriff in Escambia

22 County?

23     A.     I don't recall, sir, if he did or not.

24           MR. TISCHLER:  That's all the questions

25     I have, Mr. Powell.  Thank you.

1          (Off-the-record discussion was

2          held.)

3               CROSS-EXAMINATION

4 BY MR. MURRAY:

5     Q.    Mr. Powell, concerning your battery

6 arrest, you told us that you saw an e-mail from

7 Larry Smith that was retained in -- by the city

8 manager in Dothan.  Do you know if any documents were

9 supplied to the city manager?  Were there any

10 documents related to that battery arrest?

11    A.    I do not know if any documents were

12 supplied.

13    Q.    And I think you previously told us that,

14 in fact, those records had been first sealed and then

15 later expunged?

16    A.    Correct, by the Circuit Court in

17 Escambia County.

18    Q.    And would that also include records that

19 were present at the Escambia County Sheriff's Office?

20    A.    That's my understanding, yes.

21    Q.    Now, you told us that as soon as you

22 heard about the rumors concerning an alleged affair

23 between you and Ms. Dampier while you were the chief

24 of police in Wilson, North Carolina, that you

25 immediately reported it to the city manager?

1    A.    To the assistant city manager, Charles

2 Pittman.

3    Q.    And you also told us that there was an

4 investigation done.  And I think -- my notes reflect

5 that you said Captain Tim Johnson did that

6 investigation under the direction and control of one

7 of -- either the city manager or the assistant city

8 manager?

9    A.    He conducted the investigation under the

10 direction of the assistant city manager.

11    Q.    And were you ever provided with what the

12 findings of that internal investigation was?

13    A.    Never received a hard copy, but received

14 a verbal from the assistant city manager that

15 everything was fine and had been cleared up.

16    Q.    Was the term "unfounded" or "not

17 sustained" or anything along that line used when they

18 gave that report to you?

19    A.    I don't remember exactly what language

20 was used, but it led me to believe that it was

21 unfounded, there was no basis for the allegation.

22    Q.    Now, you've been a chief of police in

23 Hartsville; Wilson, North Carolina; and now Dothan,

24 Alabama.  In your role as a chief of police, are you

25 cautious about meeting with women in your office

1 alone?

2      A.     Yes.

3      Q.     And let's start with Hartsville, South

4 Carolina.  And if you would, explain to us what steps

5 you took to avoid any allegations of impropriety or

6 improper conduct concerning your one-on-one contacts

7 with females.

8      A.     The police department in the City of

9 Hartsville is a small agency, and the administrative

10 section is an open floor.  And when I say that, you

11 have the -- the secretaries is out, and you may have a

12 half wall between the secretaries.  The chief's office

13 is in a back corner and did not have any windows or

14 anything like that into it.  Because of the fact that

15 when you have to do business, sometimes you must close

16 a door to carry on business -- obviously, you may not

17 want some conversation to get out -- I went to the

18 extent of having a window put into the wall of the

19 office, so the administrative secretary who sits right

20 outside the office -- basically so they could monitor

21 what was going on -- I hate to use that term, but so

22 they could see what was going on inside the office, to

23 prevent any type of allegations being made about

24 improper activity inside the office.

25      Q.     And who was your administrative

1 secretary when you were at Hartsville?

2     A.    Candy Johnson.

3     Q.    And is she still employed, to the best

4 of your knowledge, at Hartsville?

5     A.    Yes.

6     Q.    Now, when you moved to Wilson, what

7 precautions did you take to avoid any problems related

8 to allegations?

9     A.    The Wilson Police Department is a larger

10 agency.  The administrative hall, when you come down

11 the hall, you enter into an outer office -- when you

12 go to the chief's office, you enter into an outer

13 office, which is where the administrative secretary

14 sits.  Everybody who goes into the chief's office has

15 to pass that particular area.  There is only one point

16 of entry into the chief's office, which is through

17 that way.

18          When meetings took place with females,

19 whether it be female employees or salespersons that

20 would come in, the door may be pushed, but it wouldn't

21 be pushed all the way to.  And once again, the

22 secretary who was there was aware of who was coming in

23 and out of the office, because there was no other way

24 to get into that location.

25     Q.    And could the secretary hear what was

1 going on inside the office?

2     A.     Yeah, I mean, it was not well insulated

3 by no means, you know.  In comparison, I mean, offices

4 are right next to each other, just --

5     Q.     Could the secretary in Wilson actually

6 see your office door?

7     A.     Yes.

8     Q.     How far away was she located from that

9 door?

10     A.     Probably the width of the desk, and then

11 cabinet space, and then walking room.  So, I mean,

12 that's, what, six foot maybe.

13     Q.     Now, what did you do, if anything, when

14 you got to Dothan?

15     A.     Dothan is basically the same way, the

16 outline of it, as far as individuals coming in to have

17 an appointment with the police chief.  The secretary's

18 office, the person has to transgress the secretary's

19 office.  However, there is an entry point at the back

20 door of the chief's office; however, it's monitored by

21 a camera in the hallway.  Use the same practice,

22 whether it be a female employee, female salesperson,

23 or a reporter for that matter, if I don't have

24 somebody sit in the meetings with me, the door is not

25 pushed all the way to.  And then, once again,

1  certainly the secretary that's out in the secretarial

2  office can hear, you know, the information that's

3  taking place.

4       Q.     And what is your secretary's name in

5  Dothan?

6       A.     Pam Deese.

7       Q.     Could you spell the last name?

8       A.     D-E-E-S-E.

9       Q.     Is she still employed in Dothan?

10      A.     Yes, she is.

11      Q.     Moving on to another subject, after you

12 became the chief of police in Wilson, there was a

13 decision made to go to a different uniform.  And I

14 just -- can you explain to us, with as much clarity as

15 possible, why that was necessary?

16      A.     Sure.  Initially, it was not a different

17 uniform, it was the same type of uniform, different

18 vendor.  And initially that was driven by price, and

19 it was under a bid process.

20             Then we were notified by NFPA -- once

21 again, I believe that stands for the National Fire

22 Protection Agency, but -- I think.  I mean, I don't

23 want to nail my feet down with that -- that there was

24 a concern in the public safety arena that the use of

25 polyester uniforms was a hazard to first responders

1 because of the fact that if they got around fires or

2 handled fires, that the uniform in and of itself could

3 melt on the individual.  So --

4     Q.     Was there a concern about injury to the

5 officers wearing such a uniform?

6     A.     Absolutely.

7     Q.     What actions did you take?

8     A.     We went to a blend uniform, which drove

9 the cost up on the uniform simply because of the type

10 of material it is.

11     Q.     Was that a uniform that was approved by

12 this association you just told us about?

13     A.     Yes.

14     Q.     Once again, moving to another topic, the

15 murder case that occurred while you were the chief of

16 police in Wilson, North Carolina.  You told us that

17 you had requested or somebody under your chain of

18 command had requested the U.S. Marshal to come in and

19 assist in a manhunt for a suspect.  Did I get that

20 correct?

21     A.     Correct.

22     Q.     And when we talk about cell phones and

23 what the marshal can do, is the marshal able to

24 intercept phone calls or is the marshal able or has

25 the capability to ping cell phones to come up with a

1 potential location?

2    A.    It's like a GPS locator.  Based on the

3 tower location and the signature off the phone, they

4 can locate where the telephone is.

5    Q.    So it's a location, as opposed to an

6 interception of an oral communication?

7    A.    Correct.

8    Q.    And whatever was done, was done by the

9 United States Marshal --

10    A.    Correct.

11    Q.    -- during this murder investigation?

12    A.    If, in fact, they came and helped us,

13 yes.

14    Q.    If, in fact, they did.

15    A.    Correct.

16    Q.    Do you know one way or the other whether

17 or not they ever pinged any cell phones to assist the

18 Wilson Police Department?

19    A.    I do not.

20    Q.    When you talked about the Wilson

21 newspaper and you talked about editorials, I was a

22 little confused about whether or not you were talking

23 about an editorial that's written as an op-ed by the

24 editor or whether you were talking about letters to

25 the editor, when we were talking about complaints or

1 kudos to the police department.  If you would, clarify

2 that.

3      A.     Actually, it's a little bit of both.  We

4 would receive -- and when I say "we," I'm talking

5 about the police department as a whole.  We would

6 receive positive letters from the public, which would

7 go into the letters to the editor, I guess is what you

8 would call it.  Sometimes they were negative.  There

9 were times when the paper itself would write a

10 positive story about the police department or a

11 negative story about the police department.

12              And to give an example, if we had a

13 vehicle pursuit that took place, that would normally

14 generate a negative letter from the editor at the

15 newspaper, about the hazards or the dangers of

16 high-speed vehicle pursuits.  And like National Night

17 Out, when we participated in National Night Out we

18 would receive a positive letter from the editor, as

19 far as community interaction.

20      Q.     Would that appear in the newspaper as a

21 letter from the editor or would it appear as an

22 editorial?

23      A.     As an editorial.

24      Q.     Okay.  Now, in talking about your

25 campaign for sheriff back in 2003 and 2004, as a

1 result of the surveillance that was being done, that

2 you told us about, by Mr. Blackburn, did that allow

3 you to freely interact with Escambia County S.O.

4 employees?

5      A.      It did not.

6      Q.      Why?

7      A.      Restating the comments I made earlier,

8 there was a -- there was a concern and a fear from the

9 employees of the sheriff's office that if they were

10 identified supporting a candidate other than the

11 incumbent, that there would be action taken against

12 them, disciplinary action taken against them by the

13 sheriff's department, and that hampered or dampened

14 some of the contacts that we could make.

15      Q.      And as a result of your knowledge, did

16 you then refrain from placing any of these employees

17 in jeopardy, friends or otherwise?

18      A.      Yes.

19      Q.      Changing topics once again.  You were

20 talking to us about Rickey Stokes in Dothan.  And does

21 he have an AM radio show or did he at any point in

22 time have an AM radio show?

23      A.      I believe that he talked on an AM radio

24 show.  It was not his.  But he was a guest -- for lack

25 of a better term, a guest personality on that radio

1 show.

2    Q.    Did he ever report or make a statement

3 while on that radio show that he was going down to

4 talk with Sheriff McNesby about the chief of police,

5 yourself?

6    A.    Yes.

7    Q.    And do you know on how many occasions

8 that occurred?

9    A.    I know on one occasion he said he was

10 going to Escambia County to speak with the sheriff, to

11 get the information on me.  And then there was a later

12 broadcast when he said he had been down and had spent

13 the day with the sheriff, and talked about how big the

14 sheriff's office was and all that, and that he had

15 real information on John Powell.

16    Q.    And can you give us some sort of a time

17 reference as to when these radio broadcasts were made?

18    A.    I believe it -- the time period during

19 the day, or the time period during the course of the

20 year that it took place?

21    Q.    During the year.

22    A.    I believe it was sometime in 2005.

23 There's a broadcast between seven and nine in the

24 morning, and four and six in the afternoon.

25    Q.    And he would have appeared on one or the

1  other of those time slots?

2      A.    Correct.

3      Q.    Now, was his appearance on the show

4  recorded and then rebroadcast or was it live?

5      A.    I believe it's live.

6      MR. MURRAY:  Can I see Exhibit 5, if we

7      can pull that out of that stack?

8      MR. TISCHLER:  Five?

9      MR. MURRAY:  Five.  Your five.

10      Thank you.

11      Q.    (By Mr. Murray)  Are the figures that

12  are reflected here on Exhibit 5 -- and for the purpose

13  of the record, it is Exhibit 5.  It is titled

14  Performance Record of John Powell.  And it purports to

15  show what appears to be UCR statistics from

16  Hartsville, South Carolina, police department and

17  Wilson, North Carolina, police department.  Am I

18  correct in my assessment?

19      A.    Correct.

20      Q.    Do you know whether or not those numbers

21  are accurate, or are they wrong?

22      A.    I do not know if they are accurate, if

23  it's an accurate reflection of the information from

24  either one of the cities.

25      Q.    Did you have an occasion to go back

1 and -- or did any of your staff go back and actually

2 analyze this to determine whether or not the

3 information contained therein is truthful or false?

4      A.      During the campaign, I believe Travis

5 Peterson did some research on it using the information

6 that's contained on the document.  And I think that

7 the results showed that there were some inaccuracies

8 in the information, but I don't recall which areas

9 that he is referring to.

10      Q.      Travis Peterson would be the one to talk

11 to?

12      A.      Yes, sir.

13      Q.      Okay.  Moving ahead to your campaign in

14 2004, were you having a problem with vandalism of your

15 campaign signs?

16      A.      We did have some campaign signs that

17 were damaged and destroyed, and we also had some

18 vandalism of the campaign office.

19      Q.      And did the sheriff's office -- was

20 there more -- strike the last.

21              Were you the only candidate having that

22 problem, or was there other candidates having that

23 problem?

24      A.      There were other candidates also having

25 problems.

1    Q.    Do you know who those candidates were?

2    A.    Gary Willis had some signs that were

3 damaged or defaced, I don't know to what extent.  He

4 also had -- his campaign headquarters was actually

5 shot into, that was reported on the local news, but I

6 don't know the outcome of that investigation.

7    Q.    Insofar as the campaign signs, the

8 signage that you and Candidate Willis were using or

9 had displayed or posted, did the sheriff's office ever

10 locate anybody who was responsible for some of that

11 destruction or vandalism?

12    A.    Yes, sir.

13    Q.    And who was that, if you know?

14    A.    They were relatives of Rex Blackburn.  I

15 don't know what the lineage was, but it was juveniles

16 who had some type of relation to sheriff's employee

17 Rex Blackburn.

18    Q.    As a result -- did you become aware of

19 the fact that they had conducted an investigation and

20 made an identification of possible suspects?

21    A.    Yes.

22    Q.    And as a result of that information, did

23 you then request the reports from the sheriff's

24 office, in an effort to try to ascertain who was

25 responsible for the vandalism of your signs?

1     A.     I did.

2     Q.     And was that during the same time frame

3 that Blackburn showed up at the campaign office?

4     A.     Yes, sir.

5     Q.     Now, was there an incident involving

6 your father and Rex Blackburn down on the courthouse

7 steps during this campaign process?

8     A.     During the campaign of 2008.  Rex

9 Blackburn was at the campaign -- or at the old

10 courthouse, I believe, downtown.  There was --

11     Q.     If you would, for the record identify

12 who your father is.

13     A.     Elmer A. Powell.

14     Q.     And do you know about what date you're

15 talking about?  You said 2008, but do you know when?

16     A.     It would be when Sheriff David Morgan

17 went to qualify to seek the office of sheriff.

18     Q.     And what, if anything, are you aware of

19 having occurred between your father and -- or occurred

20 with your father at the courthouse, the old

21 courthouse?

22     A.     Rex was at the location, had a badge

23 displayed, a sheriff's department badge displayed, was

24 wandering around the crowd of people that had shown up

25 to show support for Sheriff Morgan, or for Candidate

1 Morgan at that time.  He singled out my dad, there was

2 a transaction of words, and Rex made a comment about

3 arresting my father or taking him to jail or something

4 to that effect.

5     Q.    Do you know why or what the context was

6 that Blackburn was using when he was addressing your

7 father, why that occurred?

8     A.    I'm not really sure.  I know that there

9 was a large group of people down there.  Why my father

10 was singled out and why the comment was made to him by

11 Rex, I'm not sure.

12     Q.    Do you know what, if anything, your

13 father told him?

14     A.    Yes, sir.  My father told him to go

15 ahead and make the arrest and take him to jail.

16     Q.    And is your father retired?

17     A.    Yes, sir, he is.

18     Q.    And what was his occupation prior to

19 retirement?

20     A.    He was a -- retired with the City of

21 Pensacola Police Department.

22     Q.    How many years?

23     A.    Twenty-five, I believe.

24     Q.    I want to show you what's marked as

25 Exhibit 6.  It's previously been identified and you've

1 talked to us about it.  It's a campaign brochure that

2 you put out.  Do you recognize that?

3      A.      Yes, sir, I do.

4      Q.      Now, on any of the grand jury

5 investigations that were conducted on Sheriff McNesby,

6 was there ever a report issued by any of those grand

7 juries that indicated that he was cleared?

8      A.      Not that I'm aware of, no, sir.

9      Q.      You told us on one of them, that you

10 believe that there was a report that indicated that

11 perhaps he used poor judgment?

12      A.      Yes, sir.

13      Q.      On the other three, did the grand jury

14 just simply fail to take action?

15      A.      Yes, sir, they just didn't take any

16 action.

17      Q.      Are grand jury proceedings secret?

18      A.      They are at the time when they take

19 place, yes, sir.

20      Q.      Does anybody know why they failed to

21 take action?

22      A.      No, sir.

23      Q.      When Mr. Swinehart told you that he

24 believed that Nan Weaver was the one that was

25 responsible for having sent the package which is

1 marked as Exhibits 1 and 2 to this deposition, who was

2 Nan Weaver employed by at the time that that package

3 was sent?

4     A.     Escambia County Sheriff's Office.

5     Q.     And do you know of your own knowledge

6 what her position was at the sheriff's office?

7     A.     I don't know the official title, but I

8 know that she was -- she was an assistant to the

9 sheriff, but I don't know the exact title.

10     Q.     When you went down to the flower shop

11 during the 2004 campaign, Flowerama, and looked at the

12 tape of the transaction where the flowers delivered

13 and described in the complaint were purchased, did you

14 have the means to preserve that tape at the time?

15     A.     No, sir, I did not.

16     Q.     Did you have a camera with you?

17     A.     I did not.

18     Q.     Did you ask for the tape?

19     A.     We asked to get a copy of -- I actually

20 asked for the tape or a copy of the tape, and we were

21 advised, because of security, we could not.

22     Q.     So am I correct in understanding that

23 you asked for it, but that the manager or business

24 owner refused to give it to you?

25     A.     Correct.

1          MR. MURRAY:  That's it.

2          (Off-the-record discussion was

3          held.)

4                    CROSS-EXAMINATION

5 BY MR. PETERSON:

6     Q.    Chief Powell, my name is Jason Peterson.

7 I represent Michael Swinehart Political, Inc., and

8 Michael Swinehart in his individual capacity.

9          My first question I want to ask you is,

10 you referred in your complaint to a negative document.

11 And you were shown today Exhibit 1 and Exhibit 2 to

12 your deposition, which are the series of statements

13 related to interviews.  Is that the negative document

14 to which you're referring, in its totality?

15    A.    That's the negative document.  I can't

16 say it's in the totality, but that is the negative

17 document I'm referring to, yes, sir.

18    Q.    Do you have any information, sir, that

19 Michael Swinehart individually delivered that negative

20 document to anyone other than individuals inside the

21 McNesby campaign?

22    A.    No, sir, I do not.

23    Q.    Do you have any information, sir, that

24 any representative of Michael Swinehart Political,

25 Incorporated, delivered the negative document to

1 anybody other than individuals inside the McNesby

2 political campaign?

3     A.     No, sir, I do not.

4     Q.     Do you have any information, sir, that

5 Michael Swinehart, in his individual capacity,

6 instructed anybody in the McNesby campaign to deliver

7 that document to a third party?

8     A.     No, sir, I do not.

9     Q.     Do you have any information that any

10 representative of Michael Swinehart Political, Inc.,

11 instructed anybody in the McNesby political campaign

12 to deliver that negative document to a third party?

13     A.     No, sir, I do not.

14     Q.     When is the first time you met

15 Mr. Swinehart?

16     A.     At the barbecue festival in Dothan,

17 Alabama.  I don't remember -- it was in 2008.

18     Q.     Did you know of him prior to your

19 meeting?

20     A.     Yes.

21     Q.     How were you aware of him?

22     A.     Just through the campaign.  I had never

23 visually seen him, but I heard of his name through the

24 campaign.

25     Q.     So you would not have recognized him if

1 he walked into the room, prior to meeting him at the

2 barbecue?

3      A.      That is correct.

4      Q.      And who, again, introduced you to him at

5 the barbecue?

6      A.      Senator Harri Anne Smith.

7      Q.      In answers to interrogatories that we

8 served on you in this case, you talked about the

9 barbecue.  Do you recall preparing the answers to the

10 interrogatories?

11      A.      Yes, sir, I do.

12      Q.      And in particular, you state -- and I

13 can show it to you if you need it, so feel free to

14 ask -- that when you were introduced to Mr. Swinehart

15 at this barbecue in Dothan, Alabama, on May 17th,

16 2008, is what it says, that he asked you if you wanted

17 to fight?

18      A.      Yes, sir.

19      Q.      Was that -- did you take that to be a

20 serious threat, or was that something that was in a

21 joking, playful manner?

22      A.      I took it to mean that he knew who I

23 was, and now that I knew who he was, was I still upset

24 over the campaign and the information that had been

25 circulated about me.  Because he followed it up with a

1 series of other statements.

2    Q.    What other statements did he follow it
3 up with?

4    A.    That he didn't send the document to
5 Dothan, Alabama, but he knew who did.

6    Q.    And did you ask him who it was?

7    A.    I don't know if I asked him or if it was
8 quick enough that he said that, you know, we need to
9 get together and have lunch and discuss it, or call me
10 and we'll have lunch and discuss it, something to that
11 effect.

12    Q.    Was there anyone else present to hear
13 this conversation between you and Mr. Swinehart at the
14 barbecue?

15    A.    Yes.

16    Q.    Who else was present?

17    A.    There was a Lieutenant Skip Westberry.
18 His actual name is Anthony Westberry, I apologize.

19    Q.    Anybody else?

20    A.    Harri Anne Smith, she's a senator.  I
21 believe her husband was there.

22    Q.    What's his name?

23    A.    I don't know his first name, I'm sorry.

24    Q.    That's okay.

25    A.    I believe the mayor may have been there,

1 Pat Thomas.  I think he may have been close enough to

2 hear the conversation.

3     Q.     Had you previously discussed with either

4 Ms. Harri Anne Smith, her husband, or Anthony

5 Westberry, any issues related to the negative document

6 which you contend was sent to officials in Dothan?

7     A.     I think I asked Senator Smith how to get

8 in touch with Mr. Swinehart, prior to that meeting

9 that day.  But I don't think I went into detail about

10 why I wanted to contact him.  But I knew that she was

11 using Mr. Swinehart.

12             As far as Lieutenant Westberry, he had

13 no knowledge.  I mean, he just happened to be there

14 because they were doing security out at the festival.

15     Q.     What about the mayor of Dothan?

16     A.     No, I had not discussed it with the

17 mayor of Dothan.

18     Q.     Okay.  You didn't see any need to call

19 in law enforcement or anything at this barbecue with

20 regard to this issue about him asking you to fight,

21 did you?

22     A.     No, sir, I did not.

23     Q.     About how long was your conversation

24 with Mr. Swinehart?

25     A.     Five minutes, maybe.  Because right

1 after we met, he and the group that he was with went

2 walking around the festival.  I believe he was

3 assisting Senator Smith in a congressional campaign,

4 they were politicking.  He was there long enough to

5 provide me -- I think he gave me his telephone number,

6 and then they separated, and then they went about

7 their way.

8      Q.     Did you see him again that day, in order

9 to speak to him?

10      A.     I did not.

11      Q.     Did not have another conversation with

12 him that day?

13      A.     No, sir, I did not.

14      Q.     When was your next contact with

15 Mr. Swinehart?

16      A.     The next contact I saw him was at a

17 campaign event -- actually I believe it was an

18 election, and I don't recall the month or the day, but

19 I think it was at an election when he was actually at

20 Harri Anne Smith's campaign headquarters, and they

21 were waiting on the vote to come through.  And didn't

22 really talk to him.  I saw him in a room, but I didn't

23 make contact with him.

24      Q.     When was the next time you actually made

25 contact with Mr. Swinehart?

1  A.    When I called him on the telephone and
2 arranged a lunch.

3  Q.    What did you ask him when you called
4 him?

5  A.    I called, identified myself, said that I
6 was going to be in Pensacola on some personal
7 business, and wanted to take him up on his invitation
8 for lunch.  He readily agreed, and the decision was
9 made to meet at the Pensacola Yacht Club.

10  Q.    Are you a member at the Pensacola Yacht
11 Club?

12  A.    I am not.

13  Q.    Is Mr. Swinehart?

14  A.    I would have to make the assumption that
15 he is, because it looked like he was well known when
16 he walked in.

17  Q.    Chief Powell, did you make arrangements
18 for Ms. Jordan to be present at the yacht club on the
19 day that you had lunch with Mr. Swinehart?

20  A.    I did not.

21  Q.    That was just a coincidence?

22  A.    Correct.

23  Q.    Okay.  What was discussed during the
24 lunch at the Pensacola Yacht Club?

25  A.    We talked politics.  This was before the

1 primary election.  I remember I asked him what he

2 thought about the race between McNesby and Candidate

3 Morgan, at the time.  He indicated that he felt like

4 that McNesby would win hands down because the public

5 loved him, because I remember he made that comment.

6          We talked about our campaign, my

7 campaign that I was involved in.  He stated that, you

8 know, it was a hard year for campaigns.  He brought up

9 the fact, he said the -- as far as the document, he

10 looked at me, eye to eye, and said, "I'm the one that

11 had the document put together on you," you know.  And

12 that was the term that was used, "document."

13          And I asked him, I said, "Well, you

14 know, the guy who made contact with all those

15 people --" and I think he just called him Jimmy or

16 Jim.  And I inquired, I said, "Do you ever talk to him

17 anymore?"  And he said, "I don't even know how to get

18 in touch with him."  And, of course, we were eating as

19 we were talking.  And then I said, "Well, how in the

20 world did that thing end up in Dothan, Alabama?"  And

21 he made a comment, he said, "Well, I think it -- I

22 suspect it was Nan Weaver, is how it got up to North

23 Carolina --" I mean "Alabama."

24     Q.     Did you get the sense that he actually

25 had any personal knowledge with regard to that, or was

1 it just supposition on his part?

2      A.      Are you asking me to speculate?

3      Q.      Well, fair enough.  I mean, let me ask

4 the question this way, did he say he saw Ms. Weaver

5 transmit the document --

6      A.      He did not.

7      Q.      -- to the City of Dothan?

8      A.      He did not.

9      Q.      And with regard to that, you mentioned,

10 I think earlier in your testimony, that you have been

11 advised by Jeff VanCamp that he was present when the

12 information was faxed out --

13      A.      Correct.

14      Q.      -- is that correct?  Where was he when

15 the information was faxed out?

16      A.      At the sheriff's department.

17      Q.      Who else was present with him?

18      A.      I really didn't query Jeff when he made

19 that comment.  I have deferred that to Mr. Jim Murray.

20 Once I heard the information, I didn't dwell on it or

21 I didn't try to get involved in it.

22      Q.      Did VanCamp fax the information out?

23      A.      He didn't indicate that he did, no.  He

24 just said he was present when it was faxed out.

25      Q.      Did you get the sense that he actually

1  saw the person fax the information out?

2      A.      Yes.

3      Q.      Did he mention how many people were

4  present?

5      A.      No.

6      Q.      Did he mention it was Michael Swinehart?

7      A.      He didn't, no, sir.

8      Q.      What else was discussed during your

9  lunch with Mr. Swinehart at the Pensacola Yacht Club?

10     A.      The future of politics, both in Alabama

11 and in Florida.  He sensed that there was going to be

12 a change in the political environment in Alabama.

13 He's very familiar with the mayor, like I mentioned

14 earlier, Senator Harri Anne Smith, the mayor -- I did

15 mention that already.

16     Q.      The mayor of what city?

17     A.      Dothan.

18             Also, he felt like there was going to be

19 a change nationally in politics.  Keep in mind this is

20 prior to the presidential election.  He asked me if I

21 had any future political ambitions; tried to provide

22 insight if I choose to do politics; wanted to arrange

23 a meeting after the election between the sheriff and

24 me, and I use his term, to try to bury the hatchet.

25     Q.      He wanted to try to arrange that or you

1 wanted to?

2      A.      No, sir, he wanted to try to arrange

3 that.

4      Q.      Did you ever inquire of him of

5 potentially using his services for any of your future

6 political endeavors?

7      A.      I think my comment to him was that he

8 had a reputation in the political environment -- had a

9 good reputation in the political environment, from

10 people that I've talked with, and that an individual

11 that was going to be getting in politics, it would be

12 wise if they selected somebody like him.  And I think

13 his counter was something to the effect that he was in

14 his last campaign or last campaign season, and he only

15 had like one or two left and he was getting out of it.

16      Q.      In reading your complaint, sir -- and

17 correct me if I'm wrong -- it seems that your

18 allegation is that Mr. Swinehart and his company was

19 somehow complicit with the decision to distribute the

20 negative document to third parties.  Are you

21 contending that he knew and participated in the

22 decision to disseminate the negative document to third

23 parties?

24      A.      I'm contending that he supplied the

25 document to Ron McNesby, with the knowledge that the

1 information contained on those documents was not

2 accurate, and that that document was utilized to be

3 circulated inside the sheriff's office, and then

4 eventually up into Dothan, Alabama, to try to damage

5 my reputation and any potential career choices I may

6 have.

7      Q.     Are you saying that Michael Swinehart or

8 anyone in his company intended to damage your

9 reputation?

10     A.     I think if you put together a document

11 such as the one that was compiled, with the knowledge

12 that the information -- and not taking the chance or

13 not taking the opportunity to verify the information

14 that's contained on those documents, yes, sir, I am.

15     Q.     Well, you've mentioned a couple of times

16 that Mr. Swinehart or his company put together the

17 document.  Are you saying that he typed the words

18 that's on Exhibits 1 and 2 to your deposition?

19     A.     On the exhibits?

20     Q.     Yes, sir.

21     A.     I'm saying that Mr. Swinehart told me

22 personally that he put the document together.  Now,

23 what his meaning of that was, I can't -- I can just

24 tell you that he said he put it together.

25     Q.     Do you know what the role of Jimmy

1 Calhoun was in the interview process, to obtain the

2 information that's contained in Exhibit 1 and

3 Exhibit 2?

4       A.       Only through the context that I've had

5 with Tim Kemp with the City of Hartsville, South

6 Carolina, knowing that he was out conducting

7 interviews.  I make the assumption that he was the

8 interviewer or the person that was going out trying to

9 make contact with people.

10       Q.       And do you know upon what terms Jimmy

11 Calhoun was engaged to provide that service?

12       A.       I would -- I think he was a contractor

13 by Mr. Swinehart.  And once again, that comes from a

14 verbal verification from Swinehart.

15       Q.       Do you know what directions Swinehart

16 gave Calhoun to perform the service he was contracted

17 to perform?

18       A.       I think I've seen the document, but I

19 don't recall.  I think I've actually seen an

20 attachment.

21       Q.       Do you have any information to suggest

22 that Swinehart told Calhoun to go out and obtain false

23 information regarding Mr. Powell?

24       A.       I do not.

25       Q.       Do you have any information that anyone

1 at Michael Swinehart Political, Inc., told Jimmy

2 Calhoun to go out and obtain false information about

3 you, Mr. Powell?

4      A.      I do not.

5      Q.      Do you know how the negative document

6 was delivered back from Calhoun to Mr. Swinehart?

7      A.      No, sir, I do not.

8      Q.      Do you know how the negative document

9 was ever delivered to anyone within the McNesby

10 political campaign?

11      A.      Other than Mr. Swinehart telling me that

12 he gave it to Ron McNesby, I do not.

13      Q.      Do you know what Mr. Swinehart told

14 Mr. McNesby when he gave Mr. McNesby the document?

15      A.      No, sir, I do not.

16      Q.      The issue of surveillance that's been

17 brought, do you know if Mr. Swinehart or anybody at

18 his company played any part in deciding to put you

19 under surveillance?

20      A.      No, sir, I do not.

21      Q.      Again, I just need to make sure I'm

22 clear on this.  Has Brian Rupert, Tim Kemp,

23 Mr. VanCamp, or anybody else told you that they know

24 that Michael Swinehart disseminated the negative

25 document to third parties?

1    A.    No, sir, they have not.

2    Q.    And, in fact, you don't have any

3 firsthand information that Michael Swinehart or

4 anybody from Mr. Swinehart's company delivered that

5 information to anybody other than the McNesby

6 political campaign?

7    A.    Just to McNesby.

8    Q.    With regard to the issue concerning the

9 flower shop, Flowerama, and the delivery of flowers,

10 do you have any information that Michael Swinehart or

11 anybody from his company participated in any decision

12 to deliver flowers to you or your wife during the

13 political campaign?

14    A.    No, sir, I do not.

15    Q.    I'm getting close to done, just let me

16 run through some of these allegations in the

17 complaint.

18          I'm going to ask you some questions,

19 sir, about the allegations in your complaint.  I think

20 counsel has a copy of it, if you would like to refer

21 to it.

22          The first paragraph I would like to

23 refer to is paragraph 12.  And in the allegation, sir,

24 I think the third sentence says "Cahoon --" and I

25 don't know if that's "Cahoon" or "Calhoun," but --

1          MR. MURRAY:  There is an amended

2     complaint.

3          MR. PETERSON:  Okay, Calhoun.

4          COURT REPORTER:  I'm sorry?

5          MR. MURRAY:  I brought to counsel's

6     attention there's been an amended complaint

7     filed, where "Cahoon" was changed to "Calhoun."

8     Q.    (By Mr. Peterson)  "Calhoun was directed

9 by Swinehart, Swinehart Political, and McNesby to

10 obtain false and/or derogatory information concerning

11 the plaintiff, and supply that information to all the

12 defendants, in their efforts to undermine the

13 plaintiff's efforts to seek election to the office of

14 sheriff in Escambia County, Florida."

15          Sir, what information do you have to

16 make the allegation that Swinehart or Swinehart

17 Political directed Calhoun to obtain false and/or

18 derogatory information?

19     A.    The information that was supplied by

20 Tim Kemp when he met with Mr. Calhoun, when the

21 individual made the comment that he was hired by

22 McNesby to dig up dirt on me for the campaign.

23     Q.    Okay.  And you contend that "dig up

24 dirt" equates to false information?

25     A.    Or derogatory information, yes.

1    Q.    To both?

2    A.    And/or, yes.

3    Q.    Okay.  And that's Calhoun's statement

4 that was made to Mr. Kemp, correct?

5    A.    That is correct.

6    Q.    That's not a statement that you have any

7 knowledge that Swinehart made?

8    A.    No, that's a statement made by Calhoun.

9    Q.    And only Calhoun?

10    A.    And Calhoun was employed by

11 Mr. Swinehart.

12    Q.    And how do you know that?

13    A.    Mr. Swinehart admitted that he had hired

14 Calhoun to --

15    Q.    Do you know what the employment

16 arrangement was?

17    A.    No, sir, I do not.

18    Q.    Turn, please, to paragraph 29, sir.

19    A.    (Witness complies.)

20    Q.    The flier to which you refer in this

21 paragraph, what flier are you referring to?

22    A.    I think it's marked as item four, I

23 believe is counsel's exhibit.  Do you need this, sir?

24    Q.    Yes, sir, let me just take a quick look

25 at it.

1          Is this the accurate form of the flier

2  which you received?

3     A.     It represents the flier that I received,

4  yes, sir.

5     Q.     At the top it says "Dear" and there's a

6  blank.  Do you see that?

7     A.     Yes, sir.

8     Q.     Was there ever a name in there, that you

9  know of?

10    A.     Not that I recall, no, sir.

11    Q.     Please turn to paragraph 34, sir.  This

12 allegation says "Prior to the early part of September

13 2004, McNesby and Smith contracted with, requested or

14 agreed with Swinehart Political and Swinehart that

15 they would try to obtain derogatory and/or false

16 information on the plaintiff for the purpose of

17 smearing his candidacy for the office of sheriff."

18          On what facts do you base that

19 allegation, sir?

20    A.     The comments that was made by Larry

21 Smith early on in 2003, the additional comments that

22 was made by Mr. Calhoun when he met with Tim Kemp, the

23 document in and of itself with the information that's

24 contained on the document, and the fact that the --

25 the way the instrument itself was used during the

1 campaign.  That's what that's based on.

2    Q.    Okay.  Turn to paragraph 48, if you

3 would, sir.

4    A.    (Witness complies.)

5    Q.    There's an allegation that says "All of

6 defendants were notified on October 28th, 2004, that

7 the statements were false.  Despite the notification,

8 the defendants continued to distribute the package in

9 Escambia County, Florida."

10            Was Mr. Swinehart or Michael Swinehart

11 Political, Inc., notified?

12    A.    There was a letter drafted, I think this

13 is the exhibit -- Exhibit 3, if I'm reading his

14 numbers right.  I know he's got numbers at the bottom.

15 This letter was drafted to Mr. Swinehart by Lieutenant

16 Terry Adams, advising that the document --

17    Q.    So the notice to which you're referring

18 is the letter from Lieutenant Terry Adams?

19    A.    Correct.

20    Q.    How many political campaigns have you

21 been involved in, sir?

22    A.    As a candidate?

23    Q.    As a candidate.

24    A.    One.

25    Q.    And your political consultant for the

1 candidate in which this case revolves around was

2 Travis Peterson?

3     A.     That is correct.

4     Q.     And did Travis Peterson conduct research

5 into your opposition, on your behalf?

6     A.     Yes.

7     Q.     So just because research is conducted,

8 you're not contending that you can't conduct research

9 on your opponent?

10     A.     I'm not contending that at all, sir.

11     Q.     You mentioned -- or you were questioned

12 earlier about a cease or desist letter, whether one

13 was ever sent to any of the sheriff defendants, and I

14 think you said no.  Did you send a cease or desist

15 notice to Mr. Swinehart or his company?

16     A.     Other than the document from Lieutenant

17 Adams.

18     Q.     No, other --

19     A.     No, other than the document.

20     Q.     Okay.  Did you have any contact with

21 Mr. Swinehart or anyone from his company during the

22 campaign in which you were involved?

23     A.     Not that I'm aware of.

24     Q.     And have we covered all of the contacts

25 you had with Mr. Swinehart after the campaign?  And

1 that would be the barbecue, just your visual

2 observation of him at an election party, I guess, and

3 then the lunch at the Pensacola Yacht Club.

4      A.      I believe you left out the telephonic

5 contact I had with him scheduling the lunch.

6      Q.      Right, and the telephonic contact.  Are

7 those all the contacts you've had with Mr. Swinehart?

8      A.      Yes.

9           MR. PETERSON:  That's all I've got.

10      Thank you.

11           THE WITNESS:  Yes, sir.

12                REDIRECT EXAMINATION

13 BY MR. TISCHLER:

14      Q.      I just have a couple of follow-ups.  I

15 promise you it will be brief.

16           I'm not clear, based upon the questions

17 and answers that we've received -- and it may just be

18 me.  Were you aware that surveillance was being

19 conducted at the time of the campaign in 2004?

20      A.      We suspected that it was being

21 conducted, by the vehicles that we saw at different

22 events that we were at, and by comments that were

23 being made by citizens and employees of the sheriff's

24 office who would actually come over to the campaign

25 headquarters.  As a matter of fact, we held one event

1 where employees were there, they were concerned

2 because they felt like their tag numbers were being

3 taken down, being parked around the campaign office.

4     Q.     Do you know whether surveillance is

5 illegal?

6     A.     Is it illegal, is that what you asked?

7     Q.     Yes, sir.

8     A.     No, sir, but I think if you use the

9 resources of the -- of a law enforcement department to

10 conduct surveillance, you know, for a political

11 function that has really no bearing on law enforcement

12 activities in the county or for the -- you know, for

13 the community as a whole, I think it's

14 misappropriation of funds.

15     Q.     Okay.  And do you know whether --

16 assuming surveillance was done, do you know whether it

17 was done using sheriff's department vehicles,

18 sheriff's department equipment?

19     A.     No, sir, I do not.

20     Q.     And who is it that told you that they

21 believe they were being surveilled?

22     A.     It was a group of ladies who were

23 secretaries at the sheriff's office.

24     Q.     Any names?

25     A.     No, sir.  I mean, I -- you know, I could

1 try to get the names. I mean, I don't recall them

2 right now.

3     Q.     And did you notify anyone at the

4 sheriff's office about -- complain at all about this

5 alleged surveillance?

6     A.     No, sir.

7     Q.     You said in connection with your

8 discussion about the surveillance, that it impaired

9 your campaign because employees feared that they would

10 suffer some sort of retaliation?

11     A.     Correct.

12     Q.     My word. I'm not sure that's the word

13 you used.

14     A.     Yes, sir.

15     Q.     Do you know whether after the 2004

16 election campaign, whether any employees, in fact,

17 suffered any form of retaliation?

18     A.     No, sir, I do not.

19     Q.     In fact, we know that -- and again, I

20 can't pronounce his -- I have trouble pronouncing his

21 last name, but Gordon was promoted, wasn't he?

22     A.     He was.

23     Q.     These radio broadcasts that Mr. Stokes

24 engaged in in 2005, where he talked about having these

25 meetings with Sheriff McNesby, was this after you had

1 already been hired as the chief?

2      A.      It was.

3      Q.      We already talked about the hiring

4 process and this information being brought up during

5 that process.  Is it your contention that any of this

6 information involving these allegations found in

7 Exhibits 1 and 2 impair your ability to do your job as

8 chief of police in the City of Dothan?

9      A.      I think it has the potential of

10 undermining the operation of the police department and

11 my ability to be able to function as the department

12 head, yes.

13      Q.      Potential.  Has there been any actual

14 effect that you can identify?

15      A.      Other than the documents circulating

16 around the police department, which was cited earlier

17 during questioning, no, sir, it hasn't had an effect.

18      Q.      With regard to Exhibit 5, you were asked

19 about inaccuracies in the figures that were reported

20 regarding crime in the two places where you were chief

21 of police before Dothan.  That's a document that I

22 think we've already established that Gary Willis

23 produced during the campaign?

24      A.      It was -- well, I don't know if Gary

25 actually produced it, but it was during that time of

1 the campaign, yes.

2      Q.      Have you sued Mr. Willis about any false

3 statements in that document?

4      A.      This is not a statement against me

5 personally.  The crime statistics that's represented

6 here, he has his sources referenced.  And once again,

7 crime statistics, it depends on who is reporting the

8 crime statistics, as far as the accuracy of the

9 information.

10      Q.      So the answer to my question is no, you

11 haven't sued Mr. Willis about that information?

12      A.      That's correct.

13      Q.      In terms of the problems of vandalism

14 with signs and so forth, do you know whether

15 Sheriff McNesby also had problems with his signs being

16 vandalized?

17      A.      I think all the candidates at one time

18 had situations that came up where signs were

19 vandalized.

20      Q.      You would agree with me, during

21 political campaigns it's fairly common for signs to be

22 vandalized, removed, knocked over?

23      A.      Yes, sir, I do.

24      Q.      And in terms of Gary Willis' signs being

25 vandalized, he wasn't even running against McNesby at

1 any time, was he?

2     A.     Well, he was running against McNesby the

3 day that he signed up to run for sheriff.

4     Q.     But he was going to have to win the

5 primary first?

6     A.     Yes, sir.

7     Q.     And he didn't win the primary?

8     A.     That is correct.

9     Q.     And besides the public records request

10 you made to obtain information regarding the events

11 involving the destruction of Willis's signs, did you

12 ever file any complaint with the sheriff's office

13 about your signs being vandalized?

14     A.     No, sir, I did not.

15     Q.     Did you ever file a complaint with any

16 law enforcement agency at all about your signs being

17 vandalized?

18     A.     No, sir.

19     Q.     In terms of the incident at the

20 courthouse -- what's your father's name again?

21     A.     Elmer, E-L-M-E-R, middle initial is A,

22 last name is Powell.

23     Q.     I thought that's what you said, I wanted

24 to make sure.  Does he reside at the -- where does he

25 reside?

1    A.    The [redacted] address.

2    Q.    The [redacted] address, okay.  And he

3 was not arrested that day by Mr. Blackburn or anyone

4 else?

5    A.    No, sir, he was not.

6    Q.    And did you or he submit any complaint

7 regarding Mr. Blackburn's behavior, to any government

8 official after it occurred?

9    A.    We did not, but I understand there was a

10 complaint filed.  But I do not know the outcome of

11 that complaint.

12    Q.    Who filed the complaint?

13    A.    I'm not sure, but I heard there was one

14 filed.

15    Q.    Against Mr. Blackburn?

16    A.    That's correct.

17    Q.    When Mr. VanCamp told you that he saw

18 this information being faxed, did he indicate to you

19 it was being faxed from the sheriff's office?

20    A.    Yes, sir.

21    Q.    And that's the information that was

22 faxed to the City of Dothan that Mr. West received?

23    A.    He saw the information being faxed out.

24 I didn't get into it far enough with him to find out

25 if he knew, in fact, where it was going.

1     Q.     Okay.  So he doesn't know that that's

2 the information that went to Dothan?

3     A.     No, sir, I didn't question him on that.

4 When he started making that comment, I deferred him to

5 Mr. Murray.

6     Q.     And besides Mr. West, do you know any

7 other individuals associated with the City of Dothan,

8 with the municipality that you work for, who received

9 a fax from the sheriff's office?

10     A.     No, sir, I do not.

11     Q.     Okay.  And you would agree with me,

12 would you not, that derogatory information may be

13 true?

14     A.     I do.

15          MR. TISCHLER:  That's all the questions

16     I have.  Thank you, Mr. Powell.

17               RECROSS-EXAMINATION

18 BY MR. PETERSON:

19     Q.     I'm confused about one point.  The fax

20 to the city manager at the City of Dothan, you

21 indicated earlier, I think, there was a fax cover

22 sheet from Roberts Bail Bonds?

23     A.     That's correct.

24     Q.     Do you believe that that fax with the

25 fax cover sheet of Roberts Bail Bonds was sent from

1 the sheriff's office?

2       A.       No, sir.  I just remember seeing the fax

3 cover from Roberts Bail Bonds, and then Jeff VanCamp

4 indicated that he saw the document being faxed out of

5 the office.  I do not know where it was being faxed.

6       Q.       So you haven't tried to connect the dots

7 between the fax cover sheet indicating Roberts Bail

8 Bonds and the information that Mr. VanCamp has given

9 you?

10      A.       No, sir, that's for Mr. Murray to work

11 on.

12              MR. PETERSON:  Okay, thanks.

13              MR. MURRAY:  Nothing further.  I agree

14      to waive.

15              (WHEREUPON, the deposition was

16              concluded at 5:50 p.m.)

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF OATH

2

3 STATE OF FLORIDA    )

4 COUNTY OF ESCAMBIA )

5

6             I, the undersigned authority, certify that

7 JOHN RUSSELL POWELL personally appeared before me and

8 was duly sworn.

9

10             WITNESS my hand and official seal this 18th

11 day of February, 2009.

12

13

14             _____
               KIMBERLY M. GREGORY, RPR
15             Notary Public, State of Florida

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF REPORTER

2

3 STATE OF FLORIDA     )

4 COUNTY OF ESCAMBIA  )

5

6           I, KIMBERLY M. GREGORY, Registered

7 Professional Reporter and Notary Public at Large in

8 and for the State of Florida, hereby certify that I

9 was authorized to and did stenographically report the

10 foregoing deposition, and that the transcript is a

11 true record of the testimony given by the witness.

12           I further certify that I am not a relative,

13 employee, attorney, or counsel of any of the parties,

14 nor am I a relative or employee of any of the parties'

15 attorneys or counsel connected with the action, nor am

16 I financially interested in the action.

17           DATED this 18th day of February, 2009.

18

19

20           _____
            KIMBERLY M. GREGORY
21           Registered Professional Reporter

22

23

24

25